# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

FOOTHILL HOSPITAL - MORRIS L.
JOHNSTON MEMORIAL, a California
nonprofit corporation, dba Foothill
Presbyterian Hospital,

             Plaintiff,

    v.

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and
Human Welfare,

             Defendant.

Civil Action No. 1:07-CV-00701 (ESH)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

[Oral Argument Requested]

Plaintiff FOOTHILL HOSPITAL - MORRIS L. JOHNSTON MEMORIAL, a California nonprofit corporation, dba Foothill Presbyterian Hospital ("Plaintiff") moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment in its favor on the grounds that no genuine issue of material fact exists and, further, that Plaintiff is entitled to summary judgment as a matter of law.

The Plaintiff requests, by way of this Motion, that the Court order Defendant Michael O. Leavitt, Secretary of the United States Department of Health and Human Services ("Defendant" or "Secretary") to reverse the decision of the Administrator of the Centers for Medicare and Medicaid Services denying Plaintiff reimbursement for its Medicare bad debts for its fiscal year ending June 30, 1995 and to make payment to Plaintiff for the amounts to which it is entitled for Medicare bad debts for that year, along with interest in accordance with 42 U.S.C. § 1395(f)(2).

Plaintiff asserts that the Secretary's final decision is arbitrary and capricious, an abuse of

discretion, and otherwise not in accordance with the law, because (1) the Secretary's adoption of a policy denying Medicare bad debt reimbursement solely because the bad debts in question, although written-off as noncollectible, remain at a collection agency violates the "Bad Debt Moratorium," 42 U.S.C. § 1395f, note, which prohibits the Secretary from changing bad debt policy that was in effect prior to August 1, 1987, (2) the Secretary's adoption of this policy is arbitrary and capricious because it is inconsistent with the governing statutes, regulations and manual provisions, and (3) the Secretary's position is entitled to limited deference because it has been inconsistent over the years.

The Plaintiff's Motion is supported by Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue, its Memorandum of Points and Authorities and exhibits thereto and incorporated by reference herein, as well as the Administrative Record and all other pleadings and documents on file with the Court.

Pursuant to Local Rule 7(f), Plaintiff requests oral argument on this Motion for Summary Judgment.

Dated:  November 2, 2007                    Respectfully submitted,

                                            /s/  John R. Jacob
                                            John R. Jacob
                                            D.C. Bar No. 444412
                                            AKIN GUMP STRAUSS HAUER & FELD LLP
                                            Robert S. Strauss Building
                                            1333 New Hampshire Avenue, NW
                                            Washington, D.C. 20036
                                            Telephone:  202-887-4582
                                            Fax:  202-955-7648
                                            Email:  jjacob@akingump.com

                                            OF COUNSEL:
                                            John R. Hellow, Esq.
                                            Byron J. Gross, Esq.
                                            Hooper, Lundy and Bookman, Inc.
                                            1875 Century Park East, Suite 1600
                                            Los Angeles, California 90067
                                            Tel: (310) 551-8151
                                            Fax: (310) 551-8181

                                            Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

FOOTHILL HOSPITAL - MORRIS L.
JOHNSTON MEMORIAL, a California
nonprofit corporation, dba Foothill
Presbyterian Hospital,

        Plaintiff,

    v.

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and
Human Services,

        Defendant.

Civil Action No. 1:07-CV-00701 (ESH)

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

# MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................1

II.   APPLICABLE MEDICARE PRINCIPLES ....................................................2

    A.    The Medicare Program and Medicare Bad Debt Generally.....................2

    B.    The Medicare Appeals Process.................................................................7

III.  FACTUAL AND PROCEDURAL BACKGROUND.......................................8

IV.   ARGUMENT .....................................................................................................10

    A.    Standard of Review................................................................................10

        1.    Motion for Summary Judgment. .................................................10

        2.    Deference to Secretary's Decision. ............................................11

    B.    The Application of a Policy Denying Medicare Bad Debt Payments When
        Written-Off Debts Remain at a Collection Agency Violates the Bad Debt
        Moratorium. ...........................................................................................12

    C.    The Secretary's Current Presumption of Collectibility Policy Is Arbitrary
        and Capricious, As It Is Inconsistent With The Governing Statute and
        Regulations. ...........................................................................................20

V.    CONCLUSION..................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### Federal Cases

*Amer. Petroleum Institute v. E.P.A.*,
661 F.2d 340 (5th Cir. 1981) ................................................................12

*Amer. Ship Building Co. v. NLRB*,
380 U.S. 300, 85 S. Ct. 955 (1965) ......................................................12

*Athens Community Hospital, Inc. v. Shalala*,
21 F.3d 1176 (D.C. Cir. 1994) .............................................................11

*Battle Creek Health Systems v. Leavitt*,
498 F.3d 401 (6th Cir. 2007) ...............................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402, 91 S. Ct. 814 (1971) ......................................................11

*Dameron Hospital Association v. Leavitt*,
2007 WL 2288289, Slip Opinion (E.D. Cal. 2007) .....................5, 6, 13

*EEOC v. Arabian Amer. Oil Co.*,
499 U.S. 244, 111 S. Ct. 1227 (1991) ..................................................12

*Harris County Hospital District v. Shalala*,
64 F.3d 220 (5th Cir. 1995) .................................................................13

*H.P. Coffee Co. v. Reconstruction Finance Corp.*,
215 F.2d 818 (Emer. Ct. App. 1954) ...................................................21

\*   *I.N.S. V. Cardoza-Fonseca*,
480 U.S. 421, 107 S. Ct. 1207 (1987) .............................................12, 23

*Municipal Resale Serv. Customers v. FERC*,
43 F.3d 1046 (6th Cir. 1995) ...............................................................21

*Ohio Power Co. v. FERC*,
880 F.2d 1400 (D.C. Cir. 1989) ...........................................................21

*Pacific Coast Medical Enterprise v. Harris*,
633 F.2d 123 (9th Cir. 1980) ...............................................................12

*Sarasota Memorial Hospital v. Shalala*,
60 F.3d 1507 (11th Cir. 1995) .............................................................11

*St. Luke's Hospital v. Thompson*,
355 F.3d 690 (D.C. Cir. 2004) ...............................................................4

*Thomas Jefferson University v. Shalala*,
512 U.S. 504, 114 S. Ct. 2381 (1994) .......................................10, 11, 23

*United Transport Union v. Lewis*,
711 F.2d 233 (D.C. Cir. 1983) .............................................................12

## TABLE OF AUTHORITIES

**Page**

*University Health Services, Inc. v. Health & Human Services,*
  120 F.3d 1145 (11th Cir. 1997) ................................................................13

*U.S. v. Baxter Intern, Inc.,*
  345 F.3d 866 (11th Cir. 2003) ..................................................................12

*Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,*
  390 U.S. 261, 88 S. Ct. 929 (1968) ..........................................................12

### Federal Statutes

5 U.S.C. § 706 ...............................................................................................10

5 U.S.C. § 706(2)(A) .....................................................................................10

42 U.S.C. § 1395 .............................................................................................2

42 U.S.C. § 1395d ...........................................................................................3

42 U.S.C. § 1395e ...........................................................................................4

42 U.S.C. § 1395f .......................................................................................6, 14

42 U.S.C. § 1395f(b)(1) ...................................................................................3

42 U.S.C. § 1395h ...........................................................................................7

42 U.S.C. § 1395k(a)(2) ..................................................................................3

42 U.S.C. § 1395kk ..........................................................................................3

42 U.S.C. § 1395oo(a) .....................................................................................7

42 U.S.C. § 1395oo(f) ..................................................................................8, 10

42 U.S.C. § 1395ww(d) ....................................................................................3

42 U.S.C. § 1395x(s) ........................................................................................3

42 U.S.C. § 1395x(v)(1)(A) ....................................................................3, 4, 20

### Chaptered Laws

\* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203,
  § 4008, 101 Stat. 1330 (1987) ..................................................................14

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239,
  § 6023, 103 Stat. 2106, 2167 (1989) ........................................................16

Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647,
  § 802, 102 Stat. 3342 (1988) ................................................................6, 15

# TABLE OF AUTHORITIES

**Page**

## Federal Regulations

42 C.F.R. § 405.420 .................................................................................17

42 C.F.R. § 405.1801(a), ...........................................................................8

42 C.F.R. § 405.1803 .................................................................................8

42 C.F.R. § 405.1835(a) .............................................................................8

42 C.F.R. § 405.1875 .................................................................................9

42 C.F.R. § 412.115(a) ..........................................................................4, 20

42 C.F.R. § 413.20 .....................................................................................7

42 C.F.R. § 413.24 .....................................................................................7

42 C.F.R. § 413.80 .....................................................................................4

42 C.F.R. § 413.80(c) ...............................................................................24

42 C.F.R. § 413.80(d) ...............................................................................23

42 C.F.R. § 413.89 .....................................................................................4

42 C.F.R. § 413.89(e)(3) ............................................................................9

## Administrative Decisions

*Dameron Hosp. v. Blue Cross Blue Shield Ass'n,*
PRRB Hearing Dec. No. 2006-D16, Feb. 17, 2006,
CCH Medicare & Medicaid Guide ¶ 81,502, 2006 WL 940656 ...........23

*Lourdes Hospital v. Blue Cross and Blue Shield Association, HCFA Administrator Decision,*
*Oct. 27, 1995, CCH,*
Medicare & Medicaid Guide, ¶ 43,723.................................................23

*Methodist Hospital of Dyersburg v. Blue Cross and Blue Shield Association,*
PRRB Hearing Dec. No. 2000-D56, May 30, 2006,
CCH Medicare & Medicaid Guide ¶ 80,502, 2000 WL 796345 ............24

## Miscellaneous

*HCFA Clarification on Bad Debt Policy, HCFA Memorandum to Regional Administrators,*
*June 11, 1990, CCH* Medicare & Medicaid Guide, ¶ 38,623 ................18

Provider Reimbursement Manual – Part I § 308 ...................................4

\* Provider Reimbursement Manual – Part I § 310.2 ............................5, 21

**TABLE OF AUTHORITIES**

**Page**

Provider Reimbursement Manual – Part I § 314    .................................................................5

Provider Reimbursement Manual – Part I § 316    .............................................................5, 22

Fed. R. Civ. Pro. 56(e) .................................................................................................10

\*    Authorities On Which Plaintiff Principally Relies

## I.    **INTRODUCTION**

In this case, plaintiff Foothill Hospital - Morris L. Johnston Memorial, a California nonprofit corporation, dba Foothill Presbyterian Hospital ("Foothill" or the "Hospital") seeks reversal of a final administrative decision rendered by defendant Michael O. Leavitt, Secretary of the U.S. Department of Health and Human Services, which denied the Hospital certain Medicare reimbursement to which it was entitled for its fiscal year ending September 30, 1995 ("FYE 9/30/95"). The reimbursement that was denied was for "bad debts," which in Medicare parlance refers to deductibles and co-insurance payments that are the responsibility of the Medicare patient, but which a hospital has been unsuccessful in collecting. The claims for bad debts included on hospitals' annual cost reports are often the subject of particular scrutiny upon audit and have been the subject of numerous administrative appeals and litigation.

The Secretary's regulations set criteria for when bad debts may be claimed; providers must make "reasonable collection efforts" and must determine debts to be "uncollectible" prior to writing them off and seeking reimbursement from Medicare. To relieve providers of the obligation to prove that each separate account is uncollectible before claiming reimbursement, the Secretary's policies provide that a debt may be deemed uncollectible if a provider has made reasonable collection efforts for at least 120 days. In this case, reasonable collection efforts were made on average for close to a year before the debts were written off and claimed. However, the Hospital's claim for reimbursement was denied, solely because the debts were still the subject of collection efforts at outside collection agencies. The Secretary claims that this fact, in itself, prohibits any finding that the debts are uncollectible.

The Hospital maintains that the Secretary's policy to deny bad debt reimbursement solely because a debt remains at an outside collection agency, a policy which is not embodied in

regulations or included in sub-regulatory guidance to providers, is invalid for two principal reasons. First, the policy violates the OBRA 1987 Bad Debt Moratorium (the "Moratorium"), discussed in detail below, which was passed by Congress precisely because of the Secretary's shifting policies regarding bad debt reimbursement. The Moratorium prohibits the Secretary from changing bad debt policy, including the use of outside collection agencies, that was in effect prior to August 1987. The Hospital will explain below that, if the policy at issue herein was properly adopted at all (which the Hospital contests), it was nonetheless adopted a couple of years _after_ the Moratorium's effective date. Second, even if adoption of this policy was not prohibited by the Moratorium, it is inconsistent with the applicable governing regulations, and thus invalid. While an agency's interpretation of its own regulations is generally entitled to deference, such deference is not warranted in this case because of the Secretary's inconsistency regarding this issue. Quite surprisingly, the Secretary's own final administrative decisions in past years have allowed reimbursement to other hospitals even though debts remained at collection agencies. In fact, the Secretary had renounced the very policy that he applied to Foothill for many years and then only recently has attempted to apply it in certain instances. The Secretary should not be permitted to operate the Medicare program by turning criteria on and off at will.

Accordingly, for these reasons, the administrative decision herein should be reversed and the Hospital's bad debt claim allowed.


## II.    APPLICABLE MEDICARE PRINCIPLES

### A.    The Medicare Program and Medicare Bad Debt Generally

The Medicare Act establishes a system of health insurance for the aged and disabled. 42 U.S.C. § 1395-1395ggg. The Medicare program is federally funded and administered by the

Secretary of the United States Department of Health and Human Services ("Secretary") through the Centers for Medicare and Medicaid Services ("CMS"). 42 U.S.C. § 1395kk. Medicare covers various health care services furnished to eligible beneficiaries, including inpatient and outpatient hospital services. 42 U.S.C. § 1395d; 42 U.S.C. § 1395k(a)(2); 42 U.S.C. § 1395x(s).

From the Medicare program's inception in 1965 until 1983, hospitals were reimbursed the lower of their reasonable costs or customary charges for services provided to Medicare beneficiaries. See 42 U.S.C. § 1395f(b)(1). Reasonable costs are the costs actually incurred in furnishing covered services, excluding unnecessary costs. See 42 U.S.C. § 1395x(v)(1)(A). In 1983, Congress established the Prospective Payment System ("PPS"), under which most acute care hospitals were no longer reimbursed based upon their reasonable costs. 42 U.S.C. § 1395ww(d). Instead, under PPS, hospitals are reimbursed for inpatient hospital operating costs at a prospectively determined, fixed rate for each Medicare inpatient, which is based upon the patient's diagnosis and other factors.

The Medicare statute and regulations prohibit cost shifting. See 42 U.S.C. § 1395x(v)(1)(A) (2002); 42 C.F.R. § 413.89(d) (formerly, § 413.80(d)). Generally, cost shifting occurs in the following two ways: (1) the necessary costs of delivering health care to Medicare enrollees are borne by individuals who are not Medicare recipients or (2) the necessary costs of delivering health care to the hospital's other patients not covered by Medicare are borne by Medicare. See 42 U.S.C. § 1395x(v)(1)(A) (stating that "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs").

When receiving inpatient and outpatient hospital services, Medicare enrollees are responsible for paying coinsurance and deductible amounts. 42 U.S.C. §§ 1395e and 1395l. The failure of beneficiaries to pay the deductible and coinsurance amounts could result in the related costs of covered services being borne by other than Medicare beneficiaries. To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are reimbursed by Medicare as "bad debts." 42 C.F.R. § 412.115(a). The requirements for reimbursement for these bad debts are found at 42 C.F.R. § 413.89.[1]

In order to qualify for reimbursement of Medicare bad debts, providers must show that the unpaid deductible and coinsurance amounts meet the following criteria:

(1)    The debt must be related to covered services and derived from deductible and coinsurance amounts;

(2)    The provider must be able to establish that reasonable collection efforts were made;

(3)    The debt was actually uncollectible when claimed as worthless; and

(4)    Sound business judgment established that there was no likelihood of recovery at any time in the future. 42. C.F.R. § 413.89(e). *See also* Provider Reimbursement Manual ("PRM") § 308, reiterating these four criteria.[2]

---

[1]    Previously, the bad debt requirements were found at 42 C.F.R. § 413.80. The section was redesignated as § 413.89, effective August 11, 2004, but remained essentially unchanged. We will generally use the more recent designation in this brief.

[2]    The Provider Reimbursement Manual is a compilation of interpretive rules published by CMS. *St. Luke's Hosp. v. Thompson*, 355 F.3d 690, 692 (D.C. Cir. 2004). For the Court's convenience, we have attached a copy of the relevant PRM provisions, downloaded from the CMS website, as Exhibit 1. The full manual may be accessed by clicking on the website's Regulations and Guidance link, then on Manuals, then on Paper-Based Manuals.

Section 310 of the PRM sets forth specific criteria for "reasonable collection efforts," emphasizing that a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients and allowing for the use of an outside collection agency in addition to subsequent billings, follow-up letters, telephone calls and personal contacts.

In regard to the third criteria above requiring the debt to be actually uncollectible when claimed as worthless, guidance is provided in the Provider Reimbursement Manual: "If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible." PRM-I, § 310.2. This has been referred to as the "presumption of uncollectibility." *Dameron Hosp. Ass'n v. Leavitt ("Dameron")*, 2007 WL 2288289, Slip Copy at 3 (E.D. Cal. 2007). It relieves the provider of what would be an enormous burden of establishing, for each account, that sufficient collection efforts have been made so that the account may be written off as uncollectible. Instead, as long as reasonable collection efforts have been made, providers have been able to presume a debt uncollectible if 120 days have passed from the date of the first bill to the patient.

Uncollectible deductible and coinsurance amounts are recognized as allowable bad debts in the reporting period in which such bad debts are determined to be uncollectible. PRM-I § 314. However, if a debt is subsequently collected after it has been written off and claimed for reimbursement from Medicare, the provider must offset the amount collected against Medicare reimbursement due in the year during which it was collected. PRM-I § 316.

Nowhere in the regulations or in the detailed sections discussing bad debts is there any guidance on the impact of sending debts to an outside collection agency on whether a debt may

5

be deemed uncollectible.  This issue is only mentioned in a provision included in audit guidelines

found in Section 4 of the Medicare Intermediary Manual ("MIM").[3]  The MIM provision, which

as discussed further below was added in 1989, states:

> If the bad debt is written-off on the provider's books 121
> days after the date of the bill and then turned over to a collection
> agency, the amount cannot be claimed as a Medicare bad debt on
> the date of the write-off.  It can be claimed as a Medicare bad debt
> only after the collection agency completes its collection effort.

HIM 13-4, § 4198, Exh. A-11.  This provision essentially creates a "presumption of

collectibility,"  a presumption that a debt must be collectible if it still remains for possible

collection, however unlikely, at an outside collection agency.  *Dameron,* 2007 WL 2288289,

Slip Copy at 3.

As a result of disputes arising because of inconsistent policies regarding bad debts being

applied by Medicare fiscal intermediaries, which make payments to providers pursuant to

contracts with the Secretary, Congress enacted a "Bad Debt Moratorium" which prohibited the

Secretary from making any changes in policies relating to bad debts that were in effect on

August 1, 1987.  42 U.S.C. § 1395f note.[4]  This is referred to herein as the "Moratorium."  The

Moratorium was enacted in 1987, and amended in 1988 and 1989.  *See* Omnibus Budget

Reconciliation Act of 1987, Pub. L. No. 100-203, § 4008, 101 Stat. 1330 (1987); Technical and

Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 802, 102 Stat. 3342 (1988);

---

[3]  The Medicare Intermediary Manual is a compendium of interpretive rules, not adopted
through APA rulemaking procedures, that are supposed to provide auditing guidelines for fiscal
intermediaries.  This Manual is not provided as guidance to hospitals.  Instead, such interpretive
guidance to hospitals is contained in the Provider Reimbursement Manual, which contains no
provision that is a corollary to the referenced audit guideline exhibit. The MIM is sometimes
referred to solely as the Intermediary Manual and is often cited as HIM ("hospital intermediary
manual") 13.  Audit Guidelines are found in Section 4 of the HIM, or "HIM 13-4."

[4]  This provision was incorrectly cited in the Complaint, at ¶ 15, as § 1395e, note.

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6023, 103 Stat. 2106, 2167 (1989). A more detailed history of the Moratorium will be provided below.

### B.    The Medicare Appeals Process

A hospital that participates in the Medicare program is required to submit a cost report at the close of its cost reporting period. The cost report identifies the costs incurred by the provider during the cost reporting period and the portion of such costs to be reimbursed by Medicare. 42 C.F.R. §§ 413.20, 413.24.

Fiscal intermediaries are private organizations that make Medicare payments to providers such as Foothill pursuant to contracts with the Secretary. 42 U.S.C. § 1395h. Fiscal intermediaries are required to review the cost report and to inform the provider of the total Medicare reimbursement owing the provider for the period covered by the cost report. 42 C.F.R. § 405.1803. This determination is referred to as the notice of amount of program reimbursement ("NPR"). 42 C.F.R. §§ 405.1801(a), 405.1803. The Plaintiff's fiscal intermediary for its FYE 6/30/95 was National Government Services (formerly, United Government Services, and, before that, Blue Cross of California) ("Intermediary").

If a provider has filed a cost report and is dissatisfied with its fiscal intermediary's final determination of the total reimbursement due for the period covered by the cost report, the provider may obtain a hearing before the Provider Reimbursement Review Board ("PRRB" or "Board") "with respect to such cost report." 42 U.S.C. § 1395oo(a), 42 C.F.R. § 405.1835(a). The amount in controversy must be at least $10,000 in order for the Board to have jurisdiction over such an appeal.

The PRRB's decision may be reversed, modified, or affirmed by the Secretary. 42 U.S.C.
§ 1395oo(f)(1). The Secretary has delegated this authority to the Administrator of CMS.
42 C.F.R. § 405.1875. The decision of the CMS Administrator is the final decision of the
Secretary. *Id.*

A provider may file a civil action in the United States District Court for the judicial
district in which the provider is located or in the District Court for the District of Columbia to
seek judicial review of an adverse PRRB or CMS Administrator decision. 42 U.S.C.
§ 1395oo(f).

## III.    FACTUAL AND PROCEDURAL BACKGROUND

When submitting its cost report for its FYE 9/30/95, the Hospital included a claim for bad
debts for Medicare beneficiaries. The bad debts claimed included amounts for unpaid
deductibles and coinsurance that had been sent to an outside collection agency for collection, but
because, in the sound business judgment of the provider, there was no likelihood of recovery in
the future, these accounts had been deemed worthless by the Hospital. Collection efforts for
Medicare and non-Medicare bad debts were handled identically. In accordance with the
Hospital's collection policy, the accounts were actively pursued with at least 3 demand letters
sent to the patient before an account would be written off as a bad debt.  Administrative Record
("AR"), at 35. The average periods for collection efforts by the Hospital, before referral to an
outside collection agency, were 321 days for inpatient accounts and 303 days for outpatient
accounts. AR, at 35 and 50-56.

On December 16, 1996, the Intermediary issued a NPR, in which it disallowed
approximately $60,993 in bad debts claimed by the Hospital. The bad debts were denied solely

because the debts had been referred to an outside collection agency, which, according to the Intermediary, meant that they could not be considered worthless, as required by 42 C.F.R. § 413.89(e)(3). AR, at 131.[5] The Hospital filed a timely appeal to the PRRB of its NPR, in order to challenge the disallowance of the bad debts. All jurisdictional requirements for the appeal were met.

A hearing on the record was held before the PRRB. On December 19, 2006, the PRRB issued a decision favorable to the Hospital, in which it determined that all bad debts claimed for FYE 9/30/95 are allowable and that the fiscal intermediary's adjustments to bad debts should be reversed. *See* AR, at 18-26. The PRRB held that the bad debts were properly considered uncollectible, even though they remained at an outside collection agency. AR, at 18-26. The PRRB found that the Hospital's extensive collection efforts met the Secretary's regulatory requirements and that such efforts were completed before the Hospital determined the accounts to be uncollectible and worthless. The PRRB also found that the conclusive presumption of collectibility based on outside collection agency account status ran afoul of well established precedent. Otherwise, the PRRB held, Medicare's prohibition on cross-subsidization would be violated. Additionally, because, in the PRRB's view, the record did not contain sufficient information concerning the Provider's bad debt policy in effect prior to 1994, it believed it could not determine whether the Moratorium applied to these facts.

---

[5] In support of its adjustment, the Intermediary cited § 413.80, the former designation of current § 413.89. The amounts of the disallowances at issue herein pertain to "regular" bad debts, which are those bad debts associated with Medicare patients who are not on Medicaid. The Intermediary also made adjustments to "crossover" bad debts, i.e., those bad debts associated with patients who are on both Medicare and Medicaid, known as "crossovers" or "dual eligibles." The disallowance of crossover bad debt is not at issue in this case.

The PRRB decision was reviewed by the CMS Administrator. On February 16, 2007, the Administrator issued a decision, reversing the decision of the PRRB and upholding the fiscal intermediary's adjustment to bad debts. The Administrator held that a bad debt could not be deemed worthless and uncollectible as long as it remained at an outside collection agency. AR, at 2-9.[6] In his decision, the Administrator noted that "the record is lacking as to the Provider's bad debt policy for the applicable period and, thus, the Provider did not demonstrate that the moratorium provision applies in this case." AR at 8, n. 7.

## IV.     ARGUMENT

###     A.     Standard of Review

####          1.     Motion for Summary Judgment.

Fed. R. Civ. Pro. 56(e) provides for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law."

In this case, Plaintiff seeks judicial review of the Secretary's decision reversing the PRRB's decision. Judicial review of the Secretary's Medicare reimbursement decisions is governed by the Administrative Procedure Act ("APA") and, with a few exceptions, is limited to a review of the administrative record. 42 U.S.C. § 1395oo(f); 5 U.S.C. § 706; *Thomas Jefferson Univ. v. Shalala ("Thomas Jefferson")*, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386 (1994). Under 5 U.S.C. § 706(2)(A), the Court must hold the Secretary's action unlawful and set it aside if it is

---

[6] The Administrator did not disturb the PRRB's factual finding that the Hospital's collection efforts were reasonable and that all requirements for Medicare bad debt reimbursement were met, except for the fact that the debts had been referred to a collection agency.

inconsistent with the Medicare statutes or regulations, arbitrary or capricious, an abuse of discretion or otherwise not in accordance with law. In reviewing agency action under the arbitrary and capricious standard, the court must "engage in a substantial inquiry" and undertake a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S. Ct. 814, 823 (1971).

2.    Deference to Secretary's Decision.

The Secretary's Medicare decisions and interpretations of the Medicare Act are generally entitled to deference. *Thomas Jefferson*, 512 U.S. at 504, 114 S. Ct. at 2386-2387. However, such deference is far from absolute, and the courts have not hesitated to reverse the Secretary's decisions where, as here, they are arbitrary and capricious, inconsistent with the Medicare Act and regulations, or not supported by substantial evidence in the record. *See, e.g.*, *Sarasota Memorial Hosp. v. Shalala*, 60 F.3d 1507 (11th Cir. 1995); *Athens Community Hosp., Inc. v. Shalala*, 21 F. 3d 1176 (D.C. Cir. 1994).

The Supreme Court has emphasized that the APA requires "the reviewing court to engage in substantial inquiry" and that the presumption of regularity given to an agency action "is not to shield [such] action from a thorough, probing in-depth review." *Overton Park*, 401 U.S. at 415, 91 S. Ct. at 823. As the Supreme Court has stated,

> "The deference which a reviewing court is to afford to an agency interpretation of its regulations is not total, however. Congress has vested in the court a reviewing function over the action of the agency, including its interpretive decisions. [Citation omitted.] We would be abdicating our judicial responsibility if we were to pass on the propriety of the Secretary's interpretation without subjecting it to some degree of scrutiny. As where courts review an agency's construction of a statute which the agency administers, 'the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia...'"

*Pacific Coast Med. Enter. v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980), quoting *Amer. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318, 85 S. Ct. 955, 967 (1965); *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm'n*, 390 U.S. 261, 88 S. Ct. 929 (1968); *see also Amer. Petroleum Inst. v. E.P.A.*, 661 F. 2d 340, 348-349 (5th Cir. 1981).

When a rule is merely interpretive, and not promulgated through the APA process, less deference is given the Secretary's interpretation than if the rule was included in a properly promulgated regulation. *See EEOC v. Arabian Amer. Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227 (1991). Further, if the Secretary's interpretation has been inconsistent over the years, it is entitled to reduced deference. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446, n. 30, 107 S. Ct. 1207, 1221, n. 30 (1987); *U.S. v. Baxter Intern, Inc.*, 345 F.3d 866 (11th Cir. 2003); *United Transp. Union v. Lewis*, 711 F.2d 233, 242-243 (D.C. Cir. 1983) ("A statutory construction to which an agency has not consistently adhered is owed no deference.") .

**B.**    **The Application of a Policy Denying Medicare Bad Debt Payments When Written-Off Debts Remain at a Collection Agency Violates the Bad Debt Moratorium.**

The PRRB and the Administrator both ruled that there could be no finding that the Moratorium was violated, because there was no evidence in the record as to the Provider's bad debt policy prior to the enactment of the Moratorium in 1987.[7]  AR, at 8, n.7 and 25. Although neither devoted more than a sentence to the subject when dismissing the Moratorium issue, both clearly were taking the narrow view that the Moratorium only applies when there are facts that

demonstrate that a particular provider's bad debt procedures were approved by their intermediary, and their claims for bad debts consequently allowed, in a fiscal period prior to the enactment of the Moratorium.

It is true that many cases discussing the Moratorium have focused on the facts of a particular hospital's historical practices. *See, e.g., University Health Servs., Inc. v. Health & Human Servs.*, 120 F.3d 1145, 1147-1148 (11th Cir. 1997); *Harris County Hospital Dist. v. Shalala*, 64 F.3d 220, 222 (5th Cir. 1995). In fact, in one very recent case, the United States District Court for the Eastern District of California applied the Moratorium and ruled in favor of a hospital on the precise issue addressed in this case, i.e., whether the hospital could deem unpaid deductibles and coinsurance to be uncollectible and claim them as Medicare bad debt, even though the debts had been sent to a collection agency. *Dameron Hospital Ass'n v. Leavitt*, 2007 WL 2288289 (E.D. Cal. 2007). In *Dameron*, the Court held that there was sufficient evidence in the record to establish that, prior to August 1, 1987, the fiscal intermediary had permitted the plaintiff to write off unpaid deductibles and coinsurance and claim them as Medicare bad debt, even though such debts had been referred to an outside collection agency. Therefore, the Moratorium prohibited a denial of the plaintiff's bad debt claims for subsequent years solely on the basis that the debts were still being processed by an outside collection agency.

The Hospital acknowledges that it cannot directly rely on *Dameron*, because, although it is likely that the Hospital's bad debt practice was the same prior to 1987 as it was in 1996, evidence regarding this was not included in the record below. Nonetheless, despite the absence in the record of evidence of Foothill's pre-1987 practices, the Court must find that the

---

[7] The Administrator's decision just refers to the lack of evidence as to the Provider's policy for the "applicable period," but presumably he was referring to the period before the
(footnote continued)

Moratorium prohibits the fiscal intermediary from disallowing bad debts that are still pending at

a collection agency if the debts have otherwise been properly deemed worthless. This is because

the Moratorium has a broader reach than discussed in *Dameron*. Regardless of an individual

hospital's practices, the Moratorium prevents the Secretary from changing bad debt policy that

was in effect prior to 1987.[8]

The Moratorium, never codified but found at 42 U.S.C. § 1395f note, was originally

enacted in 1987. The original version of the Moratorium stated as follows:

> **SEC. 4008. OTHER PROVISIONS RELATING TO**
> **PAYMENT FOR INPATIENT HOSPITAL SERVICES.**
> (C) CONTINUATION OF BAD DEBT RECOGNITION FOR
> HOSPITAL SERVICES. – In making payments to hospitals under
> the XVIII of the Social Security Act, the Secretary of Health and
> Human Services shall not make any change in the policy in effect
> on August 1, 1987, with respect to payment under title XVIII of
> the Social Security Act to providers of service for reasonable costs
> relating to unrecovered costs associated with unpaid deductible and
> coinsurance amounts incurred under such title (including criteria
> for what constitutes a reasonable collection effort).

Pub. L. No. 100-203, § 4008, 101 Stat. 1330, 1355(1987). The text of the 1987 version of the

Moratorium speaks for itself; it states that the Secretary "shall not make any change" in the

policy that was in effect on August 1, 1987.

The Moratorium was first amended in 1988. That amendment, which was to be

retroactively effective to the original date of the Moratorium, stated as follows:

--------

Moratorium went into effect. AR, at 8, fn. 7.

[8] The Hospital notes that it raised the Moratorium issue more broadly before the PRRB,
but neither the PRRB nor the CMS Administrator addressed this broader view. In its Position
Paper, the Hospital stated: "The Provider contends that the Intermediary's disallowance of bad
debts based on the referral of such debts to collection agencies is not in accordance with 42
C.F.R. § 413.80. Furthermore the disallowance of bad debts on such basis represents a [sic]
violates the OBRA 1987 prohibition against the imposition of a different policy with respect to
(footnote continued)

**SEC. 802. MAINTENANCE OF BAD DEBT COLLECTION POLICY.** Effective as of the date of the enactment of the Omnibus Budget Reconciliation Act "42 USC 1395f note" of 1987, section 4008(c) of such Act is amended by inserting after "reasonable collection effort" the following: ", including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency".

Pub. L. No. 100-647, § 802, 102 Stat. 3342 (1988). Thus, in 1988, Congress merely made more explicit the elements of "reasonable collection efforts" that could not be subject to a change in policy after August 1, 1987. Notably, in both the original version and the 1988 version, "reasonable collection efforts" were just one aspect of bad debt policy that the Secretary was not permitted to change. Further, it is clear that the 1988 clarification did nothing to change the essence of the Moratorium, i.e., that the Secretary was not permitted to change policy.

The Moratorium was amended for a third, and last, time in 1989. This amendment added a sentence to the Moratorium. The first sentence remained unchanged. The 1989 amendment states:

**SEC. 6023. CLARIFICATION OF CONTINUATION OF AUGUST 1987 HOSPITAL BAD DEBT RECOGNITION POLICY.** (a) IN GENERAL. – Section 4008(c) of the Omnibus Budget Reconciliation Act of 1987 is amended by adding at the end the following: "The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy."

---

what constitutes a reasonable collection effort than was applied prior to August 1, 1987." AR, at 34-35.

(b)  EFFECTIVE DATE. – The amendment made by subsection
(a) shall take effect as if included in the enactment of the Omnibus
Budget Reconciliation Act of 1987.

Pub. L. No. 101-239, § 6023, 103 Stat. 2106, 2167 (1989).  This 1989 change added the concept

that a fiscal intermediary could not require a hospital to change its pre-1987 practices regarding

"indigency determination procedures, record keeping, and determining whether to refer a claim

to an outside collection agency."  Thus, the addition in 1989 was that a fiscal intermediary could

not disallow claims for bad debt for reasons pertaining to these specific elements of bad debt

practices, if it had approved such practices before August 1, 1987.  The 1989 amendment did

nothing to affect the meaning of the first sentence of the Moratorium, i.e, that the Secretary was

proscribed from making any changes to his pre-1987 bad debt policies.

Since the Secretary was not permitted to change his policies after 1987, the question is

then whether the prohibition on claiming reimbursement for bad debts that have been deemed

worthless, but remain at an outside collection agency, is a policy that was newly adopted after

August 1, 1987.  The history of the "presumption of collectibility" policy demonstrates that it

was not part of Medicare policy prior to 1987, and thus the policy is invalid.

Neither the pertinent regulations nor the various provisions in the Provider

Reimbursement Manual, which is the principal set of sub-regulations that governs Medicare

reimbursement for hospitals, specifically state that  bad debts cannot meet the criteria for

reimbursement when they have been sent to a collection agency.  The only specific provision on

which the CMS Administrator relies in his decision for the presumption of collectibility is the

provision in the Medicare Intermediary Manual, quoted above.  While this policy would

specifically disallow Foothill's bad debts, it was newly adopted after August 1, 1987 and is thus

subject to the Moratorium.

The presumption of collectibility simply did not exist prior to its placement in the MIM in September 1989. In fact, a previous audit guideline, which remains currently on the CMS website as part of the Intermediary Manual, does not include the presumption of collectibility, but, to the contrary, actually provides that debts referred to a collection agency were *per se* uncollectible. This guideline, Section 4499, Exhibit 15 of the Hospital Audit Program, found in the Intermediary Manual (Pub. HIM 13) is dated December 1985 and is still contained in the version of HIM 13-4 appearing on the CMS website.[9]  *See*  Exhibit 2, attached hereto. Section 15.04 provides:

> Where a provider utilizes the services of a collection agency, the provider need not refer all uncollected patient charges to the agency, but it may refer only uncollected charges above a specified minimum amount. If reasonable collection effort was applied, fees the collection agency charges the provider are recognized as an allowable administrative cost of the provider. To determine the acceptability of collection agency services, perform the following audit steps.
>
> A.    Review provider contracts with the collection agency to determine that both Medicare and non-Medicare uncollectible amounts are handled in a similar manner.

The very terms of this 1985 provision make clear the Program's view that the accounts referred to the collection agency already are considered "uncollectible."

Contradicting this policy, the presumption of collectability was added to the Medicare Intermediary Manual in 1989, after the Moratorium, by Transmittal No. 28, which is attached

---

[9]  It can be found by going to the Hospital Center, then clicking on CMS Manuals, then on Paper Based Manuals, then on Publication 13, then on Part 4 – Audit Procedures. There are a series of Word documents, and the Bad Debt section is labeled 4449EX15. As stated above, this document is dated 12/85, so clearly it was in effect prior to the Moratorium. Although it remains in the manual today on the CMS website, it still references 42 C.F.R. § 405.420, which is a prior designation for the Bad Debt regulation. Another version of the Bad Debt Hospital Audit Program, labeled as Exhibit 14 and discussed below, appears to be a more recent version, but is not posted on the website.

17

hereto in full as Exhibit 3.[10]  Transmittal No. 28 is labeled:  "NEW POLICY—EFFECTIVE

DATE:   For Prospective Payment System (PPS) cost report audits performed after 10/12/89."

Thus, the policies within Transmittal 28 were "new policies" that took effect <u>after</u> the August

1987 cutoff date for the Moratorium.

Specifically, the new bad debt policies are found at Exhibit A-11, pages 2-58 and 2-59 of

Section 4198 of the MIM.  (Section 4198 is labeled "EXHIBITS FOR PPS AUDITS.")  This

replaced the former Section 4118.2.E, which previously contained the MIM provisions on bad

debts.  A copy of this Section 4118.2.E is attached as Exhibit 4.  There is no longer a Section

4118.2 in the MIM as revised by Transmittal 28.  The former Section 4118.2.E does not include

any language which could possibly be construed to adopt a presumption of collectibility for bad

debts that remain at outside collection agencies.

CMS also issued a policy memorandum addressing this issue, entitled HCFA

Clarification on Bad Debt Policy, HCFA Memorandum to Regional Administrators, June 11,

1990, CCH Medicare & Medicaid Guide, ¶ 38,623.  AR, at 23-24.[11]  A copy  is attached as

Exhibit 5.  Notably, this was issued to CMS's Regional Administrators, not as guidance to

providers.  To the extent this policy statement carries any weight, it was made long after the

Moratorium and thus could not permissibly establish new policy.

---

[10]  Transmittal 28 skips page numbers in places, but Exhibit 3 contains the full
transmittal.  As amended by the transmittal, there are gaps in the MIM page numbers.

[11]  This policy memorandum was not mentioned by the Administrator in his decision, but
was referenced only in the PRRB decision.  The PRRB found that neither the MIM nor the
policy memorandum established a conclusive presumption that accounts assigned to an outside
collection agency have value or are collectible.

Further, this statement muddies the waters. Although it discusses the policy set forth in the MIM provision that was introduced in 1989, it also makes a statement contradictory to that policy:

> Thus, even after 120 days, a debt should not be deemed uncollectible when there is reason to believe that in fact it is collectible. However, <u>the mere fact that a debt is referred to a collection agency after the provider's in-house collection effort is completed does not mean that the debt is collectible.</u>

June 11, 1990 Memo, p. 3. This statement is the opposite of the Secretary's current position, as expressed in the CMS Administrator decision herein, which is that the mere fact that a debt is at a collection agency does mean that it must be considered collectible.

In sum, there is nothing in the record herein that would indicate that the Secretary had adopted the presumption of collectibility as a policy prior to August 1987.[12] With no such policy in existence prior to August 1987, the Secretary is barred from adopting such a restriction on the allowability of bad debts for periods audited after that date. Accordingly, the adjustments to Foothill's bad debts for its FYE 9/30/95 must be reversed.[13]

---

[12] Unlike the question of what the Hospital's own practices were and how the Intermediary treated them prior to the Moratorium, the Secretary should have the burden of proof to establish that she actually had adopted the presumption of collectibility prior to August 1987. The Secretary has introduced no evidence that would show this. Further, as discussed below, contrary CMS Administrator decisions indicate that there was no such policy in place even after the MIM provision was issued.

[13] There has been only one court case that has previously addressed the precise issue raised in this case: *Battle Creek Health Systems v. Leavitt*, 498 F.3d 401 (6th Cir. 2007). In that case, both the District Court and the Sixth Circuit ruled in favor of the Secretary, upholding the intermediary's adjustments to bad debts that had been claimed when the accounts still remained at an outside collection agency. However, neither court addressed the issue of the Moratorium, and a review of the Sixth Circuit briefs confirms that the Plaintiff did not raise the Moratorium as a bar to the Secretary's presumption of collectibility. Also, as discussed further below in Section IV.C, the parties in *Battle Creek* did not bring certain significant authorities about the Secretary's historical handling of this issue to the courts' attention. Accordingly, the *Battle Creek* decision should not be given any weight by this court.

**C.** **The Secretary's Current Presumption of Collectibility Policy Is Arbitrary and Capricious, As It Is Inconsistent With The Governing Statute and Regulations.**

Even if the presumption of collectibility policy were not clearly prohibited by the Bad Debt Moratorium, the adjustments to bad debt challenged herein should be reversed by the Court. This policy is arbitrary and capricious, because there is no support for it in the governing statute or regulations. The isolated statements of this policy in directives to the Intermediary in 1989 and 1990 should be given little weight, in light of the overall regulatory scheme, specific language as to when bad debts may be deemed uncollectible, and CMS's own otherwise contrary and consistent treatment of this issue in final agency decisions until the recent change of course.

As discussed above, the reimbursement of Medicare bad debts is based on the statutory prohibition on cost-shifting from Medicare patients to non-Medicare patients (42 U.S.C. § 1395x(v)(1)(A)), but there is no explicit mention of bad debts or the requirements for their reimbursement in the Social Security Act provisions governing the Medicare Program. The entitlement to reimbursement for bad debts and the requirements pertaining to such reimbursement are found in the Secretary's regulations. 42 C.F.R §§ 412.115(a) and 413.89. Greater detail regarding the Secretary's policies regarding bad debts and the requirements for claiming them are found in a series of provisions in the Provider Reimbursement Manual, which are discussed in some detail above and included in Exhibit 1.

Nowhere in these regulations or interpretive rules is there any direct mention of the presumption of collectibility that the Secretary wishes to impose in this case on debts that have been referred to an outside collection agency, even though reasonable collection efforts have been made and the debts have been written off as worthless. Further, the Secretary's

presumption of collectibility flies directly in the face of at least two aspects of the governing provisions. It essentially eviscerates the presumption of noncollectibility found in PRM-I § 310.2, which has remained unchanged since distributed to providers in 1968. *See* HCFA Transmittal No. 3, August 1968. The allowable presumption that debts may be deemed uncollectible if reasonable collection efforts have been made for at least 120 days has a clear policy basis: it eliminates administrative costs and burdens that would otherwise be incurred by having to document or demonstrate the uncollectibility of each account on a case-by-case basis.

While, in his decision herein, the Administrator recognizes that section 310.2 permits a debt unpaid for more than 120 days from the date the bill is first mailed to the beneficiary to be deemed uncollectible, he focuses on the language of section 310.2 that indicates that the debt "may," rather than "shall," be deemed uncollectible. However, courts construing the term "deemed" have generally found that it establishes a conclusive presumption. *See, e.g., Mun. Resale Serv. Customers v. FERC,* 43 F.3d 1046, 1053 (6th Cir. 1995); *Ohio Power Co. v. FERC,* 880 F.2d 1400, 1413 (D.C. Cir. 1989); *H.P. Coffee Co. v. Reconstruction Finance Corp.,* 215 F.2d 818, 822 (Emer. Ct. App. 1954). The Secretary's current position that the fact that a debt is at a collection agency, however unlikely the chance that it will ever be collected, is evidence of collectibility, essentially <u>destroys</u> the presumption of noncollectibility, because now the fact that 120 days has passed becomes meaningless.

Further, the Administrator's reasoning regarding the applicability of section 310.2 makes no sense. He states as follows:

> [Section 310.2] does not suggest that this presumption relieves the Provider from meeting the general regulatory documentation requirements or the specific documentation requirements in sections 310.B and 314 of the PRM. Thus, the presumption only applies where a provider has otherwise demonstrated through

appropriate documentation that it engaged in reasonable collection efforts.

AR at 7.  In this case, there is no dispute that the Hospital has engaged in reasonable collection efforts.  The PRRB found that the Intermediary did not contest that the Hospital made reasonable collection efforts (AR at 22), and the Administrator did not disturb that finding.  If such a finding was made, then, as the Administrator says, the presumption should apply.

This new presumption of collectibility also flies in the face of  PRM-I § 316, which provides for a reduction in reimbursable costs for the fiscal year in a which a debt was paid, if that debt had been written off and claimed as a bad debt in a previous cost reporting period.  This provision clearly demonstrates the expectation that, after bad debts are written off,  some efforts will continue to be made and some debts will eventually be collected.  Coupled with the 120-day presumption of uncollectibility in § 310.2 found in the Provider Reimbursement Manual (as opposed to the Intermediary's manual), this provision has been understood for years by the Hospital (and other hospitals as well) to allow for some, limited collection efforts at outside collection agencies.  Significantly, the requirement to offset payments received in subsequent years for debts that were previously written off and reimbursed protects the Medicare program against any losses or improper payments.

The Secretary's policy is also arbitrary and capricious because it incorrectly assumes that accounts sitting at collection agencies are "collectible" in any significant way.  The Secretary is well aware of the fact that the vast majority of accounts at outside collection agencies are essentially dormant and will never be collected.  There is a very good discussion of this in the PRRB decision in the Dameron case:

> The conclusive presumption urged by the Intermediary elevates
> form over substance.  The mere "active" status of an account with
> an outside collection agency, while suggestion of collectibility, is
> not in and of itself *proof* of value *or* collectibility, especially in the

22

face of evidence presented here. Further, a conclusive
presumption of collectibility arising from an account's "open" or
"active" status at an outside collection agency is contrary to both
the reality of the collection trade and the regulations that the Board
is entrusted to enforce. There is no evidence that providers control
the decision making process of their outside collection agencies.
Thus, an account that is actually worthless and uncollectible could
languish as an "open" or "active" account in an outside collection
agency indefinitely. The conclusive presumption proffered by the
Intermediary would prohibit the reimbursement of such bad debts
as required by 42 C.F.R. § 413.80(d) and (e) and violates the
prohibition against cross-subsidization at Section 1861(v)(1)(A) of
the Social Security Act.

*Dameron Hosp. v. Blue Cross Blue Shield Ass'n*, PRRB Hearing Dec. No. 2006-D16, Feb. 17,

2006, CCH Medicare & Medicaid Guide ¶ 81,502, 2006 WL 940656.

The Hospital does not dispute that, as a general principle, a court must give deference to

an agency's interpretation of its own regulations. *Thomas Jefferson*, 512 U.S. at 512, 114 S. Ct.

at 2386. However, less deference should be given if an agency is inconsistent in its

interpretation. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446, n. 30, 107 S. Ct. 1207, 1221, n. 30

(1987). In this case, the Secretary has taken directly contradictory positions in the past.

For example, in *Lourdes Hosp. v. Blue Cross and Blue Shield Ass'n*, HCFA

Administrator Decision, Oct. 27, 1995, CCH Medicare & Medicaid Guide, ¶ 43,723, the

Administrator upheld the PRRB's reversal of intermediary adjustments to bad debts that had been

written off in less than 120 days, finding that the hospital could establish that debts were not

collectible, even though the 120-day presumptive period had not yet expired.[14] Although these

debts had been sent to a collection agency, the Administrator allowed reimbursement:

....At the end of the billing cycle, which was less than 120 days,
the Provider wrote or charged off as a bad debt every outstanding

---

[14] Because this decision does not appear in Westlaw, we have included a copy for the
Court's convenience. *See* Exh. 6.

23

account, both Medicare and non-Medicare, for which there was no payment activity. Thereafter, the Provider forwarded both the Medicare and non-Medicare accounts to a collection agency. On its respective cost reports for the cost years at issue, the Provider claimed the accounts that were charged off as bad debts. The Provider submitted sample copies of the actual billing statements which document the collection efforts.

Applying the above-cited sections of the Act, regulations, and the PRM to the facts presented in the records, the Administrator finds that the Intermediary incorrectly determined that the bad debts claimed by the Provider may not be paid by Medicare. The Administrator finds that a reasonable construction of the PRM is that for debts claimed in 120 days or less from the first billing, no presumption of noncollectability exists, but, rather, the provider must establish that the debts are actually noncollectible. The Administrator finds that in the instant cases the evidence in fact establish [sic] that the debts were uncollectible.

*Lourdes*, HCFA Admin. Dec., p. 3. It could not be clearer that, in *Lourdes,* the CMS

Administrator specifically found that bad debts could be determined to be noncollectible, even

though they had been sent to a collection agency. It is astonishing that the Administrator has

taken a directly opposite position herein, without even acknowledging that his position has

changed.[15]

Similarly, five years later, the PRRB rendered a decision in *Methodist Hosp. of*

*Dyersburg v. Blue Cross and Blue Shield Ass'n*, PRRB Hearing Dec. No. 2000-D56, May 30,

2000, CCH Medicare & Medicaid Guide, ¶ 80,502, 2000 WL 796345. Like *Lourdes,* this case

focused on the issue of whether a provider could claim bad debts when it has written them off in

less than 120 days. The hospital's practice was to send the accounts to an outside collection

---

[15]  It is worth noting that the *Lourdes* decision was rendered six years after publication of the Medicare Intermediary Manual provision relied on by the Administrator herein. In *Lourdes,* the Administrator apparently thought that the only valid sources of authority on the issue were the statute, regulations, and the Provider Reimbursement Manual.

agency at the time that the hospital made an internal bookkeeping entry and claimed the debts on

their Medicare cost report. The fiscal year in question was calendar year 1992, several years

after the Medicare Intermediary Manual provision that ostensibly adopted the presumption of

collectibility. The PRRB reversed the intermediary's adjustments to these bad debts, and it could

not have been clearer that the PRRB was allowing bad debts that were still at an outside

collection agency:

> The Board concludes that the Provider followed it's [sic]
> bad debt collection policy and procedure, and that the policy was
> adequate. The Board finds that the <u>bad debts were "uncollectable"</u>
> <u>when turned over to the collection agency</u>, thus meeting both the
> four (4) criteria of 42 C.F.R. § 413.80(c), and the 120 day rule of
> HCFA Pub. 15-1 § 2310.2. The Board fins that the Intermediary
> did not submit evidence sufficient to rebut the Provider's
> documentation of an acceptable bad debt collection policy and
> procedure.

*Methodist Hosp. of Dyersburg,* PRRB Dec., p. 7 [emphasis added]. The CMS Administrator

declined to review this decision, letting it stand as the agency's final decision and thus implicitly

approving it.

   CMS itself has also disseminated directly conflicting information on this issue. In

correspondence dated March 6, 1998 from Region VI, CMS 's regional office in Texas, to one of

the fiscal intermediaries, CMS (HCFA, at the time) was asked whether a provider could claim a

Medicare bad debt which had been subject to collection efforts for 60 days in-house and then for

another 60 days at an outside collection agency, for a total of 120 days. The provider asked:

"Does the collection agency have to officially quit working the account and return it to the

provider prior to the bad debt being claimed?" The provider suggested two possible answers:

> A.    Since the collection agency is being used prior to the end of the
>        120-day period, the provider can only claim it as a bad debt when
>        the collection agency decides the account cannot be collected.

B.      If similar effort is expended non-Medicare claims, the bad debt
can be claimed at the end of the first 120 days of total collection
effort even if the collection agency is still working on the
account.

CMS responded:

4.      "B" is appropriate since it specifies that both Medicare and non-
Medicare claims have been written off their books as accounts
receivable.

*See* Question No. 4 and Response to Question No. 4, Correspondence dated December 17, 1997

from Elise Steele to Virginia McKissick, HCFA Regional Office VI, and Letter Dated March 6,

1998, attached as Exhibit 7.    Thus, in 1998, CMS stated directly that bad debts could be claimed

even when a collection agency was still working on the account.

Not only does this show that CMS was disseminating conflicting guidance, but it also

shows that CMS's agents, the fiscal intermediaries, were confused as to what the policy was.

There is another example of this confusion.  In July 1990, Mutual of Omaha, which handled

audits for a large number of hospitals around the country, distributed the June 1990 HCFA

memorandum (Exhibit 5), which purported to clarify the issue about accounts sent to collection

agencies.  We have attached, as Exhibit 8,  Mutual's cover memo to hospitals and other

providers, wherein it forwarded and explained the HCFA memorandum.  Mutual stated:

> Accordingly, the "presumption of noncollectibility" provisions of
> HCFA Pub. 15-1, Section 310.2 will be applied to include
> Medicare bad debts that have been referred to a collection agency
> except where there is evidence that such accounts are, in fact,
> collectible.

This clearly contradicts the Secretary's current position that any bad debts referred to a collection

agency are *per se* noncollectible.

The striking inconsistency between the Secretary's current position and the position taken

in prior years as evidenced by prior CMS Administrator decisions and this Mutual of Omaha

memo clearly should negate any deference that would ordinarily be given to the Secretary's

interpretation of his own regulations. In fact, it raises the question as to whether the Secretary

really intended that the presumption of collectibility be enforced as a policy in the years after it

was first inserted into the Medicare Intermediary Manual and before the last couple years when

the Secretary was allowing intermediaries to apply this policy. It may have remained in the

Medicare Intermediary Manual during the years when evidence shows that a different policy was

being applied, but there are numerous provisions in the Secretary's manuals that are essentially

out of date.[16] It really seems that the policy had been abandoned, a completely contrary policy

had been adopted, and then, without making any regulatory or sub-regulatory change or giving

any notice whatsoever to hospitals, the Secretary has decided to re-adopt a policy which he had

decided not to follow for many years. [17]

    The Hospital notes that there is no mention of these conflicting authorities -- neither the

administrative decisions in *Lourdes* and *Methodist*, nor the Mutual memo -- in the District and

Circuit Court decisions in *Battle Creek*. The Hospital has reviewed the briefs that were filed at

the Sixth Circuit, and there is no mention of these conflicting authorities in the briefs either. It

---

[16] For example, the "Exhibit 15" Bad Debt audit protocol discussed above, remains in the Intermediary Manual on the CMS website, but it cites to regulations that are out of date by several years.

[17] Further support for the fact that the Secretary had abandoned the presumption of collectibility years ago can be found by reviewing a series of publications by the Secretary's agents, Blue Cross and Blue Shield of Tennessee (later known as Riverbend). We have attached these documents, a series of communications to providers called "Medicare Reimbursement Flash," from February 1990, June 1992 and March 2000. In the first one, the intermediary announces the policy introduced in the MIM in 1989, *i.e.,* that a bad debt cannot be claimed if the account is still at a collection agency. The June 1992 Flash, however, replaces all guidance in bad debts from the first Flash but this time makes no mention of the prohibition on claiming bad debts that are still at a collection agency. Finally, the March 1990 Flash, again restating all bad debt policy, still makes no mention of this prohibition. These Flashes are submitted collectively as Exhibit 9.

appears, then, that they were not brought to the attention of the courts in *Battle Creek*. The Hospital believes it is likely that the courts in that case would have ruled differently, if these authorities had been brought to their attention.[18] Accordingly, though it is a circuit court decision, this Court should disregard it.

Given these various inconsistencies and the fact that the "presumption of collectibility" runs contrary to the relevant statutory, regulatory and PRM bad debt provisions, it would be arbitrary and capricious, and grossly unfair, to enforce this policy against the Hospital.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[18] Even if the counsel for the plaintiff in that case was unaware of these authorities, it is inexcusable for the Secretary to have failed to disclose his own conflicting decisions.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the CMS Administrator decision should be reversed and the

PRRB decision reinstated, allowing reimbursement to the Hospital for its Medicare bad debts for

FYE 9/30/95.


Dated:   November 2, 2007                          Respectfully submitted,


                                                   /s/  John R. Jacob
                                                   John R. Jacob
                                                   D.C. Bar No. 444412
                                                   AKIN GUMP STRAUSS HAUER & FELD LLP
                                                   Robert S. Strauss Building
                                                   1333 New Hampshire Avenue, NW
                                                   Washington, D.C. 20036
                                                   Telephone:  202-887-4582
                                                   Fax:  202-955-7648
                                                   Email:  jjacob@akingump.com


                                                   OF COUNSEL:
                                                   John R. Hellow, Esq.
                                                   Byron J. Gross, Esq.
                                                   Hooper, Lundy and Bookman, Inc.
                                                   1875 Century Park East, Suite 1600
                                                   Los Angeles, California 90067
                                                   Tel: (310) 551-8151
                                                   Fax: (310) 551-8181


                                                   Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

FOOTHILL HOSPITAL - MORRIS L.
JOHNSTON MEMORIAL, a California
nonprofit corporation, dba Foothill
Presbyterian Hospital,

        Plaintiff,

    v.

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and
Human Services,

        Defendant.

Civil Action No. 1:07-CV-00701 (ESH)

# PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH

# THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7(h), Plaintiff Foothill Hospital – Morris L. Johnston Memorial ("Plaintiff" or "Foothill") submits this Statement of Material Facts as to Which There is No Genuine Issue in support of its Motion for Summary Judgment.

1.     The Medicare Act establishes a system of health insurance for the aged and disabled. 42 U.S.C. §§ 1395-1395ggg.

2.     The Medicare program is federally funded and administered by the Secretary of the United States Department of Health and Human Services ("Secretary") through the Centers for Medicare and Medicaid Services ("CMS"). 42 U.S.C. § 1395kk.

3.     Medicare covers various health care services furnished to eligible beneficiaries, including inpatient and outpatient hospital services. 42 U.S.C. § 1395d; 42 U.S.C. § 1395k(a)(2); 42 U.S.C. § 1395x(s).

4.     Fiscal intermediaries are private organizations that make Medicare payments to providers such as Foothill pursuant to contracts with the Secretary. 42 U.S.C. § 1395h.

5.     A hospital that participates in the Medicare program is required to submit a cost report to its fiscal intermediary at the close of its cost reporting period. The cost report identifies the costs incurred by the provider during the cost reporting period and the portion of such costs to be reimbursed by Medicare. 42 C.F.R. §§ 413.20, 413.24.

6.     Fiscal intermediaries are required to review the hospital's cost report and to inform the provider of the total Medicare reimbursement owing the provider for the period covered by the cost report. 42 C.F.R. § 405.1803. This determination is referred to as the notice of amount of program reimbursement ("NPR"). 42 C.F.R. §§ 405.1801(a), 405.1803.

7.     If a provider has filed a cost report and is dissatisfied with its fiscal intermediary's final determination of the total reimbursement due for the period covered by the cost report, the

1

provider may obtain a hearing before the Provider Reimbursement Review Board ("PRRB" or "Board") "with respect to such cost report." 42 U.S.C. § 1395oo(a), 42 C.F.R. § 405.1835(a). The amount in controversy must be at least $10,000 in order for the Board to have jurisdiction over such an appeal. 42 U.S.C. § 1395oo(a)(2).

8.    From the Medicare program's inception in 1965 until 1983, hospitals were reimbursed the lower of their reasonable costs or customary charges for services provided to Medicare beneficiaries. See 42 U.S.C. § 1395f(b)(1).

9.    Reasonable costs are the costs actually incurred in furnishing covered services, excluding unnecessary costs. See 42 U.S.C. § 1395x(v)(1)(A).

10.    In 1983, Congress established the Prospective Payment System ("PPS"), under which most acute care hospitals were no longer reimbursed based upon their reasonable costs. 42 U.S.C. § 1395ww(d).

11.    Under PPS, hospitals are reimbursed for inpatient hospital operating costs at a prospectively determined, fixed rate for each Medicare inpatient, which is based upon the patient's diagnosis and other factors. 42 U.S.C. § 1395ww(d).

12.    The Medicare statute and regulations prohibit cost shifting. 42 U.S.C. § 1395x(v)(1)(A) (2002); 42 C.F.R. § 413.89(d) (formerly, § 413.80(d)).

13.    Cost shifting occurs in the following two ways: (1) the necessary costs of delivering health care to Medicare enrollees are borne by individuals who are not Medicare recipients or (2) the necessary costs of delivering health care to the hospital's other patients not covered by Medicare are borne by Medicare. 42 U.S.C. § 1395x(v)(1)(A).

14.    When receiving inpatient and outpatient hospital services, Medicare enrollees are responsible for paying coinsurance and deductible amounts. 42 U.S.C. § 1395e and 1395l.

15.    The failure of beneficiaries to pay the deductible and coinsurance amounts could result in the related costs of covered services being borne by other than Medicare beneficiaries. To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that are unpaid by beneficiaries are reimbursed by Medicare as "bad debts." 42 C.F.R. § 412.115(a).

16.    In order to qualify for reimbursement of Medicare bad debts, providers must show that the unpaid deductible and coinsurance amounts meet the following criteria:

(1)    The debt must be related to covered services and derived from deductible and coinsurance amounts;

(2)    The provider must be able to establish that reasonable collection efforts were made;

(3)    The debt was actually uncollectible when claimed as worthless; and

(4)    Sound business judgment established that there was no likelihood of recovery at any time in the future.

42. C.F.R. § 413.89(e); Provider Reimbursement Manual ("PRM") § 308.

17.    Section 310 of the PRM sets forth specific criteria for "reasonable collection efforts." PRM-I § 310.

18.    According to the PRM's criteria for "reasonable collection efforts," a provider's efforts to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients and allowing for the use of an outside collection agency in addition to subsequent billings, follow-up letters, telephone calls and personal contacts. PRM-I § 310.

19.    The Provider Reimbursement Manual also addresses the criteria requiring the debt to be actually uncollectible when claimed as worthless: "If after reasonable and customary

3

attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible." PRM-I § 310.2. This has been referred to as the "presumption of uncollectibility." *Dameron Hosp. Ass'n v. Leavitt ("Dameron"),* 2007 WL 228289, Slip Copy at 3 (E.D. Cal. 2007).

20.    Uncollectible deductible and coinsurance amounts are recognized as allowable bad debts in the reporting period in which such bad debts are determined to be uncollectible. PRM-I § 314.

21.    If a debt is subsequently collected after it has been written off and claimed for reimbursement from Medicare, the provider must offset the amount collected against Medicare reimbursement due in the year during which it was collected. PRM-I § 316.

22.    The issue of whether a debt is deemed uncollectible if a provider sends the debt to an outside collection agency is mentioned only in a provision included in audit guidelines found in Section 4 of the Medicare Intermediary Manual ("MIM"). The MIM provision, which was added in 1989, states:

> If the bad debt is written-off on the provider's books 121 days after the date of the bill and then turned over to a collection agency, the amount cannot be claimed as a Medicare bad debt on the date of the write-off. It can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.

HIM 13-4, Section 4198, Exh. A-11.

23.    The MIM's provision essentially creates a "presumption of collectibility," a presumption that a debt must be collectible if it still remains for possible collection, however unlikely, at an outside collection agency. *Dameron,* 2007 WL 228289, Slip Copy at 3.

24.    As a result of disputes arising because of inconsistent policies regarding bad debts being applied by Medicare fiscal intermediaries, Congress enacted a "Bad Debt Moratorium"

which prohibited the Secretary from making any changes in policies relating to bad debts that were in effect on August 1, 1987. 42 U.S.C. § 1395f, note.[1]

25.    When submitting its cost report to its fiscal intermediary at the time, Blue Cross of California, for its FYE 9/30/95, Plaintiff included a claim for bad debts for Medicare beneficiaries. Administrative Record ("AR") at 34.

26.    The bad debts claimed included amounts for unpaid deductibles and coinsurance that had been sent to an outside collection agency for collection, but because, in the sound business judgment of the provider, there was no likelihood of recovery in the future, these accounts had been deemed worthless by Plaintiff. Collection efforts for Medicare and non-Medicare bad debts were handled identically. AR at 34-35.

27.    In accordance with Plaintiff's collection policy, the accounts were actively pursued with at least three demand letters sent to the patient before an account would be written off as a bad debt. AR at 47, 35.

28.    The average periods for collection efforts by Plaintiff, before referral to an outside collection agency, were 321 days for inpatient accounts and 303 days for outpatient accounts. AR at 35 and 51-57.

29.    On December 16, 1996, the Intermediary issued a Notice with Amount of Program Reimbursement ("NPR"), in which it disallowed approximately $60,993 in bad debts claimed by Plaintiff. AR at 416.

30.    The bad debts were denied solely because the debts had been referred to an outside collection agency, which, according to the Intermediary, meant that they could not be considered worthless, as required by 42 C.F.R. § 413.89(e)(3). AR at 191.

---

[1] This provision was incorrectly cited in the Complaint, at ¶ 15, as § 1395e, note.

31.    Plaintiff filed a timely appeal to the PRRB of its NPR, in order to challenge the disallowance of the bad debts. AR at 413. All jurisdictional requirements for the appeal were met. AR at 18-26.

32.    A hearing on the record was held before the PRRB on September 20, 2006. AR at 18-26.

33.    On December 19, 2006, the PRRB issued a decision favorable to Plaintiff, in which it determined that all bad debts claimed for FYE 9/30/95 are allowable and that the fiscal intermediary's adjustments to bad debts should be reversed. AR at 18-26.

34.    The PRRB held that the bad debts were properly considered uncollectible, even though they remained at an outside collection agency. AR at 18-26.

35.    The PRRB found that Plaintiff's extensive collection efforts met the Secretary's regulatory requirements and that such efforts were completed before Plaintiff determined the accounts to be uncollectible and worthless. AR at 25.

36.    The PRRB also found that the conclusive presumptive of collectibility based on outside collection agency account status ran afoul of well established precedent. Otherwise, the PRRB held, Medicare's prohibition on cross-subsidization would be violated. AR at 25.

37.    The PRRB decision was reviewed by the CMS Administrator ("Administrator"), who issued a decision on February 16, 2007. AR at 2-9.

38.    The Administrator reversed the decision of the PRRB and upheld Intermediary's adjustment to bad debts. AR at 2-9.

39.    The Administrator held that a bad debt could not be deemed worthless and uncollectible as long as it remained at an outside collection agency. AR at 7-8.

40.     The Administrator did not disturb the PRRB's factual finding that Plaintiff's collection efforts were reasonable and that all requirements for Medicare bad debt reimbursement were met, except for the fact that the debts had been referred to a collection agency.  AR at 7-8.

41.     The PRRB's decision is the final decision in this case and is considered the decision of the Secretary.  42 C.F.R. § 405.1875.

42.     A provider may file a civil action in the United States District Court for the judicial district in which the provider is located or in the District Court for the District of Columbia to seek judicial review of an adverse PRRB or CMS Administrator decision.  42 U.S.C. § 1395oo(f).


Dated:   November 2, 2007                    Respectfully submitted,


                                             /s/  John R. Jacob
                                             John R. Jacob
                                             D.C. Bar No. 444412
                                             AKIN GUMP STRAUSS HAUER & FELD LLP
                                             Robert S. Strauss Building
                                             1333 New Hampshire Avenue, NW
                                             Washington, D.C. 20036
                                             Telephone:  202-887-4582
                                             Fax:  202-955-7648
                                             Email: jjacob@akingump.com

                                             OF COUNSEL:
                                             John R. Hellow, Esq.
                                             Byron J. Gross, Esq.
                                             Hooper, Lundy and Bookman, Inc.
                                             1875 Century Park East, Suite 1600
                                             Los Angeles, California 90067
                                             Tel: (310) 551-8151
                                             Fax: (310) 551-8181

                                             Attorneys for Plaintiff

**EXHIBIT 1**

## 300. PRINCIPLE

Bad debts, charity, and courtesy allowances are deductions from revenue and are not to be included in allowable costs; however, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the Program.

## 302. DEFINITIONS

302.1    Bad Debts.--Bad debts are amounts considered to be uncollectible from accounts and notes receivable which are created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from rendering services and are collectible in money in the relatively near future.

302.2    Allowable Bad Debts.--Allowable bad debts are bad debts of the provider resulting from uncollectible deductibles and coinsurance amounts and meeting the criteria set forth in Section 308. Allowable bad debts must relate to specific deductibles and coinsurance amounts.

302.3    Charity Allowances.--Charity allowances are reductions in charges made by the provider of services because of the indigence or medical indigence of the patient.

302.4    Courtesy Allowances.--Courtesy Allowances are reductions in charges by the provider in the form of an allowance to physicians, clergy, members of religious orders, and others as approved by the governing body of the provider, for services received from the provider.  Reductions in charges made as employee fringe benefits, such as hospitalization and personnel health programs are not considered courtesy allowances.

302.5    Deductible and Coinsurance Amounts.--Deductible and coinsurance amounts are amounts payable by beneficiaries for covered services received from providers of services, excluding medical and surgical services rendered by physicians and surgeons.  These deductibles and coinsurance amounts, including the blood deductible, must relate to inpatient hospital services, post-hospital extended care services, home health services, out-patient services, and medical and other health services furnished by a provider of services.

## 304.    BAD DEBTS UNDER MEDICARE

Bad debts resulting from deductible and coinsurance amounts which are uncollectible from beneficiaries are not includable as such in the provider's allowable costs; however, unrecovered costs attributable to such bad debts are considered in the Program's calculation of reimbursement to the provider.

The allowance of unrecovered costs attributable to such bad debts in the calculation of reimbursement by the Program results from the expressed intent of Congress that the costs of services covered by the Program will not be borne by individuals not covered, and the costs of services not covered by the Program will not be borne by the Program. Payment for

deductibles and coinsurance amounts is the responsibility of the beneficiaries. However, the inability of the provider to collect deductibles and coinsurance amounts from beneficiaries of the Program could result in part of the costs of covered services being borne by others who are not beneficiaries of the Program. Therefore, to assure that costs of covered services are not borne by others because Medicare beneficiaries do not pay their deductibles and coinsurance amounts, the Medicare Program will reimburse the provider for allowable bad debts, not to exceed the total amount of unrecovered costs of covered services furnished to all beneficiaries. In the determination of unrecovered costs due to bad debts, the Medicare Program is considered as a whole without distinction between Part A and Part B of the Program.

## 305. EFFECT OF THE WAIVER OF LIABILITY PROVISION ON BAD DEBTS

A.  Beneficiary Liability.--The waiver of liability provision of the law protects a beneficiary from liability for payments to a provider for noncovered services when (l) the services are found to be not reasonable and necessary or to involve custodial care (i.e., excluded from coverage under section 1862(a)(l) or (9) of the Social Security Act), and (2) the beneficiary did not know or could not reasonably be expected to have known that the services were not covered. Where the beneficiary had knowledge that the services were not covered, liability will remain with the beneficiary.

B.  Provider Not Accountable.--The program will reimburse the provider for the services if the provider did not know and could not reasonably be expected to have known that the services were not covered and the beneficiary had no knowledge as described n paragraph A. If the provider has such knowledge, it will assume accountability for the noncovered services. Where neither the provider nor the beneficiary is found accountable, the provider's charges for the services and the patient days are recorded as Medicare charges and Medicare patient days. The provider is entitled to collect from the beneficiary the amounts that would have represented the deductible and coinsurance amounts. If these amounts are not collected, they can be reimbursed under the Medicare bad debt provision (see 304) since the effect of the waiver of liability provision is to reimburse the provider as it would have been reimbursed had the services been covered.

C.  Provider Accountable.--Where the provider is found accountable, any bad debts the provider experiences from such a program decision (i.e., those charges the provider cannot collect from the beneficiary) cannot be reimbursed under the Medicare bad debt provision as defined in §302. Provider costs attributable to these noncovered services furnished a beneficiary where the beneficiary's liability to the provider has been waived must be included in a provider's total costs for cost report purposes. The provider's charges for the services and the patient days must be shown as non-Medicare charges and non-Medicare patient days. The provider is nevertheless entitled to collect from the beneficiary the amounts that would have represented the deductible and coinsurance amounts had the services been covered. If these

01-83          BAD DEBTS, CHARITY, AND COURTESY ALLOWANCES          310

amounts are not collected, however, they cannot be reimbursed under the Medicare bad debt provision since they apply to services held to be not covered. (See §306 below.)

306.    BAD DEBTS RELATING TO NONCOVERED SERVICES OR TO NONBENEFICIARIES

If a beneficiary does not pay for services which are not covered by Medicare, the bad debts attributable to these services are not reimbursable under the Medicare program. Likewise, bad debts arising from services to non-Medicare patients are not reimbursable under the program.

Services which are not covered are defined generally in the following Health Insurance Manuals:

        HCFA-Pub. 10     Hospital Manual - §260
        HCFA-Pub. 11     Home Health Agency Manual - §§230 and 232
        HCFA-Pub. 12     Skilled Nursing Facility Manual - §240

308.    CRITERIA FOR ALLOWABLE BAD DEBT

A debt must meet these criteria to be an allowable bad debt:

        1.    The debt must be related to covered services and derived from deductible and coinsurance amounts.  (See §305 for exception.)

        2.    The provider must be able to establish that reasonable collection efforts were made.

        3.    The debt was actually uncollectible when claimed as worthless.

        4.    Sound business judgment established that there was no likelihood of recovery at any time in the future.

310.    REASONABLE COLLECTION EFFORT

To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients.  It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations.  It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a genuine, rather than a token, collection effort. The provider's collection effort may include using or threatening to use court action to obtain payment. (See §312 for indigent or medically indigent patients.)

        A.    Collection Agencies.--A provider's collection effort may include the use of a collection agency in addition to or in lieu of subsequent billings, follow-up letters,

telephone and personal contacts. Where a collection agency is used, Medicare expects the provider to refer all uncollected patient charges of like amount to the agency without regard to class of patient. The "like amount" requirement may include uncollected charges above a specified minimum amount. Therefore, if a provider refers to a collection agency its uncollected non-Medicare patient charges which in amount are comparable to the individual Medicare deductible and coinsurance amounts due the provider from its Medicare patient, Medicare requires the provider to also refer its uncollected Medicare deductible and coinsurance amounts to the collection agency. Where a collection agency is used, the agency's practices may include using or threatening to use court action to obtain payment.

      B.   Documentation Required.--The provider's collection effort should be documented in the patient's file by copies of the bill(s), follow-up letters, reports of telephone and personal contact, etc.

310.1   Collection Fees.--Where a provider utilizes the services of a collection agency and the reasonable collection effort described in §310 is applied, the fees the collection agency charges the provider are recognized as an allowable administrative cost of the provider.

When a collection agency obtains payment of an account receivable, the full amount collected must be credited to the patient's account and the collection fee charged to administrative costs. For example, where an agency collects $40 from the beneficiary, and its fee is 50 percent, the agency keeps $20 as its fee for the collection services and remits $20 (the balance) to the provider. The provider records the full amount collected from the patient by the agency ($40) in the patient's account receivable and records the collection fee ($20) in administrative costs. The fee charged by the collection agency is merely a charge for providing the collection service, and, therefore, is not treated as a bad debt.

310.2 Presumption of Noncollectibility.--If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible.

## 312. INDIGENT OR MEDICALLY INDIGENT PATIENTS

In some cases, the provider may have established before discharge, or within a reasonable time before the current admission, that the beneficiary is either indigent or medically indigent. Providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively. Otherwise, the provider should apply its customary methods for determining the indigence of patients to the case of the Medicare beneficiary under the following guidelines:

A.  The patient's indigence must be determined by the provider, not by the patient; i.e., a patient's signed declaration of his inability to pay his medical bills cannot be considered proof of indigence;

B.  The provider should take into account a patient's total resources which would include, but are not limited to, an analysis of assets (only those convertible to cash, and unnecessary for the patient's daily living), liabilities, and income and expenses.  In making this analysis the provider should take into account any extenuating circumstances that would affect the determination of the patient's indigence;

C.  The provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., title XIX, local welfare agency and guardian; and

D.  The patient's file should contain documentation of the method by which indigence was determined in addition to all backup information to substantiate the determination.

Once indigence is determined and the provider concludes that there had been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the §310 procedures.  (See §322 for bad debts under State Welfare Programs.)

## 314. ACCOUNTING PERIOD FOR BAD DEBTS

Uncollectible deductibles and coinsurance amounts are recognized as allowable bad debts in the reporting period in which the debts are determined to be worthless.  Allowable bad debts must be related to specific amounts which have been determined to be uncollectible.  Since bad debts are uncollectible accounts receivable and notes receivable, the provider should have the usual accounts receivable records-ledger cards and source documents to support its claim for a bad debt for each account included.  Examples of the types of information to be retained may include, but are not limited to, the beneficiary's name and health insurance number; admission/discharge dates for Part A bills and dates of services for Part B bills; date of bills; date of write-off; and a breakdown of the uncollectible amount by deductible and coinsurance amounts.  This proposed list is illustrative and not obligatory.

## 316. RECOVERY OF BAD DEBTS

Amounts included in allowable bad debts in a prior period might be recovered in a later reporting period.  Treatment of such recoveries under the program is designed to achieve the same effect upon reimbursement as in the case where the amount was uncollectible.

Where the provider was reimbursed by the program for bad debts for the reporting period in which the amount recovered was included in allowable bad debts, reimbursable costs in the period of recovery are reduced by the amounts recovered.  However, such reductions in reimbursable costs should not exceed the bad debts reimbursed for the applicable prior period.

**EXHIBIT 2**

4499.                    HOSPITAL AUDIT PROGRAM                    12-85

4499.    EXHIBITS

EXHIBIT   1 -   GENERAL

EXHIBIT   2 -   REVENUE COMPARISONS AND TESTS

EXHIBIT   3 -   MISCELLANEOUS INCOME, EXPENSE AND ADJUSTMENTS TO COST

EXHIBIT   4 -   GRANTS, GIFTS AND INCOME FROM ENDOWMENTS

EXHIBIT   5 -   STATISTICS

EXHIBIT   6 -   PATIENT DAYS

EXHIBIT   7 -   EXPENSE COMPARISONS

EXHIBIT   8 -   SALARY REVIEW AND PAYROLL TESTS

EXHIBIT   9 -   HOSPITAL BASED AND EMERGENCY ROOM PHYSICIANS

EXHIBIT  10 -   LOWER OF COSTS OR CHARGES

EXHIBIT  11 -   INTEREST

EXHIBIT  12 -   DEPRECIATION

EXHIBIT  13 -   APPRAISALS

EXHIBIT  14 -   RETURN ON EQUITY CAPITAL

EXHIBIT  15 -   BAD DEBTS

EXHIBIT  16 -   COST TO RELATED ORGANIZATIONS

EXHIBIT  17 -   PHYSICAL THERAPY AND OTHER THERAPY SERVICES

EXHIBIT  18 -   LIMITATIONS ON COVERAGE OF COSTS

EXHIBIT  19 -   COST OF EDUCATIONAL ACTIVITIES

EXHIBIT  20 -   VALUE OF SERVICES OF NONPAID WORKERS

EXHIBIT  21 -   BALANCE SHEET

EXHIBIT  22 -   RESEARCH COSTS

EXHIBIT  23 -   CONCLUSION OF AUDIT

FIELD AUDIT PROGRAM
FOR HOSPITALS UNDER
THE MEDICARE PROGRAM

Provider Name:_____ Period Ended:
Provider Number:_____ Reviewed by:


                                                    Audit Hours

Sections                                       Field      Review

1.   General
2.   Revenue Comparison and Tests
3.   Miscellaneous Income, Expenses and Adjustments to Cost
4.   Grants, Gifts and Income from Endowments
5.   Statistics                                                      6.
     Patient Days
7.   Expense Comparisons
8.   Salary Review and Payroll Tests
9.   Hospital Based and Emergency Room Physicians
10.  Lower of Costs or Charges
11.  Interest
12.  Depreciation
13.  Appraisals
14.  Return on Equity Capital
15.  Bad Debts
16.  Cost to Related Organizations
17.  Physical Therapy and Other Therapy Services
18.  Limitations on Coverage of Costs
19.  Cost of Educational Activities
20.  Value of Services of Nonpaid Workers
21.  Balance Sheet
22.  Research Costs
23.  Conclusion of Audit

                          **TOTAL**


Rev. 16                                                   5-5

EXHIBIT 15

12-85       HOSPITAL AUDIT PROGRAM

## BAD DEBTS

### -15-

**PROVIDER NO:** _____    **REVIEWED BY:**

**PERIOD ENDED:** _____    **DATE REVIEWED:**

| AUDIT SECTION | AUDIT PROCEDURE REFERENCE |
|---|---|
| Methods of Determining Bad Debt Expense | 15.01 |
| Analysis of Deductible and Coinsurance Amounts Claimed | 15.02-15.03 |
| Utilization of Collection Agency | 15.04 |
| Review of Prior Year Bad Debts | 15.05 |
| Review of Indigent Patient Claims | 15.06 |
| Recovery of Prior Year Bad Debts | 15.07 |
| Title XIX State Plans | 15.08 |
| Conclusion | 15.09 |

Rev. 16

15-2

EXHIBIT 15 (Con't)
HOSPITAL AUDIT PROGRAM                                    12-85

**SECTION 15**    **BAD DEBTS**

Regulation Reference:  §405.420

**GENERAL:**    Bad debts are amounts considered to be uncollectible from accounts and notes receivable which were created or acquired in providing services.  The Medicare Program recognizes that there are instances where a provider should not be held accountable for bad debts attributable to beneficiaries who received services covered by the program.  Therefore, under the Medicare program, bad debts resulting from deductible and coinsurance amounts for provider services which are uncollectible from beneficiaries are considered in the program's calculation of reimbursement to the provider. However, the uncollectible amounts are not includable as such in the provider's allowable cost.

**OBJECTIVE:**    1.    To determine that allowable bad debts resulted from uncollectible deductibles and coinsurance amounts for provider services.

2.    To determine that unrecovered costs attributable to Medicare bad debts are properly computed in the program's calculation of reimbursement to the provider.

3.    To determine that a proper credit was made for the recovery of bad debts.

4.    To determine the allowability of Title XIX (Medicaid) bad debts if included in the calculation of allowable bad debts.

5.    To assure that bad debts for deductibles and coinsurance amounts applicable to the professional services of provider based physicians are not included in Medicare bad debts.

**OTHER REFERENCES:**

HCFA-Pub. 15-I, §300

Cost Report Forms:    HCFA 2552-83, Worksheet E

15-3

| STEP | PROCEDURE DESCRIPTION | AUDITOR'S INITIAL AND DATE | WP REF |
|---|---|---|---|

15.01    The auditor should review the provider's policies and procedures to obtain an understanding of the method used to determine bad debts, bad debt collection effort and the method used to record the recovery of bad debts previously written off. After reviewing bad debt policies and procedures, the auditor should determine that only uncollectible deductible and coinsurance amounts are included in the calculation of reimbursable bad debts.

15.02    Obtain documentation to support the amount claimed for bad debts applicable to Medicare beneficiaries. Verify the mathematical accuracy of the amount claimed for the year under review.

15.03    From the documentation obtained in step 15.02, select a sample of patient accounts receivable ledger cards. Prepare a worksheet listing the patient's name, health insurance number, date of billing, dates of services, date of write-off and amounts of deductible and coinsurance claimed for bad debts. Based upon this analysis, perform the following audit steps:

    A.  Determine that the bad debt relates only to deductibles and coinsurance for provider services and that bad debts related to deductibles and coinsurance for the professional patient care services of provider based physicians are not included.

    B.  Ascertain that the provider made reasonable collection efforts to collect the bad debt by reviewing documentation such as bills issued to the patient or, if deceased, to the person responsible for the patient's financial obligations, and records of telephone or personal contacts with the beneficiary.

    C.  Determine that the period of time from the first billing to the write-off date is at

15-4

EXHIBIT 15 (Cont.)
HOSPITAL AUDIT PLAN

12-85

| STEP | PROCEDURE DESCRIPTION | AUDITOR'S INITIAL AND DATE | WP REF |
|------|----------------------|----------------------------|--------|
| | least 120 days unless the patient is considered indigent or medically indigent. | | |
| | D. Determine if any title XIX (Medicaid) bad debts are included in the amount claimed for bad debts. If Medicaid bad debts are included, perform audit step 15.08. | | |
| | E. Determine if the bad debt was for services which are not covered by Medicare or for services to non-Medicare patients. If so, disallow the amount claimed and consider expanding the sample. | | |
| 15.04 | Where a provider utilizes the services of a collection agency, the provider need not refer all uncollected patient charges to the agency, but it may refer only uncollected charges above a specified minimum amount. If reasonable collection effort was applied, fees the collection agency charges the provider are recognized as an allowable administrative cost of the provider. To determine the acceptability of collection agency services, perform the following audit steps. | | |
| | A. Review provider contracts with the collection agency to determine that both Medicare and non-Medicare uncollectible amounts are handled in a similar manner. | | |
| | B. Determine that the patient's file is properly documented to substantiate the collection effort by reviewing the patient's file for copies of the agency's billing, follow-up letters and reports of telephone and personal contacts. | | |
| | C. Determine that bad debt amounts recovered by the collection agency are properly recorded by verifying that the full amount collected is credited to the patient's account and the collection fee is charged to administrative expense. | | |

15-5

EXHIBIT 15  (Cont.)
<u>12-85</u>                    HOSPITAL AUDIT PROGRAM

| STEP | PROCEDURE DESCRIPTION | AUDITOR'S INITIAL AND DATE | WP REF |
|------|----------------------|----------------------------|--------|

15.05    Obtain a list of prior year bad debts claimed and ascertain that the same bad debts have not been claimed in the current year.

15.06    There could be instances where the provider may have established that the beneficiary is either indigent or medically indigent.  Determine if the provider has a listing of patients determined to be indigent.  If so, select a sample of these patients' accounts receivable ledger cards and perform the following audit steps:

   A.  Ascertain that the patient's indigence was determined by the provider.

   B.  Determine if the provider took into account the patient's total resources which would include an analysis of assets (but only those which are convertible to cash and unnecessary for the patient's daily living), liabilities and income and expenses.

   C.  Ascertain that no other source such as title XIX, local welfare agency or guardian would be legally responsible for the patient's medical bill.

   D.  Ascertain that the patient's file contains documentation of the method by which indigence was determined in addition to all back-up information to substantiate the determination.

   E.  If there is not sufficient documentation to conclude that the patient is indigent, disallow the amount claimed for the bad debt.

15.07    Amounts included in allowable bad debts in a prior period could be recovered in a later reporting period.  The auditor should verify that recoveries of such bad debts are properly offset.  To determine if bad debt recoveries were properly handled, perform the following steps:

15-6

EXHIBIT 15 (Cont.)
HOSPITAL AUDIT PROGRAM                                          12-85

| STEP | PROCEDURE DESCRIPTION | AUDITOR'S INITIAL AND DATE | WP REF |
|------|----------------------|----------------------------|--------|

A.  Obtain a listing from the provider of bad debts recovered during the period under review.

B.  From the listing obtained, select a sample of patients' accounts receivable ledger cards.

C.  From the account receivable ledger card or other source documentation, determine the amount of bad debt that was originally reimbursed by the program. Ascertain if there was any recovery of the bad debt. Where a recovery was made, determine if reimbursable bad debts for the year of recovery were reduced by the amounts recovered. However, such reductions in reimbursable bad debts for the year of recovery should not exceed the bad debts reimbursed for the applicable prior period.

D.  Where the provider was not reimbursed by the program for bad debts for the reporting period in which the amount recovered was includable in allowable bad debts, ascertain that reimbursable bad debts in the period of recovery were not reduced.

E.  Determine if the provider records recoveries of previously written off accounts in a separate revenue account. Where this is done, analyze the revenue account to determine if any amounts relate to Medicare deductibles and coinsurance. If the provider cannot provide support for deposits made into the account, then make an adjustment based upon the following formula.

TOTAL MEDICARE BAD DEBTS FOR CURRENT AND PRIOR YEAR

Total Bad Debts for Current and Prior Year
x Total Recoveries = Adjustment

15-7

EXHIBIT 15 (Cont.)
HOSPITAL AUDIT PROGRAM

| STEP | PROCEDURE DESCRIPTION | AUDITOR'S INITIAL AND DATE | WP REF |
|---|---|---|---|

15.08  Prior to 1968, title XIX State plans under the Federal medical assistance programs were required to pay the Part A deductible and coinsurance amounts for inpatient hospital services. Effective January 1, 1968, State title XIX plans are no longer required to pay these amounts, but instead have the option to do so. Therefore, to the extent that State plans do not provide for payment of the Medicare deductible and coinsurance amounts for patients eligible for title XIX benefits, such unpaid amounts are allowable as bad debts provided that the requirements relative to indigent or medically indigent patients are met. To determine if title XIX deductible and coinsurance amounts for individuals entitled to benefits under title XIX are allowable bad debts, perform the following steps:

A. Where the Medicare deductible and coinsurance amounts for patients eligible for title XIX benefits were paid by the State or Welfare agency, insure that those amounts are not included in the claimed bad debts.

B. Review the provider's policies and procedures for billing the State for the deductible and coinsurance amounts. If the provider does not have an ongoing billing system or if there is a system but it has not operated properly, disallow related bad debts for deductible and coinsurance amounts claimed under Medicare.

C. If the State is being billed correctly and has accepted liability, ascertain that title XIX deductible and coinsurance amounts are not included in the claimed bad debts.

D. If the State has been billed, but did not pay the amount due, determine if there is a written notice of rejection in the patient's file. Review the rejection notice and if it is found to be acceptable allow the bad debt for Medicare purposes.

15.09  Write a conclusion on audit procedures performed.

**EXHIBIT 3**

. PB89–950402

# medicare
Intermediary Manual
Part 4—Audit Procedures

RECEIVED

APR 26 1990

WEISSBURG AND ARONSON, INC.
L.A. LIBRARY

Department of Health
and Human Services

Health Care Financing
Administration

---

Transmittal No.  28

Date  SEPTEMBER 1989

---

| REVISED MATERIAL | REVISED PAGES | REPLACED PAGES |
|---|---|---|
| Table of Contents | 4-1 4-3 (3 pp.) | |
| Chapter I | | |
| Table of Contents | 2-1 (1 p.) | 2-1 (1 p.) |
| Chapter II | 2-31 – 2-32 (2 pp.) | 2-31 – 2-50 (20 pp.) |
| Sec. 4118 | 2-41 – 2-63 (23 pp.) | |
| Sec. 4198 Exhibits | 2-75 – 2-76 (2 pp.) | 2-75 – 2-76 (2pp.) |
| Sec. 4199 Exhibits | 2-81 – 2-89 (11 pp.) | 2-81 – 2-90 (10 pp.) |
| | 2-93 – 2-94 (2 pp.) | 2-93 – 2-94 (2 pp.) |
| | 2-101 – 2-102 (2 pp.) | 2-101 – 2-102 (2 pp.) |
| | 2-109 – 2-112 (4 pp.) | |

NEW POLICY—EFFECTIVE DATE:   For Prospective Payment System (PPS) cost report audits performed after   10/12/89

Sections 4118 and 4198, Prospective Payment System (PPS) Hospital Audit Guidelines.—PPS Audit Guidelines are a compilation of cost reimbursement issues applicable to PPS audits. The Exhibits identify the most significant and/or recurring issues. They require audit priority because they have a significant impact on the accuracy and integrity of all PPS cost reporting periods. Included in these Guidelines are reimbursement issues directly affecting PPS payments. Review and document each area in your audit workpapers or provide an explanation as to why the item was not reviewed. Emphasize the issues which include major reimbursement, i.e., pass-throughs, during the audit. For example, if a PPS hospital's reimbursement area with the largest dollars is Direct Medical Education, this area must be the major focus of the audit. Other pass-throughs must also be given sufficient audit time to ensure their allowability. The last priority of the audit would be items involving the integrity of the cost report.

Section 4199, TEFRA Review Guidelines.—Various exhibits are updated or clarified in accordance with reimbursement principles. Audit in accordance with the quality standards in §4112.

HCFA-Pub. 13-4

REPRODUCED BY
U.S. DEPARTMENT OF COMMERCE
NATIONAL TECHNICAL INFORMATION SERVICE
SPRINGFIELD, VA. 22161

CHAPTER 1

MANAGEMENT AND ADMINISTRATIVE FUNCTION

Reporting of Provider Audit Activity

| | Section | Page |
|---|---|---|

Audit Priority Matrix

| | Section | Page |
|---|---|---|
| Audit Priority Matrix........................................ | 4013 | 4-51 |
| Introduction.............................................. | 4013.1 | 4-51 |
| General Instructions.................................. | 4013.2 | 4-52 |
| Completing the Audit Priority Matrix............... | 4013.3 | 4-52 |
| Audit Selection Priorities............................. | 4013.4 | 4-54 |
| Level of Audit Effort................................. | 4013.5 | 4-55 |
| Special Instructions.................................. | 4013.6 | 4-56 |
| Exhibit................................................. | 4013.7 | 4-57 |

Provider Reimbursement Profile

| | Section | Page |
|---|---|---|
| Provider Reimbursement Profile............................... | 4016 | 4-65 |
| Introduction.............................................. | 4016.1 | 4-65 |
| General Instructions.................................. | 4016.2 | 4-65 |
| Completing the Provider Reimbursement Profile........... | 4016.3 | 4-66 |
| Contractor Budget..................................... | 4016.4 | 4-70 |
| Exhibit I.................................................. | 4016.5 | 4-71 |

Audits

| | Section | Page |
|---|---|---|
| General Instructions for Submitting Cost Report Data to HCFA................................................. | 4020 | 4-103 |
| Submission of Automated Cost Reports...................... | 4021 | 4-104 |
| Cost Reports Submitted Via Timesharing Systems............................................. | 4021.1 | 4-104 |
| Cost Reports Submitted on Magnetic Tape............... | 4021.2 | 4-104 |
| Approval of FI Transmission Process.................. | 4021.3 | 4-107 |
| HCRIS Standard Input Format.......................... | 4021.4 | 4-108 |
| Identification Data and Data from Sources Other than the Cost Report...................... | 4021.4.1 | 4-108 |
| Standard Format for Data From Worksheets............. | 4021.4.2 | 4-111 |
| Labeling Format....................................... | 4021.4.3 | 4-113 |
| Table 1: Worksheet Indicators......................... | 4021.4.4 | 4-115 |
| Submission of Manual Cost Reports........................ | 4022 | 4-120 |
| HCRIS Detailed Cost Report Requirements and Edits........... | 4023 | 4-122 |
| HCRIS Detailed Data Requirements...................... | 4023.1 | 4-122 |
| Financial Data Requirements.......................... | 4023.2 | 4-123 |
| Labeling of Cost Centers............................... | 4023.3 | 4-123 |
| Edits to be Applied................................... | 4023.4 | 4-123 |
| Table 2: Medicare Cost Report Data Specifications........................................ | 4023.5 | 4-124 |
| Table 3: Values for Special Codes..................... | 4023.6 | 4-179 |

CHAPTER I

AUDITS

| | Section | Page |
|---|---|---|
| Worksheet G | 4024.31 | 4-187 |
| Worksheet G-1 | 4024.32 | 4-187 |
| Worksheet G-2 | 4024.33 | 4-187 |
| Worksheet G-3 | 4024.34 | 4-187 |
| Supplemental Worksheet D-4 | 4024.35 | 4-187 |
| Supplemental Worksheet D-5 | 4024.36 | 4-187 |
| Supplemental Worksheet D-6 | 4024.37 | 4-187 |
| Supplemental Worksheet D-7 | 4024.38 | 4-187 |
| Supplemental Worksheet E-3 | 4024.39 | 4-187 |
| Supplemental Worksheet E-4 | 4024.40 | 4-187 |
| Supplemental Worksheet F | 4024.41 | 4-187 |
| Supplemental Worksheet A-8-3 | 4024.42 | 4-188 |
| Supplemental Worksheet D-9 | 4024.43 | 4-188 |
| Supplemental Worksheet H Series | 4024.44 | 4-188 |
| Supplemental Worksheet I Series | 4024.45 | 4-188 |
| Audit Subcontract | 4025 | 4-189 |
| Approval | 4025.1 | 4-189 |
| Routing of Audit Subcontracts | 4025.2 | 4-189 |
| Required Documentation | 4025.3 | 4-189 |
| Competition | 4025.4 | 4-189 |
| Model Audit Subcontract Firm | 4026 | 4-191 |
| Appendix A - Hourly Rate of Audit Form Personnel | 4027 | 4-199 |
| Appendix B - List of Providers of Services to be Audited | 4028 | 4-200 |
| Addendum | 4029 | 4-201 |

Rev. 28

4-3

CHAPTER 2

GUIDELINES FOR PERFORMING PROVIDER AUDITS

|  | SECTION | PAGE |
|---|---|---|
| Audit – General................................................ | 4100 | 2-3 |
| Your Responsibilities................................ | 4100.1 | 2-3 |
| Definitions.......................................... | 4100.2 | 2-3 |
| Your Responsibility in Suspected Fraud or Abuse Cases........................................ | 4101 | 2-5 |
| Audit Work Plan and Selection Process.................... | 4104 | 2-8 |
| Audit Priority Considerations....................... | 4104.1 | 2-8 |
| Audit Selection..................................... | 4104.2 | 2-9 |
| Documentation of Selection Process.................. | 4104.3 | 2-10 |
| Audit Responsibility When Provider Changes Intermediaries.. | 4105 | 2-10 |
| Provider Statistical and Reimbursement Report........ | 4105.1 | 2-10 |
| Audit Reports....................................... | 4105.2 | 2-11 |
| Desk Review.................................................. | 4108 | 2-11 |
| Functions of the Desk Review....................... | 4108.1 | 2-11 |
| Determining the Depth of the Desk Review........... | 4108.2 | 2-11 |
| Standards for Audits Under Medicare...................... | 4112 | 2-12 |
| Scope of Audit...................................... | 4112.1 | 2-12 |
| Determining Depth of Audit.......................... | 4112.2 | 2-13 |
| General Standards................................... | 4112.3 | 2-13 |
| Standards for Examination........................... | 4112.4 | 2-16 |
| Reporting Standards................................. | 4112.5 | 2-22 |
| Audit Responsibility for Home Office Costs of Chain Organizations...................................... | 4113 | 2-23 |
| Single Intermediary Servicing All Providers in Chain............................................ | 4113.1 | 2-23 |
| More Than One Intermediary Servicing Providers in Chain......................................... | 4113.2 | 2-24 |
| Designation of Home Office Audit Responsibility Where Two or More Intermediaries Service the Chain............................................ | 4113.3 | 2-25 |
| Scope of Home Office Audit.......................... | 4113.4 | 2-25 |
| Provider Records Maintained in Home Office.............. | 4114 | 2-25 |
| Provider Permanent Reference File....................... | 4115 | 2-27 |
| General Information................................. | 4115.1 | 2-27 |
| Contracts for Services.............................. | 4115.2 | 2-28.1 |
| Accounting Policies................................. | 4115.3 | 2-28.2 |

|  | Section | Page |
|---|---|---|
| TEFRA Review Guidelines.................................. | 4117 | 2-29 |
| Prospective Payment System (PPS) Hospital Audit Guidelines................................. | 4118 | 2-31 |
| Emphasized Audit Priorities............................. | 4118.1 | 2-31 |
| Exhibits for PPS Audits--Guidelines........................ | 4198 | 2-41 |
| Exhibits for TEFRA Guidelines............................. | 4199 | 2-75 |

4118.    PROSPECTIVE PAYMENT SYSTEM (PPS) HOSPITAL AUDIT GUIDELINES

The Social Security Amendments of 1983 (P.L. 98-21) provide that effective with cost reporting periods beginning on or after October 1, 1983, Medicare's payment for Part A hospital inpatient operating costs will be paid under the prospective payment system (PPS) on a per discharge basis.  Part A inpatient hospital operating costs include costs (including malpractice insurance costs) for general routine, ancillary, and intensive care-unit type services with respect to inpatient services.    They exclude as pass-through items, capital-related costs, direct medical education costs, non-physician anesthetist costs, bad debts, and kidney acquisition costs.  Payments for pass through costs and Part B inpatient ancillary and outpatient services are paid retrospectively on a reasonable cost basis.

Included in the PPS Audit Guidelines are reimbursement issues directly affecting PPS payments.   Review and document each area in your audit workpapers or provide an explanation as to why the item was not reviewed.  These review areas cannot be deferred for future audits.  Give items selected for audit, e.g., pass-throughs, sufficient review time and attention to ensure their allowability in accordance with Medicare reimbursement policy.

Some reimbursement issues which are significant under cost based principles of reimbursement are not presented since they have a limited effect on PPS program payments.  However, since data from PPS cost reports are used to evaluate issues such as the PPS update factor, these issues may require audit priority.  Therefore, it may be necessary to audit other issues not addressed to ensure the general accuracy and integrity of the PPS cost report.  To minimize the audit effort expended on these issues, limit your investigation of Worksheets A-6 and A-8 variances to those which equal or exceed 25 percent or $20,000 (whichever is greater).  Furthermore, do not pursue a variance that is less than 1 percent of total operating costs.  If you elect to perform a variance analysis of Worksheet A, use this same criteria (25 percent or $20,000, whichever is greater but not less then 1 percent of total operating costs) to identify the cost centers to review.

The PPS Audit Guidelines (See Exhibit A §4198) are not all inclusive and are used in conjunction with the current Uniform Desk Review Program, Hospital Audit Program and the Medicare Provider Statistical and Reimbursement System (PSRR).  (See §§4100ff., 4300ff. and 4400ff. as well as Form HCFA-339, Provider Cost Report Reimbursement Questionnaire (PRM 15-II, §1100).)

4118.1  Uniform Provider Statistical and Reimbursement System (PSRR).—The Medicare PSRR provides statistical data about Medicare dollars remitted by an intermediary to hospitals and other providers.  This information is displayed on detail and summary reports, and produced upon request from your systems department.  You must have the PSRR system implemented for utilization of data for purpose of final settlement of cost reports effective for cost reporting periods beginning on or after January 1, 1989.

Detail and statistical summary reports year-to-date (YTD) on claim (HCFA-1450) activity are used by you and providers for accounting and auditing purposes. Fill out a written request form directed to your systems department for the provider's report information you desire from the YTD Provider Summary File for cost report settlement.

Provider Summary Reports are the main output of the PSRR System. (See Part 2, §§2241-2245.) They are produced from the YTD Provider Summary File and contain information required for each provider for cost report settlement and HCFA reporting purposes. All data captured by the PSRR system through the last monthly update is included.

Once the appropriate job has been run (either MD4110AR or MD4305AR depending upon reports requested), up to four reports may be produced. The Provider Summary, and DRG Summary (for PPS hospitals) and Outpatient Clinical Lab Reports, (if applicable) will always be produced plus one of the last two listed:

   o   Provider Summary Report:  Summarizes claims data and other information required for the Medicare Cost Report and HCFA reporting purposes.

   o   DRG Summary Report:  Summarizes PPS data by DRG—Federal Portion, Hospital Specific Portion and Outliers

   o   Clinical Lab Report:  Summarizes, by HCPCS with Revenue Code, information on total charges billed and total reimbursement

   o   Payment Reconciliation Report:  Shows the detail for each claim (HCFA-1450) accepted by the PSRR system.

   o   Control Reports:  Shows the results of the user's corrections to the Provider Summary File, Revenue Code Summarization Table, and Provider Table.

If there were errors on the Parameter Selection Card, the Parameter Error Report will be produced. If there are no data for the requested provider, a No Reports Listing will be produced.

**4198. EXHIBITS FOR PPS AUDITS**

<u>Page</u>

Exhibit A, Specific Audit Areas for PPS

| | | |
|---|---|---|
| A-1 | Payments By Primary Payers, Where Medicare Is Secondary (MSP)............................................... | 2-42 |
| A-2 | Excluded Units.......................................................... | 2-43 |
| A-3 | Medicare Settlement Data............................................ | 2-44 |
| A-4 | Kidney Acquisition Cost............................................. | 2-46 |
| A-5 | Nonphysician Anesthetists.......................................... | 2-47 |
| A-6 | Provider Based Physician Compensation...................... | 2-48 |
| A-7 | Capital-Related Costs................................................ | 2-49 |
| A-8 | Lease Arrangements.................................................. | 2-52 |
| A-9 | Direct Medical Education Costs................................... | 2-53 |
| A-10 | Indirect Medical Education Adjustment......................... | 2-56 |
| A-11 | Medicare Bad Debts.................................................. | 2-58 |
| A-12 | Cost Allocations...................................................... | 2-60 |
| A-13 | Disproportionate Share Hospitals.............................. | 2-61 |

EXHIBIT A-1
PAYMENTS BY PRIMARY PAYERS, WHERE MEDICARE IS SECONDARY (MSP)

Issue: Payments by primary payers, where Medicare is the Secondary Payer and has a residual liability, must be correctly shown on the hospital's cost report, Worksheet E. This applies to:

o    Automobile medical, no fault, or any liability insurance;

o    ESRD beneficiaries in the 12-month period with EGHP;

o    Workers' compensation including Black Lung;

o    Working aged with EGHP and their spouses age 70 or over;

o    VA, PHS or other Federal Agency plans; and

o    Disabled beneficiary large group health plan (LGHP) provisions.


General Information:

o    The amount reported on Worksheet E must include all payments by primary payers where Medicare has a residual claims liability. This amount must not contain any primary payer payments which satisfy the beneficiaries' Medicare deductibles or coinsurances. (See Part 3, §§3680 - 3685 and 3693ff.).

Audit Emphasis:

o    Review the provider's accounts receivable for Medicare patients (utilize the admission/discharge listing to identify Medicare patients) for MSP credit balances to determine if the amount on the hospital's cost report, Worksheet E, is properly reported. Credit balance MSP data may also be listed on the provider's late charge money only billing adjustment log.

o    Ensure that MSP amounts entered on Worksheet E do not include payments for deductible and coinsurance. (See Part 3, §3682.)

o    Determine whether the amount in the "Net Primary Payments Made Under MSP" column of the PSRR closely approximates the amount of partial MSP payments determined in your review of accounts receivable credit balances. If the amount is significantly lower, report to your MSP unit for further investigation of the method used to prepare Medicare bills where other payers are involved.


2-42                                                                        Rev.    28

EXHIBIT A-2
EXCLUDED UNITS

**Issue:** Under PPS, excluded units of a provider are reimbursed on the basis of cost. Excluded unit status is granted to certain units meeting the qualifications described in 42 CFR 412.25 through 412.32 and PRM Part I §§2803ff.

**Concern:** The providers may shift costs to these units through either inappropriate direct costing on their accounting records or through the use of inappropriate statistics for cost allocation.

**Audit Emphasis:**

o    Confirm that the unit meets the qualifications to continue as an excluded unit. (PRM Part I §2803.61.)

o    Ensure that excluded units are identified as separate cost centers  on the cost report.

o    Analyze the nature of the direct costs for the excluded unit to determine their allowability and proper classification.

o    Review the HCFA Form-1007 used to calculate the excluded unit target rate. Ensure that the target rate used in the cost report is correct and that any bonus/penalty is properly calculated and applied.

o    Ensure that beds assigned to the unit are physically separate from other beds.

o    See Exhibit A-12 for audit emphasis regarding overhead cost allocation.

o    See Exhibit A-3 for audit emphasis regarding Medicare settlement data.

o    Test that providers submit a cutoff bill for excluded units.

o    Ensure that cutoff or interim bills are not counted as discharges on the cost report.

EXHIBIT A-3
MEDICARE SETTLEMENT DATA

Issue: As a function of the PPS cost report settlement, ensure that proper statistical data is reported on the cost reports. The Medicare settlement data consists of charges, days, deductibles, coinsurances, interim payments, and details of the Federal and Hospital-Specific portions of the DRG payment and outlier payments.

Concern:

The use of accurate settlement data is important since:

     o   The inpatient days and charges are utilized in determining medical education and capital reimbursements.

     o   Outpatient apportionment data are used in determining outpatient reimbursement.

     o   Both inpatient and outpatient deductibles, coinsurances, and MSP primary payment amounts affect total program reimbursement; and

     o   The Federal portion of DRG payments and outlier payments are used to compute the indirect medical education adjustment and disproportionate share payments.

General Instructions:

The Medicare apportionment data (e.g., days, charges) must be related to the actual volume of services rendered during the cost reporting period. In hospitals subject to PPS, payment for inpatient services is based on discharges. Therefore, cut-off bills are not required for the second year under PPS and thereafter. (See PRM Part I §2805.)

Use the PSRR data to make the settlement unless the provider furnishes proof that this data is inaccurate. To ensure that the settlement data is based on the actual volume of services for the reporting period, obtain the PSRR listings no earlier than 12 months after the end of the provider's fiscal year or no earlier than 90 days prior to the NPR date if the settlement occurs sooner than 15 months after the end of the fiscal year. For example for a cost reporting period ending on December 31, 1989, the PSRR listing will be dated December 31, 1990 or 90 days prior to the settlement NPR date. If the settlement NPR date is February 1, 1991, the PSRR must be dated no earlier than November 3, 1990.

EFFECTIVE FOR COST REPORTING PERIODS BEGINNING ON OR AFTER JANUARY 1, 1989, YOU MUST USE THE NATIONAL UNIFORM PROVIDER STATISTICAL AND REIMBURSEMENT REPORT (see Part 2, §§2241-2245) TO OBTAIN THE MEDICARE SETTLEMENT DATA. (See §4118.1)

Audit Emphasis:

      o    Before entering the PSRR data into the cost report, modify it to reflect the various adjustments such as credits/debits (two-part adjustment bill deleting information on the original bill by a credit and adding correct data by a debit), PRO adjustments, money only adjustments, etc.

      o    If the PSRR listing used in the prior year's settlement did not capture a significant number of claims for that year, do not include the settlement data for those claims in the current year. Instead, revise the prior year cost report to include this data.

Rev. 28

2-45

EXHIBIT A-4
KIDNEY ACQUISITION COSTS

**Issue:** The cost incurred for kidney acquisition for certified renal transplant hospitals is a pass-through cost for providers reimbursed under PPS. For other providers, reimbursement for the cost incurred for kidney acquisition is through the sale of excised kidneys to other hospitals or organ procurement agencies (OPA). Medicare does not directly reimburse these providers for the cost of kidney acquisition.

**Audit Emphasis:**

1.   For Certified Renal Transplant Providers.—

o   Test the costs included in the kidney acquisition cost center on the hospital cost report and Supplemental Worksheet D-6, to determine if only the direct costs and allocated overhead associated with the kidney acquisition are included.

o   Verify the kidney acquisition days and charges reported on Supplemental Worksheet D-6.

o   Ensure that non-Medicare kidney acquisition costs are excluded from Medicare reimbursement through Supplemental Worksheet D-6.

2.   For all other Providers Performing Kidney Excisions.—

o   If there is an entry on Worksheet A, line 83, test that the direct cost of kidney acquisition has been correctly included in the kidney acquisition cost center, so that overhead expenses (Worksheet B, line 83) are properly allocated to the cost center. The cost center does not flow to settlement since these costs are not reimbursable.

o   Ensure that the charges and days for excising of kidneys are excluded from Medicare charges and days but are included in total charges and days.

09-89    GUIDELINES FOR PERFORMING PROVIDER AUDITS·  4198 (Cont.)·

## EXHIBIT A-5
## NONPHYSICIAN ANESTHETISTS

**Issue:** For cost reporting periods beginning on or after October 1, 1984, costs incurred by the provider for hospital employed nonphysician anesthetists is reimbursed as a pass-through as are nonphysician anesthetists who provide services at the hospital under arrangement (contract).

For cost reporting periods beginning on or after January 1, 1989, anesthesia services furnished by CRNAs are reimbursed by the carrier under the CRNA fee schedule. Payments under the fee schedule are made directly to the CRNA or to a hospital, physician, or ASC which employs, or contracts with, the CRNA. The CRNA also applies to anesthesiology assistants (AAs). However, CRNA pass-through payments continue for hospitals located in rural areas through the end of calendar year 1991. (See HCFA Pub. 60A—PM A-88-32.)

**Concern:** During the period of your evaluation for the rural hospital's exemption request, you continue to pay the nonphysician anesthetist pass-through (PM A-88-32). If you deny the request, the affected CRNAs, AAs or qualified biller may bill the carrier for covered services retroactive to January 1, 1989. There is the possibility that nonphysician anesthetists could be paid twice.

**Audit Emphasis:**

o    Analyze the nature of the direct cost claimed as a pass-through to ensure that it is correct and applicable only to hospital employed nonphysician anesthetists.

o    For cost reporting periods beginning on or after January 1, 1989, if the rural hospitals exemption request is denied, ensure that there are no nonphysician anesthetists pass-throughs on the cost report. Direct billing must be through the carrier.

o    See Exhibit A-12 for audit emphasis regarding cost allocations.

EXHIBIT A-6
PROVIDER BASED PHYSICIAN COMPENSATION

Issue: The physician regulations, 42 CFR 405.480 and 42 CFR 405.482, require the application of RCEs to physician compensation paid by the provider for provider services rendered by the physician.  The hospital cost report applies the RCEs to the hospital complex and, after cost allocation, brings a proportionate share of the disallowance back into Part A inpatient cost for inpatient services subject to PPS.

Audit Emphasis:

    o    Ensure that the provider submitted the required "time allocation agreements" with the cost report (See 42 CFR 405.481, PRM Part I §2182.3.D, and Form HCFA-339, Exhibit 2).  Review the supporting documentation used as a basis for these agreements (See the PRM Part 1 §2182.3.E.) If the provider does not have the required "time allocation agreements", treat the total compensation as being applicable to the "professional component".

    o    Ensure that the professional component and provider component amounts shown on Supplemental Worksheet A-8-2 are based on the verified "time allocation agreements."

    o    Review the provider's documentation supporting the "hours" used on Supplemental Worksheet A-8-2.

    o    Where the provider has increased the published RCEs for physician malpractice, membership in professional societies, and physician continuing education cost, review the propriety of the adjustment.

    o    Ensure that the RCE disallowance is reflected in the appropriate cost center on Worksheet A.  (For example, if a part of a pathologist's compensation was included in the Laboratory cost center and a part in the Interns/Residents in Approved Programs cost center, offset any RCE disallowance proportionately against both cost centers.)

EXHIBIT A-7
CAPITAL-RELATED COSTS

**Issue:** To ensure consistency in the application of the capitalization policy between the base year and the PPS year. Capital-related costs include the areas of capitalization, relifing of depreciable assets, estimated useful lives of depreciable assets and componentized depreciation.

**Concern:** Capital-related costs are treated as a pass-through under PPS; i.e., they are reimbursed on the basis of cost. Review capital-related costs to ensure that the provider has not attempted to increase the amount of pass-through cost by either changing the estimated useful lives of capital assets, changing capitalization parameters, classifying operating expenses as capital related cost, or capitalizing operating costs.

Capital-related costs allocated to the provider from a home office as well as capital-related costs furnished the provider by other related organizations should be stated as a pass-through on the provider's cost report. The amounts allocated from the home office should be reviewed by the designated intermediary. (See §8500 – Home Office Field Audit Program.) However, utilize the appropriate audit steps listed below to review capital-related costs from a related organization other than a home office.

**Audit Emphasis:**

CURRENT YEAR ASSET ACQUISITIONS:

     o · On a test basis (see §4112.3.E.3) verify the cost or appraised value of the new assets and trace the lives to the appropriate list of AHA useful life guidelines.

     o Ensure that depreciation for newly acquired buildings and additions is not claimed prior to the date these assets were placed in service. Determine when new buildings and additions were placed into service. Ensure that the depreciation reported in the year of acquisition is in accordance with PRM Part I §118 .

     o Review the provider's capitalization policy and ensure that it is properly applied to the minor equipment acquisitions. (See PRM Part I §§106 and 108.) Note that the established capitalization policy applies to each asset rather than a group of similar assets.

CONSISTENCY OF CAPITALIZATION:

     o Determine whether there were any changes in the provider's capitalization policy between the PPS base period and the current year. Per 42 CFR 412.113, capital-related cost in cost reporting periods beginning before October 1, 1986 must be treated consistently with the base period.

     o · Review the propriety of direct costing of capital-related cost and compare with the PPS base period for consistency of classification as capital-related or operating cost (See 42 CFR 412.113.)

GAINS/LOSSES ON DISPOSAL OF ASSETS:

o    Review the provider's computation of the gain/loss and ensure that individual gain or loss was allocated in accordance with PRM Part I §132.

o    Ensure that trade-ins were treated in accordance with PRM Part I §104.11.

o    Where accelerated depreciation has been claimed, ensure that the computations are in compliance with the recapture provisions of PRM Part I §132.

RELIFING OF ASSETS:

o    Where an asset has been relifed, ensure that the provider has your written approval prior to the beginning of the cost reporting period.

o    Review the relifing of assets acquired prior to the entrance into the Medicare program.

NOTE:   Appraisal firms have developed an asset relifing program which shifts a disproportionate share of depreciation applicable to fully depreciated pre-Medicare assets to the years under Medicare. This is accomplished by extending the lives of pre-Medicare assets which are fully depreciated under the program, on a year-to-year basis, until the assets are actually retired. Since many of these assets were already relifed once after the provider's entrance into the program, ensure that further depreciation is not allowed, even though the asset may continue in use (42 CFR 413.144(b) and PRM Part I §122).

INTEREST EXPENSE AND INCOME OFFSETS:

o    Determine if the interest incurred on each loan is reasonable as stated, is reported on an accrual basis and that the tests for being necessary and proper as outlined in the PRM have been met. Reference: PRM Part I §§202.1, 202.2, and 202.3.

o    Test to ensure that only interest related to capital assets is included as a pass-through cost.

o    Review the cost for refinancing of long term debt and borrowing determinations. Ensure that refinancing is in accordance with Medicare policy. (PRM Part I §233)

o    Test to ensure that investment income is correctly offset against appropriate capital-related or working capital interest expense. If investment income offset is required under PRM Part I §§ 202.2 and/or 226.4B, only that portion of investment income that bears the same relationship to total investment income as the portion of capital-related interest expense bears to the total interest expense is offset against capital-related interest expense.

PROPERTY TAXES AND INSURANCE:

   o   Ensure that property taxes and insurance pertaining to nonreimbursable assets are not included in provider pass-through costs. An inventory of physical property descriptions is useful in identifying non-reimbursable activities.

   o   Ensure that the liability portion of auto insurance is not included as a capital-related cost.

## EXHIBIT A-8
## LEASE ARRANGEMENTS

Issue: To ensure that the rental charges are properly recorded or that the reimbursement treatment of the transaction is in accordance with the PRM Part I Chapter 1.

Concern: Providers may attempt to identify and classify as pass-through cost the estimated capital-related portion of service contracts which were previously included as part of the base period operating cost in calculating the PPS hospital specific rates. Such treatment is contrary to the requirements of 42 CFR 412.113.

Where a provider enters into a sale and leaseback arrangement or a lease purchase agreement, the rental charges must be properly recorded. Some lease agreements are the same as installment purchases of facilities or equipment. Review the agreement for the rental charge that is includable in allowable costs in accordance with the criteria in PRM Part I Chapter 1. If a determination is made that a sale or leaseback agreement for plant facilities or equipment is entered into with a related party, the reimbursement treatment of the transaction must be in accordance with PRM Part I §§1011.5 and 110A.

Audit Emphasis:

    1.   Sale and Leaseback Arrangements.—(See PRM Part I §110A.)

       o   Determine if adequate alternative facilities or equipment were available at lower cost by contacting area real estate leasing companies.

       o   Determine if rental charges do not exceed the amount which the provider would have included in reimbursable costs had it retained legal title to the facilities or equipment.

    2.   Virtual Purchase Leases.—

       o   Review leases (unless reviewed in prior years) to determine whether they qualify as virtual purchases. (See PRM Part I §110.B.)

       o   Ensure that the amount claimed for virtual purchase leases is limited to the amount which the provider would include in allowable cost if it had legal title to the assets (i.e., depreciation on straight line basis, insurance, and interest.)

    3.   Other.—

       o   Ensure that any rental amount pertaining to maintenance and repairs is not treated as a capital related cost.

       o   Ensure that capital-related cost excludes amounts applicable to service contracts unless a portion of the contract amount meets the criteria of 42 CFR 413.130(c) and PRM Part I §108.2. However, even if a portion of the contract amount meets this criteria, determine whether its current year treatment is consistent with the PPS base year. (See 42 CFR 412.113.)

                                                   

EXHIBIT A-9
## DIRECT MEDICAL EDUCATION COSTS

**Issue:** To ensure direct medical education costs are properly reimbursed for PPS.

**Concern:** Direct medical education costs are pass-through costs under PPS and are reimbursed on the basis of reasonable cost. Therefore, Direct Medical Education costs may be subject to cost shifting or other practices which may inflate their costs. Direct Medical Education includes both approved nursing and paramedical education programs and approved intern and resident programs.

For cost reporting periods beginning on or after July 1, 1985, Direct Medical Education consists of two components:

    o   Nursing and Allied Health Programs operated by hospitals are reimbursed on a reasonable cost basis, as they were prior to July 1, 1985.

    o   Graduate Medical Education (GME) Costs including approved programs in osteopathy, dentistry, and podiatry as well as medicine are limited to a per resident amount calculated in the base period, multiplied by the number of FTE residents reported in the current cost reporting period.

In establishing the per resident amount for a specific hospital based on Federal FY 1984 GME costs, it is important that the amount determined be an accurate reflection of legitimate GME costs incurred during the base period. The nature of the new payment approach for GME costs, in that payment amounts are "locked-in" for the foreseeable future, requires that inappropriate costs not be included in these amounts. There is concern that some questionable costs have been included in the Direct Medical Education pass-through.

For example, physicians' compensation costs for services to the hospital that are unrelated to approved educational activities were, in some cases, misclassified at the beginning of PPS. Such misclassified costs should not be perpetuated as you establish the per resident amounts.

**Audit Emphasis:**

As part of the cost report audit and settlement, review the following items for Direct Medical Education:

    o   Program must be approved by appropriate authority. (PRM Part I §§402.1c and 402.4.)

    o   Review the nature of direct cost (Worksheet A, columns 1 and 2) for the Interns and Residents - in approved program", "Nursing School" and "Paramedical Program" cost centers to ensure that the amounts are related to the net cost of those programs. (See 42 CFR 412.85.)

Rev. 28

2-53

NOTE:   The costs associated with the following activities do not qualify as Direct Medical Education cost:

    -   Orientation and on the job training.

    -   Part-time education for bona-fide employees at properly accredited academic or technical institutions devoted to undergraduate or graduate work.

    -   Costs and travel expense of educational seminars and workshops.

    -   Maintenance of a medical library.

    -   Training of a patient or patient's family in the use of medical appliances.

    -   Clinical training of nursing, paramedical and other students not enrolled in an approved education program operated by the provider.

    -   Other activities that do not involve the actual operation of an approved educational program including the costs of interns and residents in anesthesiology who are employed to replace anesthetists.

    o   If medical education costs were directly assigned to other cost centers in the PPS base period, and they were not identified and removed from the inpatient operating costs used to set the PPS Hospital Specific Rate (HSR), ensure that these costs are not claimed as direct medical education pass-through during the PPS transition period.

    o   Review reclassifications of costs to medical education cost centers on the hospital cost report, Worksheet A-6, to see if they are proper.   For example, the provider's malpractice costs relating to I&Rs are reimbursed through the malpractice cost center on Worksheet D-8/Supplemental Worksheet D-8 and not through a reclassification to the I&R cost center.   However, if the provider purchases a policy for personal/professional malpractice coverage of the I&Rs in addition to the blanket malpractice policy which covers all employees (including I&Rs), the cost of this additional personal malpractice may be treated as a fringe benefit.   As such, it would not be subject to the Worksheet D-8 apportionment.   HCFA's policy regarding direct assignment of cost would, however, preclude a reclassification of this fringe benefit cost from A&G to the I&R cost center.   (See PRM Part I §§2307 and 2144.)   Also, to be allowable, this fringe benefit must be reasonable, and, when applicable, be reported to IRS for tax purposes. (See PRM Part I §2144.)

    o   Review the Worksheet A-8 adjustments pertaining to I&Rs, nursing school, and paramedical programs.   (Ensure that tuition is correctly offset.)   Scrutinize any costs which are transferred from a medical school to determine whether they relate to the direct medical education programs.

GUIDELINES FOR PERFORMING PROVIDER AUDITS.   4198(Cont.)

o    Ensure that all costs associated with I&Rs working outside the hospital (e.g., other hospitals, freestanding ASCs, family practice centers) are set up in a nonreimbursable cost center.

o    Ensure that the graduate (I&R) medical education pass-through excludes teaching physicians' direct patient care and administrative costs (e.g., utilization review, autopsies, administration of a department, supervision of technicians).  In addition, salaries of teaching physicians are subject to RCEs.  (See Exhibit A-6.)

o    See Exhibit A-12 for audit emphasis regarding overhead cost allocation.

Additional Audit Emphasis Applicable Only to Graduate Medical Education for Cost Reporting Periods Beginning on or After July 1, 1985:

o    For cost reporting periods beginning on or after July 1, 1985, verify proper classification of Interns and Residents-(Approved) salaries and Salary Related Fringe Benefits and Interns and Residents-(Approved) - Other Costs on Worksheet A, lines 21A and 21B.  Ensure that only the salaries of I/R are included on Worksheet A, line 21A.  (See PRM - Part II §§1907 and 1910.

NOTE:  When the regulation implementiong §9202 of COBRA is published, these guidelines will be updated to include other appropriate review steps.

4198(Cont.)     GUIDELINES FOR PERFORMING PROVIDER AUDITS          09-89

EXHIBIT A-10
INDIRECT MEDICAL EDUCATION ADJUSTMENT

Issue: A PPS hospital with an approved graduate medical education program receives an additional payment representing the indirect cost of services rendered by interns and residents (I&Rs). This amount is based upon a ratio of the number of I&Rs to beds. The computation of the allowance for the indirect medical education adjustment is based upon the Federal Portion of the PPS and outlier payments. (See PRM Part I §2405.3.)

Audit Emphasis:

    o   Verify the number of FTE for I&Rs shown on Form HCFA-2552-85, Worksheet S-3, Column 9, line 8. This number is determined based upon a one-day count on September 1st of each year. However, for cost reporting periods beginning between October 1, 1984 and June 30, 1985 make a count on April 15, 1985.

    o   Obtain and test the provider's assignment records for I&Rs to verify time spent and location; ensure that you do not count any I&R as more than one full-time employee in any cost reporting period regardless of the number of hospitals in which the I&R is providing services. If the I&Rs work at more than one hospital and the assignment records indicate that the one day count is not representative of the provider's actual number of I&Rs during the cost reporting period, apportion each I&R's time proportionately to each facility.

    o   Test that the following I&Rs are not included in the indirect medical education count:

        –   in unapproved programs;
        –   working at another provider;
        –   assigned to excluded units;
        –   replacing non-physician anesthetists; or
        –   assigned to freestanding clinics such as family practice centers or nonprovider clinics.

    o   When a cost reporting period begins at a time different than the beginning of the academic year (July 1) there may be considerable fluctuation in the count of interns between two academic years within the cost reporting period. Prorate the I&R counts for the two academic years based upon the number of months of each academic year that comprise the cost reporting period. (See PRM Part I §2405.3.F.5.)

o    Ascertain the number of beds approved and available for patient care during the cost reporting period. Frequently, auditors find that the beds available are fewer than those approved. Determine the number of beds in a hospital by counting the number of available bed days during the cost reporting period. Exclude beds assigned to newborns, custodial care, and PPS excluded distinct part hospital units. Divide that number by the number of days in the cost reporting period. If you cannot be reasonably certain of the bed count or where changes have taken place:

–    Ensure that the bed count at the end of the period for each accommodation area is properly recorded on the cost report.

–    Compare the number of beds with the number in the prior year. Where there is a difference, obtain an explanation.

–    Check board minutes to see if areas of the hospital were closed or if the number of beds were reduced during the cost report period.

o    For discharges on or after May 1, 1986, but before October 1, 1988, use the following formula for calculating the indirect medical education adjustment:

("R" is the ratio of I&Rs to beds)

$$2 \times \left[(1 + R)^{.405} - 1\right] \text{ times the Federal DRG Revenue (Federal portion of the DRG payment plus outlier payments)}$$

o    For cost reporting periods which straddle May 1, 1986, apply the original indirect medical education adjustment formula (below) to the Federal DRG revenue for discharges occurring prior to May 1, 1986. Apply the new formula to the portion of the Federal DRG revenue applicable discharges on or after May 1, 1986.

$$.1159 \ (R/.1) \text{ times the Federal DRG Revenue}$$

o    For discharges on or after October 1, 1988 and before October 1, 1990, use this formula:

$$1.89 \times \left[(1 + R)^{.405} - 1\right] \text{ times the Federal DRG Revenue (Federal portion of the DRG payment plus outlier payments)}$$

EXHIBIT A-11
MEDICARE BAD DEBTS

**Issue:**  The objective is to obtain accurate data concerning the amount of Medicare bad debts for reimbursement purposes.

**Concern:**  Medicare bad debts for deductible and coinsurance are reimbursed as a pass-through cost.  Since they have a direct dollar for dollar effect upon the provider's reimbursement, there is an incentive to claim bad debts before they become worthless and to claim other than Medicare bad debts.

**References:**

PRM Chapter 3 §308 (criteria)

**Audit Emphasis:**

As part of the cost report audit and settlement:

   o   Obtain a bad debt listing that contains all the data necessary to perform an adequate review.  This includes:

| | |
|---|---|
| --Beneficiary's name | --Amount of Debt |
| --HICN | --Deductible and coinsurance amounts |
| --Date of first bill | --Amount paid by beneficiary |
| --Date of write-off | |

   o   Test the bad debts to ensure that the amounts claimed as Medicare bad debts are only for Medicare deductibles and coinsurance for provider services.

**NOTE:**  When the hospital fails to charge patients for deductibles or coinsurance, the amounts cannot be claimed as bad debts.

   o   Test that bad debts attributable to the portion of an ESRD patient's bill subject to the composite rate are separated from the other hospital bad debts, and

   o   A reasonable collection effort was made to collect the deductible and coinsurance amounts.

NOTE:   To be considered reasonable, a provider's effort to collect Medicare deductible
and coinsurance amounts must be similar to the effort put forth to collect
comparable amounts from non-Medicare patients. Reasonable collection efforts
involve the issuance of a bill, on or shortly after, discharge or death of the
beneficiary to the responsible party. This may include third party payers such as
the beneficiary's estate, Medicaid, or a private insurance company. It includes
actions such as subsequent billings, collection letters and telephone calls or
personal contacts with the party, which constitute a genuine, rather than a
token, collection effort. The provider's collection effort may include using or
threatening to use court action. A collection agency may be utilized.
Documentation of the provider's collection efforts must be placed in the
patient's file, i.e., the bill(s), follow-up letters, reports of telephone and personal
contact. Where the patient's records are stored electronically, the file must
indicate the charges, the billing date, to whom and the number and date of
follow-up billing and letters.

        -   After reasonable and customary attempts to collect the bill, the debt
remaining unpaid more than 120 days from the date the first bill was mailed (unless the
patient was deemed indigent). If the bad debt is written-off on the provider's books 121
days after the date of the bill and then turned over to a collection agency, the amount
cannot be claimed as a Medicare bad debt on the date of the write-off. It can be claimed
as a Medicare bad debt only after the collection agency completes its collection effort.

        -   The criteria in PRM Part I §312 was applied where indigency was used
as a basis for the write-off.

        o   Ensure that allowable bad debts do not include deductible and coinsurance
amounts required to be paid by Medicaid or other third parties.

        o   Review other income items on Worksheet G-3 of Form HCFA-2252-85 or the
provider's working trial balance to determine whether recoveries of prior year(s) bad
debts are shown. If shown, determine whether any amounts were applicable to Medicare
patients. If Worksheet G-3 and the provider's working trial balance do not show this
information, review the provider's system of recording bad debt recoveries. If this review
indicates that some prior year bad debts were recovered in the current year, determine
the Medicare portion.

NOTE:   The Medicare recoveries should be offset against the current year's reimbursable
cost (Form HCFA-2552-85, Worksheet E, Part A, line 13 or Worksheet E, Part B,
line 25B) to the extent that these bad debts were reimbursed in prior periods.
(See PRM Part I §316.)

Rev. 28                                                        2-59

EXHIBIT A-12
COST ALLOCATIONS

Issue: To ensure a proper allocation of general service costs on Worksheet B through the use of correct statistics on Worksheet B-1.

Concern: Shifting of cost can occur through cost allocations on the hospital cost report by manipulating the statistics on the report, Worksheet B-1, to inappropriately allocate cost to either pass-throughs or cost reimbursed areas of the provider.

Through discrete costing on the provider's accounting records, costs can be shifted to areas which can increase its cost reimbursement.

Audit Emphasis:

    o    Review the current year Worksheet B-1 statistics, especially in the following areas:

            –    Excluded units;
            –    Medical education cost centers;
            –    Outpatient areas;
            –    Other cost reimbursed components of the complex such as hospital-based HHAs and SNFs;
            –    Nonphysician anesthetists cost center; and
            –    Capital-related cost allocation to departments with high Medicare utilization versus nonreimbursable areas or departments with low Medicare utilization.

    o    Test the accumulation of statistics from the source data.

    o    Discuss methods used to gather statistical data with departmental personnel. Determine through inquiry if the statistical basis used reflects actual operations of the cost center and properly allocates costs.

    o    Determine if changes have been made in the provider's operation and/or plant layout which require recognition in the cost allocation statistics.

Rev.    28

GUIDELINES FOR PERFORMING PROVIDER AUDITS   4198(Cont.)

### EXHIBIT A-13
### DISPROPORTIONATE SHARE HOSPITALS (DSH)

**Issue:** This provision requires that adjustments be made in the Federal portion of the DRG payment to achieve increased payments to hospitals serving a disproportionate share of low income patients.  The additional payment equals the Federal portion of the DRG payment and outlier payments (but excludes any additional payments for the costs of the indirect medical education) multiplied by an adjustment percentage (42 CFR 412.106(b). If a hospital meets the definition, an additional payment is made for discharges occurring on or after May 1, 1986.  The DSH adjustment is applied only to the Federal portion of the DRG payment (including the outlier payments) and is basically a year-end lump sum adjustment. However, identify hospitals that are eligible to receive the DSH adjustment and make interim payments (bill basis) subject to a year-end settlement based upon the hospital's actual DSH percentage for the cost reporting period.

Audit Emphasis:

Review the following:

   o   Total patient days;
   o   Medicare patient days;
   o   Medicaid patient days;
   o   Number of beds; and
   o   Percentage of the hospital's total Part A patient days attributable to patients who are also SSI recipients (supplied by HCFA).

   1.   Total Patient Days.—Perform the following revenue test prior to auditing total patient days:

| (1) Type of Accommodation | (2) No. of Beds | (3) Room Rate | (4) Days Room Rate in Effect | (5) Total | (6) % Utilization | (7) Total Estimated Routine Revenue | (8) Revenue Per Financial Statement Working Trial Balance |
|---|---|---|---|---|---|---|---|
| Semi-Private | | | | | | | |
| Private | | | | | | | |
| ICU | | | | | | | |
| CCU | | | | | | | |
| Other Intensive Care Units | | | | | | | |
| Nursery | | | | | | ———— | ———— |
| Total | | | | | | $ ———— | $ ———— |

Rev. 28

2-61

Multiply the number of beds, times each room rate, times the number of days the room rate was in effect, to arrive at total potential revenue. Determine the percentage of days utilized in each accommodation area; multiply utilization times the total potential revenue to arrive at total estimated routine revenue. Match the resultant amount with the routine revenue on the financial statements. If there is less than a 2 percent variance, accept the total patient days.

If the variance exceeds 2 percent, audit total days using the steps in Exhibit 6, Hospital Audit Program.

    2.   Medicare Patient Days.—See Exhibit A-3.

    3.   Medicaid Patient Days.—Obtain Medicaid patient days from the State Medicaid Agency. Compare them with the amount shown in the cost report. If the variance in Medicaid days based upon comparison of the days from the State agency with the days in the cost report exceeds 2 percent, or if no data is obtained from the State agency, perform the following:

    o   Obtain the provider's summary of the Medicaid days for the period. Test its clerical accuracy and trace the total to the cost reporting forms.

    o   For a test period, trace the days on the provider's accumulation of Medicaid days to the days on the remittance advices/billing or claim forms.

    4.   Number of Beds.—Bed count is part of the criteria for DSH. For the DSH determination, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period excluding beds assigned to newborns, custodial care, and PPS excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

    o   Ensure that the bed count at the end of the period for each accommodation area is properly recorded.

    o   Compare the number of beds with the number in the prior year. Where there is a difference, obtain an explanation.

    o   Check board minutes to see if areas of the hospital were closed or if the number of beds were reduced.

    5.   Computation of DSH Exception.—42 CFR 412.106(b)(1) contains a provision whereby a hospital can qualify for an adjustment if it is located in an urban area, has 100 or more beds, and can demonstrate that, during its cost reporting period, more than 30 percent of its total inpatient care revenues was derived from State and local government payments for indigent care furnished to patients not covered by Medicare or Medicaid.

If the hospital meets this criteria, the DSH payment adjustment factor is 15 percent. Beginning on or after October 1, 1988, the adjustment factor is 25 percent.

It is incumbent upon a hospital to demonstrate that more than 30 percent of its total inpatient care revenues were from State and local government payments for indigent care furnished to patients not covered by Medicare or Medicaid. Verify the submitted data.

NOTE:   Do not review this area unless data is presented as part of the request for payment.

4199.  EXHIBITS                                                          Page

Exhibit A, General Audit Areas for TEFRA................................  2-76
Exhibit B, Specific Audit Areas Appearing Frequently for TEFRA.......
  B-1   Cost Allocation..................................................  2-77
  B-2   Capital-Related Costs............................................  2-78
  B-3   Cost Offsets, Income Offsets and Nonreimbursable
       Cost Centers...................................................  2-80
  B-4   Direct Medical Education Costs...................................  2-81
  B-5   Sick Leave and Vacation Accrual..................................  2-84
  B-6   Pension Expense..................................................  2-85
  B-7   Interest Expense.................................................  2-86
  B-8   Service Contracts................................................  2-89
  B-9   Central Services and Supplies and Pharmacy.......................  2-91
  B-10  Physician Allocations............................................  2-92
  B-11  Administrative and General Expenses..............................  2-94
  B-12  Leased Facilities................................................  2-96
  B-13  Insurance Expense................................................  2-97
  B-14  Malpractice Insurance............................................  2-98
  B-15  Related Organization.............................................  2-100
  B-16  Planning and Start-Up Costs......................................  2-101
  B-17  Corporate Organization...........................................  2-102
  B-18  Return on Equity Capital.........................................  2-104
  B-19  Home Office Cost Allocations.....................................  2-105
  B-20  Home Office Cost and Equity......................................  2-106
  B-21  Payments by Primary Payers, Where Medicare is the
       Secondary Payer................................................  2-108
  B-22  Advertising......................................................  2-109
  B-23  Medicare Bad Debts...............................................  2-111

NOTE:  These Exhibits represent areas where significant and recurring adjustments often
exist.  Therefore, document in your Desk Review that these issues have been
considered, and when an audit is performed, document these issues in the audit
workpapers.  The audit areas are mandated for review, but the preaudit tests and
audit emphasis steps are optional.  The extent to which any area is audited is
commensurate with the dollar impact of the issue.  The review of these areas
does not relieve you of your responsibility for performing the desk review, or the
need to review other areas on the cost report.

Case 1:07-cv-00701-ESH    Document 8-4    Filed 11/02/2007    Page 35 of 55

EXHIBIT A

GENERAL AUDIT AREAS FOR TEFRA

A.    The following cost elements appear frequently as adjustments.  Review them in accordance with your audit programs:

1.    Patient Telephone and Television

Type of Adjustment:

a.    Fringe benefits of telephone operator, etc.
b.    Equipment and overhead  elimination
c.    Adjustment to proper amount

2.    Fund-Raising

Costs of fund-raising, including advertising, promotional, or publicity costs incurred for this purpose are  not allowable.

3.    Discharges

Are a key element in the cost report settlement.  Verify them during provider audits.

4.    Other Types of Adjustments for Review:

a.    Nursing salaries
b.    Collection and physician billing costs
c.    Insurance

o    Adjust to actual expense
o    Not funded
o    Self insurance requirements not met
o    Allocation to nonallowable cost center

d.    Ambulance costs
e.    Nonallowable educational costs
f.    Shell space and idle facilities

## EXHIBIT B-4

### DIRECT MEDICAL EDUCATION COSTS

**Issue:** To ensure direct medical education costs are properly reimbursed for TEFRA.

**Concern:** Direct medical education costs are a pass-through. They may be subject to cost shifting or other practices which may inflate their costs. Direct medical education includes both approved nursing and paramedical education programs and approved I&R programs.

For cost reporting periods beginning on or after July 1, 1985, Direct Medical Education consists of two components:

    1.   <u>Nursing and Allied Health Programs.</u>—Operated by hospitals are reimbursed on a reasonable cost basis, as they were prior to July 1, 1985.

    2.   <u>Graduate Medical Education Costs.</u>—Include approved programs in osteopathy, dentistry, and podiatry as well as medicine are limited to a per resident amount calculated in the base period, multiplied by the number of FTE residents reported in the current cost reporting period.

In establishing the per resident amount for a specific hospital based on Federal FY 1984 GME costs, it is important that the amount be an accurate reflection of legitimate GME costs incurred during the base period. The nature of the new payment approach for GME costs, in that payment amounts are "locked-in" for the foreseeable future, requires that inappropriate costs not be included. There is concern that some questionable costs have been included in the Direct Medical Education pass-through.

For example, physicians' compensation costs for services to the hospital that are unrelated to approved educational activities were, in some cases, misclassified at the beginning of PPS. Such misclassified costs should not be perpetuated.

<u>Preaudit Tests:</u>

    o   Review Provider Questionnaire for changes in education programs;

    o   Review current and prior year's working trial balances for significant education cost variances; and

    o   Review prior year's audit notes and adjustment report for education items.

Rev. 28

2-81

Desk Review Steps:

Ensure proper handling of costs by reviewing:

o    Program approved by appropriate authority. (PRM Part 1 §§402.1c and 402.4.)

o    Nursing and paramedical programs operated by the provider claiming cost of direct medical education before the cost incurred can be reimbursed as a pass-through.

o    If the hospital operates a paramedical education program, ensure that a new cost center has been established on Worksheet A of the hospital cost report.

o    Review Direct Costs (Worksheet A, Col. 1 and 2, line 21) for costs and compare to the prior year's cost for variance analysis.

o    Review Worksheet B, Col. 21 for cost allocations of I&Rs to prior year cost allocations for variances.

o    To prevent loading of direct costs, compare fringe benefits for consistency with the TEFRA base period.

o    Test the hospital cost report, Worksheet B-1 statistics, for cost allocation reasonableness, keeping in mind the size of the program and the number of students involved. If some of the I&Rs work outside of the provider setting any general service cost incurred by the hospital on their behalf is allocated to a nonreimbursable cost center.

o    Compare the HCFA 1007, Target Amount Computation (TAC), Parts IV, V, and VI departmental amounts to the amounts shown in the current period to ensure Medical Education costs are consistent by cost center and amount. Explain variances.

NOTE:    If cost is erroneously classified in both the base and TEFRA years, recompute the TEFRA target amount where not barred by 42 CFR 405.1885 and adjust the final settlement year.

o    Ensure that I&Rs salaries have been reduced for the portion of time they spend in activities outside the hospital setting (e.g., freestanding ASCs and family practice centers). In addition, salaries of teaching physicians are subject to RCEs.

o    Ensure that malpractice costs relating to I&Rs are reimbursed through the malpractice cost center on Worksheet D-8/Supplemental Worksheet D-8 and not through an allocation of malpractice costs to the I&R cost center.

o    Test salaries and FTE statistics for consistency between years by dividing salaries by FTE/hours statistics to get average hourly rates.

Review claimed costs of new educational services along with Form HCFA-339, Item G for the following:

    o    Are educational activities disclosed and costs claimed as part of reimbursable cost?

    o    Cost for on-the-job training or other activities which do not involve the operation or support, except through tuition or similar payments of an approved education program.   Provider contributions to nursing schools previously under control of the provider and which are now operated by the community are allowable.

    o    Exclusion of costs of patient education or general health awareness programs offered as a service to the community.

Ensure that other direct and indirect costs of approved medical education programs (other than I&Rs and nursing school) are excluded from TEFRA pass-through costs.

Contact the carrier to ensure that Medicare payment for teaching physicians' services was not duplicated under Part B.

Audit Emphasis:

    o    Review and analyze costs, physician contracts and HBP Rationales as necessary.  See Form HCFA-339, Schedules 1 and 3 as a means to avoid unnecessary field work or to focus the emphasis of field audit work.

Review the direct cost (Worksheet A, Columns 1 and 2, for the "I&Rs – in approved program," "Nursing School" and "Paramedical Program" cost centers to ensure that the amounts are related to the net cost of the programs.  (See 42 CFR 412.85.)

NOTE:  The costs associated with the following activities do not qualify as direct medical education cost:

    o    Orientation and on-the-job training.

    o    Part-time education for bona-fide employees at properly accredited academic or technical institutions devoted to undergraduate or graduate work.

    o    Costs and travel expense of educational seminars and workshops.

    o    Maintenance of a medical library.

    o    Training of a patient or patient's family in the use of medical appliances.

    o    Clinical training of nursing, paramedical and other students not enrolled in an approved education program operated by the provider.

       o    Other activities that do not involve the actual operation of an approved educational program including the costs of I&Rs in anesthesiology who are employed to replace anesthetists.

Review reclassifications of costs to medical education costs centers on the hospital cost report, Worksheet A-6, to see if they are proper. For example, malpractice costs relating to I&Rs are reimbursed through the malpractice cost center on Worksheet D-8/Supplemental Worksheet D-8 and not through a reclassification to the I&R cost center.

Review the hospital cost report, Worksheet A-8, adjustments pertaining to I&Rs, nursing school, and paramedical programs. (Ensure that tuition is correctly offset.)

Ensure that all costs associated with I&Rs working outside the hospital (e.g., freestanding ASCs, family practice centers) are set-up in a nonreimbursable cost center.

Ensure that the graduate (I&Rs) medical education pass-through excludes teaching physicians' direct patient care and administrative costs, (e.g., UR, autopsies, supervision of technicians). In addition, salaries of teaching physicians are subject to RCEs.

Ensure that university costs which do not pertain to the training of I&Rs (e.g., School of Sociology) are not included in the graduate medical education cost center.

As part of the cost report audit and settlement review Direct Medical Education for Cost Reporting Periods beginning on or after July 1, 1985.

For cost reporting periods beginning on or after July 1, 1985, verify proper classification of I&Rs (Approved)-Salaries, and Salary Related Fringe Benefits and I&Rs (Approved) Other Costs on Worksheet A, Lines 21A and 21B. Ensure that only the salaries of I&Rs are included on Worksheet A, Line 21A. (See PRM – Part II, §§1907 and 1910.)

NOTE:    When the regulation implementing §9202 of COBRA is published, these guidelines will be updated.

EXHIBIT B-5

SICK LEAVE AND VACATION ACCRUAL

Issue: To ensure that the sick leave and vacation expense has been properly accrued on a basis consistent with that of the prior year (except when the election has been made to move from a cash to an accrual basis).

Concern: That the sick leave and vacation accrual has been correctly calculated, FICA has not been included, and that the accrual was not based upon anticipated salary increases.

Preaudit Tests:

Review the provider's sick leave and vacation policies and procedures, and review notes to the financial statements to determine if there has been a change in the sick leave and vacation accrual policy.

Audit Emphasis:

Vacation Costs

o    For the first 2 months of the providers accounting period, determine if any vacation accrued or paid by the provider reflects only vacation earned in the period it is recorded in, and is computed from payroll records related to each employee. See PRM Part I §2146.2.

o    Determine employer payroll taxes applicable to vacation, such as FICA and pension, are accrued in the period when the vacation costs are accrued, but treated as a cost in the period when the vacation costs are paid. See PRM Part I §2146.2.

o    When a conversion from cash to accrual basis of accounting is made, determine the pre-Medicare portion has been eliminated.  See example in PRM Part I § 2146.3B.

o    Ascertain if the provider did not also accrue anticipated salary increases as part of the vacation accrual.  Only the rate in effect when the vacation was earned should be used in the computation.  See PRM Part I §§2146.4B and 2146.4ff.

Sick Leave

o    Determine if sick leave accrued or paid by the provider reflects only sick leave earned and recorded in all applicable periods and is computed from payroll records of each employee. See PRM Part I §2144.8A.

o    When a conversion from cash to accrual basis of accounting is made, determine if the pre-Medicare portion has been eliminated.  See PRM Part I §2144.8 B2/3.

EXHIBIT B-6

PENSION EXPENSE

**Issue:** To ensure that the pension plan costs are allowable and, therefore, meet the requirement of PRM Part I §2142.

**Concern:** The pension fund must be properly funded. These funds are not to be used at the discretion of the provider. Any investment income earned by the fund must not, at any time, be used for other than the exclusive benefit of the employees or their beneficiaries.

Preaudit Tests:

   o   Review the notes to financial statements to determine if actuarial assumptions changed in the cost reporting period.

   o   Review the current and prior year's working trial balances and identify year-to-year variances. See HCFA-339, Items F1, 2, and 3.

   o   Consult the permanent file to determine if a formal plan exists which is communicated to all eligible employees and is not forfeitable by them after they are vested, even if they change employers. See PRM Part I §2142.4.

Audit Emphasis:

   o   Ascertain if the pension expenses were paid within 1 year after the liability was incurred (or within 3 years if written justification is approved). See PRM Part I §2142.6A.

   o   Review actuarial report relating to the pension plan. See PRM Part I §2142.4A.

   o   Determine if the provider complies to the minimum 10 years amortization of Past Service Costs. See PRM Part I §2142.5A.

   o   Test pension funding to determine if the provider is obligated to make payments into the fund. See PRM Part I §2142.3.

   o   Determine if any investment income earned by the fund is used for anything other than for the exclusive benefit of the employees or their beneficiaries.

Rev. 28                                                          2-85

EXHIBIT B-7

INTEREST EXPENSE

Issue:

1.    To ensure that interest expense is necessary and proper for the operation, maintenance or acquisition of the provider's facilities.

2.    To ensure that interest included in allowable costs is:

    o    Supported by an agreement that the funds were borrowed.
    o    Identifiable in the provider's accounting records.
    o    Related to the reporting period in which the costs were incurred.

Concern: Providers whose costs are under the target rate will either attempt to expense interest in the TEFRA year which should be capitalized or, capitalize interest which should be expensed in order to maximize their TEFRA incentive payments.

References:    Regulation: §§ 413.153 and 413.161
                PRM, Chapter 2
                PRM, Chapter 23
                Cost Report: Worksheet A
                (HCFA-2552) Worksheet A-8
                            Worksheet G
                            Worksheet G-1
                            Worksheet G-3
                            Worksheet F, Part 1

Preaudit Tests:

    o    Compare the working trial balance between the current and prior periods to determine if there was a significant increase in interest expense.  If so, refer to audit for resolution.

    o    Recompute interest expense by reference to the terms of the loan instruments.  See PRM Part I §203E(2).

    o    Multiply the average principal balance of notes or mortgages payable by the interest rate to determine if the interest claimed on the trial balance, before adjustments and reclassification, approximates the interest expense claimed.  Refer large variances to audit.  Refer any new loans that become evident to audit for investigation and review.

Audit Emphasis:

o    Determine if the interest incurred on each loan is reasonable, is stated on an accrual basis and that the tests for necessary and proper as outlined in PRM have been met. See PRM Part I §§202.1, 202.2, and 202.3

–    Ensure that the indebtness and the related interest are necessary and for a purpose related to patient care; determine if:

+    Interest was incurred on a loan to meet the financial needs of the provider.

+    Interest expense is reduced by investment income where appropriate.

+    Capital borrowing is not incurred when adequate funded depreciation is maintained.

+    Interest expense related to cost report overpayments determined after September 3, 1982, is not claimed as a reimbursable expense.

NOTE:    Borrowing must not result in excess working capital. See PRM Part I §202.2.)

–    Ensure that interest is proper:

+    Obtain information needed to determine reasonableness of interest rate. (Not in excess of what a prudent borrower would have to pay in an arm's length transaction in the money market when the loan was made.) See PRM Part I §203.

+    Determine if interest is incurred between parties related either by ownership or control. Investigate the relationship of borrower and lender to determine if any form of ownership or control exists. (See exception, PRM Part I §218.2.)

o    Obtain or prepare an analysis of interest expense for the following loans:

–    Working capital.

–    Long-term (constructions, expansion and acquisition loans).

–    Inter-fund.

Rev. 28

NOTE:   Ensure that interest expense on these items has been properly reclassified to:

+   Building and fixed equipment;

+   Movable equipment; and

+   Administrative and general.

o   If comparative analysis of the balance sheet data indicates no reductions to the outstanding debt balances, determine the reason the debts are not being paid.

o   For proprietary providers – watch for interest that represents a distribution of profit such as:

–   Interest on partner's capital accounts; and

–   Dividends to stockholders.

Determine if such interest has been excluded from interest expense or other operating expense. See PRM Part I §§218ff.

o   Determine if inter-fund interest has been charged only on loans from depreciation which has been cash funded, loans from donor restricted funds, or loans from qualified pension funds.

o   Review the provider's funded depreciation account for proper treatment in accordance with Reg. 413.134(e); 413.153(c)(2); 413.153(c)(3); and PRM Part I §226.

o   Examine the source of the investment income to determine if it should be offset against interest expense. Use Board minutes, bank correspondence, provider records, etc., to identify sources of funds.

o   Ensure that losses/gains from refinancing or refunding is audited in accordance with PRM Part I §215 and 233.

NOTE:   Investment income must be used to offset allowable interest expense except income derived from the following (PRM Part I §§202.2 and 2338.1):

–   Funded depreciation. See PRM Part I §§226.1 and 2105.2C and D.

–   Provider qualified pension fund. See PRM Part I §228.

–   Restricted or unrestricted gifts and/or grants held separate and not commingled with other funds. See PRM Part I §§202.2, 222.2, and 224.2.

EXHIBIT B-8

### SERVICE CONTRACTS

Issue: To ensure that all service contracts are treated, either in part or in total, as a capital-related expense or as a current operating expense, consistent with their treatment in prior periods.

Concerns: Providers may attempt to identify and pass through the estimated capital-related portion of service contracts which were previously included as part of the base period operating cost in calculating the TEFRA target rate. This practice would permit the provider to circumvent the target rate cost reductions and the §223 cost limits as applicable to the TEFRA cost reporting year. Additionally, it would be used by providers which expect to exceed the TEFRA target rate and/or §223 cost limits and as a precedent setting practice to be used during any PPS transition period. On the other hand, providers that do not exceed those limits have a strong incentive to shift from inpatient operating to capital-related costs in order to maximize TEFRA incentive payments.

Preaudit Tests:

Refer to Form HCFA-339, Section J, Step 2, for reported changes to purchased service contracts. If marked yes, ensure that the provider has submitted details of all applicable changes including modifications, additions and terminations.

Audit Emphasis:

   o·   Review all terminated service contracts and ascertain:

      –   Is the provider now performing the services as an addition to its own inhouse services?

      –  If the answer is "yes," did the provider acquire additional equipment and/or enter into new lease agreements? If the answer is "additional equipment," see that depreciation is established in accordance with PRM Part I Chapter 1.

   o   Ensure that no portion of the cost is capital cost unless it meets the provision of PRM Part I §108.2.

   o   Review service contracts effective subsequent to the base year cost which have a separate capital-related cost component in conjunction with 42 CFR 413.130.

Commentary:

Ensure that only separately identified supplier capital-related costs are reimbursed. Ensure that the supplier's equipment is located on its premises during the entire lease period and is utilized only by the provider.

2. Obtain a copy of the provider's computation of the professional component to be excluded from costs on worksheet A-8 for provider component/professional component. Consult the provider based physician schedules on Form HCFA-339, Section K.

3. Determine if the rationale used in the computation agrees with the information on file. If there is a significant change in the provider's component/professional component, further investigation is warranted. Consult the provider based physician schedules on Form HCFA-339, Section K.

4. Review the provider's computation. Check for clerical accuracy. Also, compare the basic elements of the computation to applicable accounts in the general ledger (e.g., revenues, salaries).

5. If the provider is claiming an unmet guaranteed amount (emergency room only), determine if it meets the criteria in PRM Part I §2109.

6. If the provider is billing for the physician and is retaining a portion of the charges for billing and collection, offset the amount retained against Administrative and General costs.

7. Determine if physician charges are handled consistently between Medicare and non-Medicare charges. Charges on the cost report should reflect either gross or net for all pay classifications (e.g., Medicare, Medicaid, private insurance), with the exception of clinical laboratory services as nonphysician services which should not be billed to the carrier. This does not apply to non-Medicare patients; consequently, clinical laboratory services may be billed to non-Medicare patients as physician services which creates an exception governing the use of net and gross charges in the cost report.

8. Determine if Medicare charges for patients with Part A only coverage have been excluded from worksheet D-3.

9. Where a hospital purchases services such as x-ray, EKG, etc., for its patients from another hospital "under arrangements" and they include a physician component, the physician medical or surgical service must be billed to the carrier, with the exception for pathology services which are reimbursed as Part A cost. Test check provider billings to verify that this billing practice is performed.

Rev. 28                                    2-93

EXHIBIT B-11

## ADMINISTRATIVE AND GENERAL EXPENSES

**Issue:** To ensure that items included in Administrative and General (A&G) expense have been handled properly on the cost report.

**Concern:** That nonallowable costs and costs which should be capitalized will be charged to A&G expense. Also, that required reclassifications from A&G to other cost centers may not be made. If the provider has elected to reclassify the A&G expense cost center into component cost centers, the requirements in PRM Part I §2313.1 must be met.

**Preaudit Tests:**

o    Compare the current year's A&G expense amounts to the prior period amounts and determine what A&G expense accounts from the working trial balance are grouped together and equal the A&G cost center in the cost report. Refer to audit those items or accounts that appear to be nonallowable.

o    Scan the working trial balance for a description of the types of expenses included in the A&G cost center. Determine if the inclusion in A&G is proper.

o    If there is a material amount of expense included in A&G – Other or Miscellaneous Expense, after consideration of the results of prior year audits and knowledge of the provider, and if the amounts are unresolved, refer to field audit for further review.

o    Review current and prior year's reclassifications and worksheet A-8 adjustments affecting A&G to determine if the appropriate adjustments have been made in the current year.

o    If the provider has reclassified the A&G expense cost center into component cost centers, determine if the requirements of PRM Part I §2313.1 have been met. Your prior approval is required before the provider may use the component method of allocating A&G.

**Audit Emphasis:**

o    Perform a detailed analysis of A&G expense as indicated by the results of the preaudit procedures. Review to ensure that nonallowable costs and costs that should be capitalized have been excluded and that appropriate reclassifications of cost have been made. Remove direct and indirect expense.

The allowability of each cost item is subject to the reimbursement principles in the PRM governing the specific cost in question. The following are examples of costs which are improperly charged to A&G expense (PRM Part I Chapter 21):

–    Advertising, legal, consulting;
–    Organization or start-up costs; and
–    Planning costs.

EXHIBIT B-16

PLANNING AND START-UP COSTS

Issue: To ensure that planning and start-up costs were properly treated in the TEFRA year.

Concern: Providers will attempt to expense planning costs in the TEFRA year rather than capitalizing them as part of the asset. Also, providers may attempt to expense all start-up costs in the TEFRA year.

On the other hand, the incentive may be the opposite under TEFRA:

     o   If the provider is under the limit, capitalizing increases the incentive payment and allows a pass-through.

     o   If the provider is over the limit, capitalizing allows a pass-through where expensing gives benefit only to outpatient.

     o   For proprietary providers, capitalizing increases return on equity.

Preaudit Tests:

     o   Review the comparative analysis of the working trial balance to determine if there were significant increases in departmental salaries, utility costs, etc. Increases may indicate that start-up costs were expensed because of the addition of new services or the expansion of existing services.

     o   Scan the statistical page of the current and prior period cost reports noting any changes in the number of beds. An increase may indicate that start-up cost was incurred.

     o   Review the prior year balance sheet to determine if the provider had construction in progress. If so, examine the current year balance sheet to determine if there was a decrease or elimination of this amount which may indicate that start-up cost was incurred.

     o   Scan the working trial balance to determine if there has been a significant increase in the "Miscellaneous A&G" subaccount. Such an increase may indicate that planning costs were expensed because of the addition of new services or the extension of existing services.

Audit Emphasis:

     o   Obtain explanations from the provider for all preaudit exceptions noted.

     o   Verify the explanations through tests of source documents such as invoices and work assignment sheets.

EXHIBIT B-17

CORPORATE REORGANIZATION

**Issue:** Identification of nonallowable reorganization cost which may artificially inflate capital costs and allocations.

**Concern:** That reorganizations may occur in order to maximize reimbursement through shifting of costs and/or capital determinations. However, valid reasons for a provider reorganization do exist; therefore, reorganizations which meet regulatory requirements are permissable regardless of their impact on reimbursement. (See §§4500ff.—Change in Ownership.)

**Preaudit Tests:**

   o   Review the permanent file (e.g., board minutes) for reorganization planning in process and implementation of reorganization.

   o   Review the current financial statements (i.e., notes and opinion) for any indication of reorganization.

   o   Scan selected working trial balance and subsidiary accounts (e.g., A&G, legal, consulting, management, licensing fees) observing significant increases attributable to a reorganization.

   o   Review the Provider questionnaire (HCFA Form-339) for an indication that a reorganization may have taken place.

**Audit Emphasis:**

   o   Obtain copies of the organization chart, chart of accounts, tax returns, internal audit questionnaires and CPA's management letter noting any changes associated with a reorganization.

   o   Review board minutes noting the form and date of the reorganization. Also, identify any services (legal, consulting, accounting, in addition to salary and fringe benefits of key provider personnel who were involved with the reorganization) and ensure that they are removed from allowable costs.

**NOTE:** If there are no indications of corporate reorganization, teminate audit effort.

   o   Review management contracts noting changes associated with a reorganization.

   o   Review job description/functional statements of selected departments for changes attributable to a reorganization.

   o   Analyze, in-depth, identified trial balance accounts for reorganization costs.

EXHIBIT B-22

ADVERTISING

Issue: To determine that advertising costs, consulting costs, public relations, promotion, and marketing costs include only amounts related to furnishing covered services to Medicare beneficiaries.

Concern: Many providers are incurring consulting costs relative to the area of marketing studies or community relations costs. They are moving beyond public relations into marketing activities related to maintaining a competitive edge and increasing patient utilization. Costs of these activities are much greater now than in the past. Review these costs in accordance with PRM Part I §2136. Some examples of unallowability are:

    o   Cost of advertising, by a provider to the general public, which seeks to increase patient utilization including:

        –   Boasting of low mortality rates;

        –   Newspaper, billboard, radio, or television commercials to persuade one to seek a specific treatment or operation; and

        –   Catchy jingles on radio or television to influence a choice of health care providers.

    o   Health care consultant costs to:

        –   Determine primary and secondary service areas including demographic and epidemiological characteristics

        –   Determine the development of satellite physician offices, or the development of a medical office building

        –   Recommend the basis for development of a foundation, ways to enhance provider investment income, and the provider relationship with governmental health departments

        –   Analyze community needs for provider and related health care programs and facilities with estimates of requirements for the immediate future and longer range, i.e., demonstrating a look at the provider today and the need to build up the census or market position; and

        –   Analyze establishment of wellness programs or fitness centers.

4199(Cont.)     GUIDELINES FOR PERFORMING PROVIDER AUDITS          09–89

<u>Audit Emphasis:</u>

    o   Prepare an analysis of the cost charged to the advertising, consulting, public relations, promotion and marketing accounts.    These costs are usually found as subaccounts in the A&G account.

    o   Ask the provider representative who its vendors are for advertising, consulting, public relations, promotion, and marketing.

    o   Relative to the above response, the provider vendor records may be kept alphabetically; pull the invoices and supporting data for analysis and testing.   If records are not kept alphabetically, select a representative sample of expenditures for review and testing.

    o   Determine if costs are allowable in accordance with the above examples and with PRM Part I §§2136ff.

2-110                                                                Rev.  28

EXHIBIT B-23

## MEDICARE BAD DEBTS

**Issue:**  The objective is to obtain accurate data concerning the amount of Medicare bad debts for reimbursement purposes.

**Concern:**  Medicare Bad Debts for deductible and coinsurance are reimbursed as a pass-through cost.  Since they have a direct dollar for dollar effect upon the provider's reimbursement, there is an incentive to claim bad debts before they become worthless and to claim other than Medicare bad debts.

**References:**

PRM Part I Chapter 3, §308

**Audit Emphasis:**

As part of the cost report audit and settlement:

    o    Obtain a bad debt listing that contains all the data necessary to perform an adequate review.  This includes:

| | | |
|---|---|---|
| o   Beneficiary's name | o   Amount of Debt | |
| o   Account Number | o   Deductible and coinsurance amount | |
| o   Date of first bill | o   Amount paid by beneficiary | |
| o   Date of write-off | | |

    o    Use statistical sampling techniques for testing bad debt listings for both Part A & B.  As an example, stratify accounts with large balances and then select every 10th item.  These items are your test sample.  For sampling methodology for use in error rate projection and adjustments see § 4116.

    o    Test the bad debts to ensure that:

    -    Amounts claimed as Medicare bad debts are only for Medicare deductibles and coinsurance for provider services.

**NOTE:**  When the hospital fails to charge patients for deductibles or coinsurance, the amounts cannot be claimed as bad debts.

    -    Bad debts attributable to the portion of an ESRD patient's bill subject to the composite rate are separated from the other hospital bad debts.

    -    After reasonable and customary attempts to collect the bill, the debt remained unpaid more than 120 days from the date the first bill was mailed (unless the patient was deemed indigent).  If the debt is written-off on the provider's books 120 days after the date of the bill and then turned over to a collection agency, the amount

cannot be claimed as a bad debt on the date of the write-off. It can be claimed as a bad debt only after the collection agency completes its customary collection effort.

     -    The criteria in PRM Part I §312 was applied where indigency was used as a basis for the write-off.

     -    Reasonable collection efforts were used to collect the deductible and coinsurance amounts.

NOTE:   To be considered reasonable, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort to collect comparable amounts from non-Medicare patients.   Reasonable collection efforts must involve the issuance of a bill on, or shortly after, discharge or death of the beneficiary to the party responsible for the patient's financial obligations. This may include third party payers such as the beneficiary's estate, Medicaid, or a private insurance company. It includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with the party, which constitute a genuine, rather than a token, collection effort.   The provider's collection effort may include using, or threatening to use, court action to obtain payment.   In addition, a collection agency may be utilized.   Documentation of the provider's collection efforts must be in the patient's file, e.g., the bill(s), follow-up letters, reports of telephone and personal contact.   Where the patient's records are stored electronically, the file must indicate the charges, the billing date, to whom and the number and date of follow-up billing and letters.

    o    Ensure that allowable bad debts do not include deductibles and coinsurance amounts required to be paid by Medicaid or other third parties.

    o    Review other income items on Worksheet G-3 of Form HCFA-2252-85 or the provider's working trial balance to determine whether recoveries of prior year(s) bad debts are shown.   If shown, determine whether any amounts were applicable to Medicare patients.

If Worksheet G-3 and the provider's working trial balance do not show this information, review the provider's system of recording bad debt recoveries.   If this review indicates that some prior year bad debts were recovered in the current year, determine the Medicare portion.

NOTE:   The Medicare recoveries should be offset against the current year's reimbursable cost (Form HCFA-2252-85, Worksheet E, Part A, line 13 or Worksheet E, Part B, line 25B) to the extent that these Medicare bad debts were reimbursed in prior periods. (See PRM Part I §316.)

**EXHIBIT 4**

E.   Medicare Bad Debts.—Medicare Bad Debts for deductible and coinsurance amounts are reimbursed as a pass-through cost. Since they have a direct dollar for dollar effect upon the provider's Medicare reimbursement, there is an incentive to inflate the amount claimed.

As part of the cost report audit and settlement review the following:

o   Test that amounts claimed as Medicare bad debts are only for Medicare deductibles and coinsurance for provider services. Ensure that bad debts attributable to ESRD patients are separate from hospital bad debts.

NOTE:   When the hospital fails to charge patients for deductibles or coinsurance, the amounts are not to be written off as bad debts.

o   Provider has written off Medicare bad debts on their books in a prior period but is claiming them for reimbursement in the current cost reporting period, review prior periods' bad debt expense and recoveries as well as current year's bad debt expense and recoveries to ensure that bad debts are not written off twice. Ensure that bad debts for uncollected deductibles and coinsurance are only recognized as allowable bad debts in the period in which they were written off.

o   Medicare is a secondary payor under certain circumstances. (See HCFA-Pub. 13-3, § 3682.) Test that the hospital cost report, Worksheet E, "primary payor payments," does not include payments by other primary payers for Medicare deductible and coinsurance. (See § 4118.1B.)

o   If a partial payment is made for a bad debt due the provider, but not specifically identified as to which debt it applies, ensure that the payment is apportioned to Part A and Part B deductibles, coinsurance and noncovered services.

F.   Nonphysician Anesthetists.—For cost reporting periods beginning on or after October 1, 1984, costs incurred by the provider for hospital employed nonphysician anesthetists is reimbursed as a pass-through. In addition, nonphysician anesthetists who provide services at the hospital under arrangement (contract), are reimbursed as a pass-through. Verify that adjustment is made to HSR for nonphysician anesthetists costs by the recalculation of Form HCFA-1007; furthermore, test the treatment of these costs for consistency. (See § 4206.) Also, ensure that the amount claimed as a pass-through is correct.

G.   Discrete Costing.—Through discrete costing on the provider's accounting records, costs can be shifted to areas which can increase its cost reimbursement.

As part of the cost report audit and settlement:

o   Compare the provider's current and prior years' working trial balance for evidence of cost shifting to different accounts.

**EXHIBIT 5**

**MISC-DOC, MED-GUIDE 1990 MED-GUIDE-TB ¶38,623, HCFA Clarification on Bad Debt Policy., HCFA Memorandum to Regional Administrators , (June 11, 1990)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**HCFA Clarification on Bad Debt Policy.**

**HCFA Memorandum to Regional Administrators** June 11, 1990, Subject: Bad Debt Policy.

**Medicare: Bad Debts**

**Provider reimbursement--Bad debts, charity, and courtesy allowances--Bad debt policy.--**
In an attempt to reduce the frequency with which providers may be prematurely designating bad debts as "uncollectible" merely because they have been turned over to a collection agency, regional administrators were given clarification regarding (1) the point in the collection effort at which a provider may claim a Medicare bad debt, and (2) the documentation required to support a claim for a Medicare bad debt. These instructions were prompted by the moratorium, first instituted by section 4008(c) of the Omnibus Budget Reconciliation Act of 1987 (P.L. 100-203), on the implementation of the bad debt documentation requirements that were contained in the FY 1990 audit guidelines, which represent a revision to the audit guidelines in effect as of August 1, 1987. Intermediaries are cautioned that even after 120 days--the amount of time after which the *Provider Reimbursement Manual* declares a debt "may" be deemed uncollectible--a debt should not be considered uncollectible when there is reason to believe that in fact it is collectible. Regarding the documentation required, a disallowance based on the FY 1990 audit guidelines must be reversed if the intermediary otherwise would have accepted the provider's documentation, provided that doing so is consistent with the *Manual* and the audit guidelines in effect as of August 1, 1987.

See ¶5236.
**[Text of Memorandum]**

We have received numerous requests for clarification on an issue regarding the Medicare bad debt policy. The primary areas of concern are: (1) the point in the collection effort at which a provider may claim a Medicare bad debt, and (2) the documentation required to support a claim for a Medicare bad debt.

*Provider Reimbursement Manual* (PRM) Section 310.2, Presumption of Noncollectibility, provides that, "If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible." Our intent has always been that section 310.2 be read within the context of the bad debt policy provided in sections 308 and 310. That is, until a provider's reasonable collection effort has been completed, including both in-house efforts and the use of a collection agency, a Medicare bad debt may not be reimbursed as uncollectible. This is in accordance with the fourth criterion in section 308, which provides that an uncollected Medicare account cannot be considered an allowable Medicare bad debt unless sound business judgment established that there is no likelihood of recovery at any time in the future. We have always believed that, clearly, there is a likelihood of recovery for an account sent to a collection agency and that claiming of a Medicare bad debt at the point of sending the account to the agency would be contrary to the bad debt policy in sections 308 and 310.

Therefore, in accordance with our position, when we had been informed of such situations, we had advised regional offices and others that a bad debt could not be claimed while an account is at the collection agency.

However, we have been made aware from a number of sources that many providers have claimed a Medicare bad debt upon sending an account to a collection agency and that intermediaries have permitted an allowable bad debt in that situation. This is because a debt referred to a collection agency can sometimes be considered as pending indefinitely--i.e., for as long as the collection agency retains the claim and does not return it to the provider or actually inform the provider that it is uncollectible. Accordingly, we have reexamined our position on this issue, considering the actual language of section 310.2 and the impact of section 4008(c) of the Omnibus Budget Reconciliation Act (OBRA) of 1987, as amended by section 8402 of the Technical and Miscellaneous

Revenue Act of 1988 and section 6023 of OBRA of 1989. We refer to those enactments as "the moratorium" on changes to the bad debts policy. They provide as follows:

*Continuation of Bad Debt Recognition for Hospital Services.*–In making payment to hospitals under title XVIII of the Social Security Act, the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under title XVIII of the Social Security Act to providers for reasonable costs related to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under such title (including criteria for what constitutes a reasonable collection effort), including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency. The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

We believe that an intermediary could reasonably have interpreted the title of section 310.2, Presumption of Noncollectibility, to provide that an uncollectible account could be *presumed* to be a bad debt if the provider has made a reasonable and customary attempt to collect the bill for at least 120 days *even though* the claim has been referred to a collection agency. Such an interpretation is reasonable unless it is apparent that the debt is not a bad debt, for example, because the beneficiary is currently making payments on account, or has currently promised to pay the debt. As noted above, section 310.2 provides that the debt *may* be deemed uncollectible rather than that the debt "shall" or "must" be deemed uncollectible. On the contrary, "may" connotes the existence of discretion. Thus, even after 120 days, a debt should not be deemed uncollectible when there is reason to believe that in fact it is collectible. However, the mere fact that a debt is referred to a collection agency after the provider's in-house collection effort is completed does not mean that the debt is collectible.

Therefore, where an intermediary, in accordance with the preceding paragraph, applied section 310.2 to permit an allowable Medicare bad debt for an account sent to a collection agency, consistent with the provider's procedures for non-Medicare patients, the moratorium would prohibit the intermediary from applying the policy differently despite HCFA directives to the contrary dated subsequent to August 1, 1987. Accordingly, where an intermediary at HCFA's direction later disallowed Medicare bad debts which it had originally allowed, the intermediary should reverse that disallowance.

Finally, we believe that it is important to emphasize that, generally, the bad debt policy is otherwise unaffected by the above discussion. If a provider's collection effort at a collection agency typically extends beyond 120 days, we do not expect that the provider would now cease all collection efforts beyond that time simply based on our recognition that section 310.2 would permit a presumption of a bad debt after 120 days. The provider's additional collection effort may well result in collection of some of the bad debts despite the earlier *presumption* of uncollectibility. Moreover, if a provider refers its non-Medicare accounts but not its Medicare accounts to a collection agency, the Medicare accounts could not be claimed as a Medicare bad debt even after the passage of 120 days. In the same manner, if a provider refers all uncollected accounts to a collection agency but only records in its books the Medicare accounts as bad debts at the point of referral, the Medicare bad debts cannot be allowed. Also, some providers send an informational statement to the beneficiary which does not require payment and believe that the mailing of such a statement starts the 120 days. The 120-day period does not begin until the hospital has made a serious demand for payment, i.e., until it has sent a bill for an amount owed by the beneficiary.

Another concern expressed about the bad debt policy relates to the documentation required to be maintained by providers to support their claim for Medicare bad debts. In resolving this concern, we considered the impact of the moratorium on the bad debt documentation requirements contained in the FY 1990 audit guidelines, which represent a revision to the audit guidelines in effect as of August 1, 1987. The moratorium prohibits the intermediary from disallowing Medicare bad debts on the basis of those revised audit guidelines if the intermediary otherwise would have allowed the bad debts on the basis of its reasonable interpretation of the documentation requirements in effect on August 1, 1987 (including the previous audit guidelines and PRM section

314). Accordingly, when an intermediary disallowed bad debts on the basis of the documentation requirements in the FY 1990 audit guidelines, the intermediary must reverse that disallowance if it would have accepted the provider's documentation, provided that doing so is consistent with PRM sections 310.B, and 314, and the audit guidelines in effect as of August 1, 1987.

To assure proper implementation of these clarifications, the regional offices must issue the above clarifications, as written, to all intermediaries no later than 1 week after receipt of this memorandum. Also, inform the intermediaries that they should convey the contents of this memorandum to all their providers.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**EXHIBIT  6**

**CMS-DEC, MED-GUIDE 1995-2 MED-GUIDE-TB ¶43,723, Lourdes Hospital (Paducah, Ky.) v. Blue Cross and Blue Shield Association/Adminastar of Kentucky., HCFA Administrator Decision , (Oct. 27, 1995)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Lourdes Hospital (Paducah, Ky.) v. Blue Cross and Blue Shield Association/Adminastar of Kentucky.**

**HCFA Administrator Decision** Oct. 27, 1995

**Medicare: Bad Debts**

**Provider reimbursement--Medicare bad debts--Reasonable collection effort.--**
Reg. Sec. 413.80(a) provides that bad debts attributable to the deductible and coinsurance amounts of Medicare beneficiaries are reimbursed under the Medicare program. To be allowable, the provider must establish that the debts were actually uncollectible and that reasonable collection efforts were made. A provider complied with the regulation by (1) making inquiries into the patients' financial resources and insurance, (2) sending itemized bills to patients approximately five days after discharge, and (3) sending at least three additional statements after the initial billing. The PRRB correctly found, therefore, that the intermediary improperly disallowed the Medicare bad debts claimed by the provider.

In making its adjustments for the 1987 and 1989 cost years at issue, the intermediary recognized the provider's representation of the amounts that were recouped as a result of a collection agency's efforts. Because the provider's figures were neither documented nor auditable, the amount of the offset should have been calculated in accordance with the intermediary's usual method for computing an offset in cases where there are no verifiable figures.

See ¶5233.60.

**PRRB Dec. Nos. 95-D58, 95-D59 and 95-D60 (Guide ¶43,585 ) are modified.**

**[Text of Decision]**

The above-captioned cases are before the Administrator, Health Care Financing Administration (HCFA), for review of the decisions entered on August 31, 1995, by the Provider Reimbursement Review Board (the Board). The review is during the 60-day period in section 1878(f)(1) of the Social Security Act (the Act), as amended (42 USC 139500(f)). By letters dated September 20, 1995, the parties were notified of the Administrator's intention to review the Board's decisions in these cases. HCFA's Bureau of Policy Development (BPD) submitted comments requesting that the Administrator reverse the Board's decisions. The Provider submitted comments, requesting that the decisions be affirmed. Accordingly, the cases are now before the Administrator.

*ISSUE AND THE BOARD'S DECISIONS*

The issue concerns whether the Intermediary's adjustments disallowing Medicare bad debts claimed by the Provider were proper. Specifically, the questions to be decided are whether the Provider correctly claimed bad debts before the passage of more than 120 days from the first billings and whether the Provider met its burden of showing that it properly offset recovered amounts against previously claimed bad debts.

The Board held that the Intermediary's adjustments were not proper. The Board found that the Intermediary should not have relied solely on section 310.2 of the Provider Reimbursement Manual (PRM) to disallow the bad debts. Section 310.2 is merely a guideline for establishing reasonable collection efforts and non-collectibility. Other factors in the regulations and the PRM also must be considered. The evidence establishes that the Provider made reasonable collection efforts. The Board also found that the Provider's historical experience, combined with its reasonable collection efforts, demonstrated that the bad debts written off in less than 120 days were in fact worthless.

Further, despite the Intermediary's assertion that it maintained a written policy of disallowing bad debts under 120 days old, the record shows that the Intermediary's actual practice was otherwise. Moreover, the Intermediary's witness conceded at the hearing that the Provider may not have been aware of the Intermediary's written policy, thereby implying that the Provider was not adequately notified. Therefore, the Intermediary's conduct was inconsistent with a HCFA memorandum and its adjustments were impermissible.

## SUMMARY OF COMMENTS

BPD commented that if a provider claims a bad debt in 120 days or less from the first bill, the provider must document that the debt is actually uncollectible. That is, although a provider must in all cases document that it used reasonable collection efforts, it must also make a clear showing if claiming a debt in less than 120 days that the debt was uncollectible and would remain so, even if efforts were sustained for more than 120 days. The PRM does not permit a debt to be "deemed" uncollectible until more than 120 days from the first billing.

The Provider commented that BPD contends that it would be incorrect to afford a provider the presumption of uncollectibility contained in section 310.2 of the PRM prior to the expiration of 120 days. The Board, however, did not afford the Provider a presumption of uncollectibility. The Board found that the Provider demonstrated that it made reasonable collection efforts and that the debts written off in less than 120 days were actually uncollectible. This finding is supported by the record and consistent with HCFA policy.

## DISCUSSION AND EVALUATION

The entire records which were furnished by the Provider Reimbursement Review Board have been examined, including all correspondence, position papers, and exhibits. The Board's decisions have been reviewed by the Administrator. All timely comments received after entry of the Board's decisions have been made a part of the records and have been considered.

Section 1861(v)(1)(A) of the Social Security Act requires that providers of services to Medicare beneficiaries are to be reimbursed the reasonable cost of those services. Reasonable cost is defined by that section as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included...." In addition, section 1861(v)(1)(A) sets forth the requirement that Medicare shall not pay for costs incurred by non-Medicare beneficiaries, and vice-versa, i.e., Medicare prohibits cross-subsidization of costs.

The foregoing principles are reflected and further explained in the Medicare regulations. The regulations establish at 42 CFR §413.9(c) that the determination of reasonable cost must be based on costs related to the care of Medicare beneficiaries. If the provider's costs include amounts not related to patient care, or costs that are specifically not reimbursable under the program, those costs will not be paid by the Medicare program.

The regulations specifically provide at 42 CFR §413.80(a) that bad debts are reductions in revenues and are not included in allowable costs. However, section 413.80(a) further provides that bad debts attributable to the deductible and coinsurance amounts of Medicare beneficiaries are reimbursed under the Medicare program. Bad debts are defined at 413.80(b)(1) as:

amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future.

Section 413.80(d) of the regulations states that payment for deductibles and coinsurance amounts is the responsibility of the beneficiaries. However, recognizing the reasonable costs principle of <u>section 1861(v)(1)(A) of the Act</u>, prohibiting cross-subsidization, the program acknowledges that the inability of providers to collect deductibles and coinsurance amounts from Medicare beneficiaries could result in part of the costs of Medicare covered services being borne by individuals who are not beneficiaries. To prevent such cross-subsidization, Medicare pays providers for allowable bad debts. [1]

Thus, <u>42 CFR §413.80(e)</u> sets forth the criteria that must be met before Medicare will pay for claimed bad Debts. To be allowable, a bad debt must meet the following criteria:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must be able to establish that reasonable collection efforts were made.

(3) *The debt was actually uncollectible when claimed as worthless.*

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future. [2]

(Emphasis added.)

Additionally, section 310.2 of the PRM, entitled "Presumption of Noncollectibility" provides:

If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible.

A HCFA memorandum, dated April 1, 1992, clarified the intent of section 310.2 of the PRM:

[S]ection 310.2 adds the presumption that a bill is uncollectible if reasonable collection efforts have been pursued for more than 120 days. Section 310.2 provides that if, after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible. This presumption relieves providers of having to document that a debt is "actually uncollectible when claimed as worthless," consistent with section 308(3). The presumption will hold unless there is reason to believe that the debt is, in fact, collectible.

However, this presumption is simply not available with respect to debts that are claimed in 120 days or less from the first bill. For those debts, the provider must be prepared to demonstrate that the debt was "actually uncollectible."

The records in these cases reveal that the Provider pursued comparable in-house collection efforts for all accounts. The Provider's collection policy included, *inter alia*, the following. The Provider made inquiries of the patients' financial resources and insurance information at the time of admission. Upon discharge, patients were notified of their total charges, and an itemized bill was sent to each patient approximately five days after discharge. At least three additional statements were sent after the initial billing. At the end of the billing cycle, which was less than 120 days, the Provider wrote or charged off as a bad debt every outstanding account, both Medicare and non-Medicare, for which there was no payment activity. Thereafter, the Provider forwarded both the Medicare and the non-Medicare accounts to a collection agency. On its respective cost reports for the cost years

at issue, the Provider claimed the accounts that were charged off as bad debts. The Provider submitted sample copies of the actual billing statements which document the collection efforts.

Applying the above-cited sections of the Act, regulations, and the PRM to the facts presented in the records, the Administrator finds that the Intermediary incorrectly determined that the bad debts claimed by the Provider may not be paid by Medicare. The Administrator finds that a reasonable construction of the PRM is that for debts claimed in 120 days or less from the first billing, no presumption of noncollectibility exists but, rather, the provider must establish that the debts are actually uncollectible. The Administrator finds that in the instant cases the evidence in fact establish that the debts were uncollectible. [3]

The Administrator further notes that in making its adjustments for the cost years at issue, the Intermediary recognized the Provider's representation of the amounts recouped by the Provider as a result of the collection agency's efforts. As the Intermediary's auditor correctly noted, however, the Provider's figures were not auditable as no documentation was given to support them. [4] Regulations 42 CFR 413.20 and 413.24 together require that providers must maintain cost data that is capable of verification by qualified auditors. Therefore, the Administrator finds that the amount to be offset should be calculated in accordance with the Intermediary's usual methodology for computing the offset in cases where there are not verifiable figures. [5]

*DECISION*

The Board's decisions, that the Intermediary erred in disallowing reimbursement for the bad debts at issue, are modified for the foregoing reasons.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES.

[1] *See* 42 CFR §413.80(d) ; 42 CFR §§412.2(e)(3) , 412.115(a) .

[2] *See also* section 308 of the PRM.

[3] It should be noted that the Administrator's decision is based solely on the language of the PRM and the evidence in these cases. To the extent that the Board implied that the Intermediary violated the statutory moratorium on the disallowance of bad debts, first enacted by Pub. L. 100-203 and subsequently amended, the Administrator does not agree.

[4] The Intermediary's witness testified that the auditor appeared to recognize the Provider's recoupment figures as a compromise. Transcript of the September 16, 1994 Oral Hearing (Tr.) at 157. That is, the auditor recognized the Provider's figures while acknowledging that no audit trail existed; however, the auditor did not, as the Provider requested, reduce the Provider's figures further to take into account that a large portion of the amounts recovered represented bad debt claims that were originally disallowed by the Intermediary. The Intermediary stated in its Position Papers for PRRB Decision Nos. 95-D58 and 95-D59 that if the Board were to reverse its adjustment with respect to payment of the bad debt claims, then the bad debt recoveries should be calculated under its methodology.

[5] The Intermediary's method of calculating Medicare recoveries in the absence of a verifiable list of total Medicare recoveries was to: (1) add the current year and prior year of allowable Medicare bad debts and divide the result by the total bad debts from the current and prior years to arrive at a ratio; (2) multiply the ratio by the total recoveries for the current year and arrive at the estimated amount of Medicare recoveries for that year. Tr.

156; *see also* Intermediary's Exhibits I-6 for 95-D58, and I-7 for 95-D59.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**EXHIBIT 7**

# Medicare A

Provider Reimbursement and Audit Division • 8200 TH 10 West – Suite 440 • San Antonio, Texas 78230
Telephone No. (210) 349-6303 • Fax No. (210) 340-3126

December 17, 1997

Ms. Virginia McKissick
Payments and Systems Branch
Division of Medicare
Health Care Financing Administration
Regional Office VI
1301 Young Street, Room 833
Dallas, TX   75202

Dear Virginia:

Enclosed is a list of questions related to Medicare bad debt situations that have been encountered. We have proposed responses but need your input. Please review them and let us know what you think is the right action in each instance.

Thank you for your help.

Sincerely,

*Elise Steele*

Elise Steele
Training/Quality Specialist

Independent Licensee of the Blue Cross and Blue Shield Association

## MEDICARE BAD DEBT SITUATIONS

1. When is a bill actually considered to have been sent to a patient as part of the provider's collection effort?

   Possible answers:   A.   When a statement is sent to the patient asking for an amount to be paid

   B.   When a statement is sent to the patient stating that Medicare or other insurance has been billed but it doesn't ask for an amount to be paid

   Recommendation:   "A" since there is no attempt to collect unless an amount is asked to be paid.

   HCFA response:

2. A Medicare patient owes a fairly large amount of coinsurance and is making a small payment each month. When can the claim be written off as a bad debt?

   Considerations:   a.   This claim could not reasonably be sent to a collection agency since payments are being made.

   b.   The claim is technically not worthless although it may take years to ever be paid off.

   c.   If allowed to write off despite the payments, the provider is probably not treating non-Medicare patients in the same manner.

   d.   If allowed to write off despite the payments, there is no provider incentive to continue to bill or encourage the small payments.

   Possible answers:   A.   If the average monthly payment is less than 1/60 of the total amount of deductible and coinsurance to be paid (i.e., it would take more than 5 years to pay off the debt), allow the claim to be written off after total billings of 120 days. Any future payments would be treated as Medicare recoveries. This method would only be allowable if also followed for non-Medicare patients.

   B.   Do not allow the provider to claim the bad debt until payments have stopped for at least 120 days.

   Recommendation:   "A."

   HCFA response:

1

## MEDICARE BAD DEBT SITUATIONS (Continued)

3.  A Medicare patient has made only one payment on the 90th day following the first billing. At 120 days after the first billing, can the remaining deductible and coinsurance amount due be written off as a bad debt?

    Possible answers:  A.  If the average monthly payment is less than 1/60 of the total amount of deductible and coinsurance to be paid (i.e., it would take more than 5 years to pay off the debt), allow the claim to be written off after total billings of 120 days. Any future payments would be treated as Medicare recoveries. This method would only be allowable if also followed for non-Medicare patients.

    B.  Do not allow the provider to claim the bad debt until payments have stopped for at least 120 days.

    Recommendation:  "A." In this case, the amount paid would be divided by 120 days and that amount then multiplied by 30 to arrive at the average monthly payment.

    HCFA response:

4.  A provider writes off a Medicare bad debt and sends it to a collection agency at 60 days after the first billing. The collection agency works it for 60 days (for a total of 120 days of collection effort) with no amounts recovered. When can the provider claim it as a Medicare bad debt? Note that the entire 120 day period occurs during the current cost reporting period. Does the collection agency have to officially quit working the account and return it to the provider prior to the bad debt being claimed?

    Possible answers:  A.  Since the collection agency is being used prior to the end of the 120-day period, the provider can only claim it as a bad debt when the collection agency decides the account cannot be collected.

    B.  If similar effort is expended for non-Medicare claims, the bad debt can be claimed at the end of the first 120 days of total collection effort even if the collection agency is still working the account.

    Recommendation:  "B."

    HCFA response:

12/97

5.   A Medicare patient who has not been determined to be indigent is admitted into a CMHC for weekly visits which result in several small coinsurance amounts due. Does the CMHC have to follow all collection procedures including the 120-day period of collection for this patient before claiming the coinsurance amount as a bad debt despite the fact that the patient has never paid any money related to any visits?

   Possible answers:    A.   Yes. If indigency is not established and periodically verified, all normal collection procedures have to be followed for each visit.

                        B.   Yes, for the first two visits only (to establish a pattern). Then if no payment is received, we would allow the provider to write off the amounts for later visits after the first billing has been sent which asks for payment. This should be repeated each year to see if the patient has decided to start paying.

   Recommendation:   " B."

   HCFA response:

6.   a.   If a patient is in a skilled nursing facility, is the SNF allowed to bill the coinsurance related to the entire month at the beginning of the month? Note that a refund would be given if the patient did not stay the entire month.

        Recommendation:   ?

        HCFA response:

     b.   If so, would that billing constitute the first billing for the 120-day collection period even though the services had not been rendered?

        Recommendation:   Yes.

        HCFA response:

     c.   If not, what would the first billing date be?

        Recommendation:   The 120-day collection period would begin with the first billing sent after the services had been rendered.

        HCFA response:

3

12/97

7. The " 8/1/87 " rule is based on which of the following interpretations?

   Possible answers:    A.   The cost reporting period that includes the date of 8/1/87.

                        B.   The provider procedures in effect at 8/1/87 (and accepted by the
                             intermediary at a later time of audit).

                        C.   The most recent intermediary audit work done as of 8/1/87 (which
                             could be related to 1985 provider procedures).

   Recommendation:   " C. "

   HCFA response:

8. Does a change of ownership of a facility cause the " 8/1/87 " rule to be disregarded for
   consistency of procedures accepted by the intermediary?

   Recommendation:   If a facility has an owner different from that during the period applicable
                     to the " 8/1/87 " rule, that rule has no relevance.

   HCFA response:

4                                                                                    12/97



DEPARTMENT OF HEALTH & HUMAN SERVICES

Region VI
Health Care Financing
Administration

K:\FINANCE\PROVREIM\16-1-1\QUEST\NB.TBC

1301 Young Street
Room 833
Dallas, Texas 75202

March 6, 1998

Ms. Elise Steele, Training/Quality Specialist
Medicare Part A
Provider Reimbursement and Audit Division
8200 IH 10 West, Suite 440
San Antonio, TX   78230

*Intermediary Rationale*
*6- Bad Debt adjustment*
*for continuing collections*

Dear Ms. Steele:

I am responding to your letter dated December 17, 1997 in which you listed eight questions with proposed possible answers.  Without restating your questions, I am addressing them by number and I am enclosing a copy of the questions.

1.  "A" is the correct response.  The June 11, 1990 memo from the director of the Bureau of Program Operations and the Division of Policy Development pointed out, on page 3: . . ."Also, some providers send an informational statement to the beneficiary which does not require payment, and believe that the mailing of such a statement starts the 120 days.  The 120-day period does not begin until the hospital has made a serious demand for payment, i.e., until it has sent a bill for an amount owed by the beneficiary."

2.  "B" is the appropriate answer.  I consulted with the Division of Cost Reporting and learned that HCFA's policy is unchanged; it does not allow a debt to be written off while the beneficiary is making any payment, no matter how small.

3.  "B" is correct.  Since the patient made a payment 90 days after the first billing, the provider should continue the collection effort until payments have stopped for at least 120 days.

4.  "B" is appropriate since it specifies that both Medicare and non-Medicare claims have been written off their books as accounts receivable.

5.  "B" is appropriate.  The auditor should verify that the provider repeated the collection effort yearly.  However, you would not permit a writeoff of Medicare claims unless the provider applies the same policies they would to a non-Medicare claim.



Ms. Elise Steele          Page 2

No, the SNF cannot bill the coinsurance related to the entire month at the beginning of the month.    42 CFR 489.22 Special provisions applicable to prepayment requirements. (a) states: "A provider may not require an individual entitled to hospital insurance benefits to prepay in part or in whole for inpatient services as a condition of admittance as an inpatient, except where it is clear upon admission that payment under Medicare, Part A cannot be made."

N/A.

I agree that the 120-day collection period would begin with the first billing sent after the services had been rendered.

7.     The "8/1/87" rule is based on the interpretation in "C," the most recent intermediary audit work done as of 8/1/87.

8.     I agree that if the facility has an owner different from that during the period applicable to the "8/1/87 rule," that rule has no relevance.

Sincerely,

Virginia McKissick, Accountant
Division of Financial Management and
    Program Initiatives

Enclosure

**EXHIBIT  8**

A FISCAL INTERMEDIARY FOR THE MEDICARE PROGRAM

# MEDICARE NEWSLETTER



**Mutual
of Omaha**

MEDICARE DIVISION
P O BOX 1602
OMAHA NE 68101
(402) 978-2850

Hosp.  90-19
SNF    90-10
Rehab  90-5
July   1990

### Medicare Bad Debt Reimbursement

Attached is a reprint of a recent letter from the Health Care
Financing Administration regarding Bad Debt Reimbursement to
Providers.  The letter clarifies the provisions of the Omnibus
Budget Reconciliation Act (OBRA) of 1987 and subsequent
amendments.

Mutual of Omaha is still expected to continue to perform certain
tests of Medicare bad debts; however, audit procedures applied
cannot require more documentation or apply policy for
disallowance of bad debts which is contrary to policy in effect
prior to August 1, 1987.  Accordingly the "presumption of
noncollectibility" provisions of HCFA Pub. 15-1, Section 310.2
will be applied to include Medicare bad debts that have been
referred to a collection agency except where there is evidence
that such accounts are, in fact, collectible. Providers are
still required to meet other conditions for allowability as set
out in Chapter 3.  Also, the "date of bill" documentation
requirements of HCFA Pub. 15-1, Section 314, will be imposed on
Medicare bad debts which have been selected for audit test only.


Mutual of Omaha Insurance Company
Medicare Division

ATTACHMENT

Reprint of Letter from HCFA Regarding
Medicare Bad Debt Policy

We have received numerous requests for clarification on an issue regarding
the Medicare bad debt policy. The primary areas of concern are: (1) the
point in the collection effort at which a provider may claim a Medicare bad
debt, and (2) the documentation required to support a claim for a Medicare
bad debt.

Provider Reimbursement Manual (PRM) Section 310.2, Presumption of
Noncollectibility, provides that, "If after reasonable and customary
attempts to collect a bill, the debt remains unpaid more than 120 days from
the date the first bill is mailed to the beneficiary, the debt may be deemed
uncollectible". Our intent has always been that Section 310.2 be read
within the context of the bad debt policy provided in Sections 308 and 310.
That is, until a provider's reasonable collection effort has been completed,
including both in-house efforts and the use of a collection agency, a
Medicare bad debt may not be reimbursed as uncollectible. This is in
accordance with the fourth criterion in Section 308 which provides that an
uncollected Medicare account cannot be considered an allowable Medicare bad
debt unless sound business judgment established that there is no likelihood
of recovery at any time in the future. We have always believed that,
clearly, there is a likelihood of recovery for an account sent to a
collection agency and that claiming of a Medicare bad debt at the point of
sending the account to the agency would be contrary to the bad debt policy
in Sections 308 and 310.

Therefore, in accordance with our position, when we had been informed of
such situations, we had advised regional offices and others that a bad debt
could not be claimed while an account is at the collection agency.

However, we have been made aware from a number of sources that many
providers have claimed a Medicare bad debt upon sending an account to a
collection agency and that intermediaries have permitted an allowable bad
debt in that situation. This is because a debt referred to a collection
agency can sometimes be considered as pending indefinitely - i.e., for as
long as the collection agency retains the claim and does not return it to
the provider or actually inform the provider that it is uncollectible.
Accordingly, we have reexamined our position on this issue, considering the
actual language of Section 310.2 and the impact of Section 4008(c) of the
Omnibus Budget Reconciliation Act (OBRA) of 1987, as amended by Section 8402
of the Technical and Miscellaneous Revenue Act of 1988 and Section 6023 of
OBRA of 1989. We refer to those enactments as "the moratorium" on changes
to the bad debts policy. They provide as follows:

Continuation of Bad Debt Recognition for Hospital Services. - In making
payment to hospitals under title XVIII of the Social Security Act, the
Secretary of Health and Human Services shall not make any change in the
policy in effect on August 1, 1987, with respect to payment under title
XVIII of the Social Security Act to providers for reasonable costs
related to unrecovered costs associated with unpaid deductible and
coinsurance amounts incurred under such title (including criteria for

ATTACHMENT
Page 2

what constitutes a reasonable collection effort), including criteria
for indigency determination procedures, for record keeping, and for
determining whether to refer a claim to an external collection agency.
The Secretary may not require a hospital to change its bad debt
collection policy if a fiscal intermediary, in accordance with the rules
in effect as of August 1, 1987, with respect to criteria for indigency
determination procedures, record keeping, and determining whether to
refer a claim to an external collection agency, has accepted such
policy before that date, and the Secretary may not collect from the
hospital on the basis of an expectation of a change in the hospital's
collection policy.

We believe that an intermediary could reasonably have interpreted the title
of Section 310.2, Presumption of Noncollectibility, to provide that an
uncollectible account could be presumed to be a bad debt if the provider has
made a reasonable and customary attempt to collect the bill for at least 120
days even though the claim has been referred to a collection agency. Such
an interpretation is reasonable unless it is apparent that the debt is not a
bad debt, for example, because the beneficiary is currently making payments
on account, or has currently promised to pay the debt. As noted above,
Section 310.2 provides that the debt may be deemed uncollectible rather than
that the debt "shall" or "must" be deemed uncollectible. On the contrary,
"may" connotes the existence of discretion. Thus, even after 120 days, a
debt should not be deemed uncollectible when there is reason to believe that
in fact it is collectible. However, the mere fact that a debt is referred
to a collection agency after the provider's in-house collection effort is
completed does not mean that the debt is collectible.

Therefore, where an intermediary, in accordance with the preceding
paragraph, applied Section 310.2 to permit an allowable Medicare bad debt
for an account sent to a collection agency, consistent with the provider's
procedures for non-Medicare patients, the moratorium would prohibit the
intermediary from applying the policy differently despite HCFA directives to
the contrary dated subsequent to August 1, 1987. Accordingly, where an
intermediary at HCFA's direction later disallowed Medicare bad debts which
it had originally allowed, the intermediary should reverse that
disallowance.

Finally, we believe that it is important to emphasize that, generally, the
bad debt policy is otherwise unaffected by the above discussion. If a
provider's collection effort at a collection agency typically extends beyond
120 days, we do not expect that the provider would now cease all collection
efforts beyond that time simply based on our recognition that Section 310.2
would permit a presumption of a bad debt after 120 days. The provider's
additional collection effort may well result in collection of some of the
bad debts despite the earlier presumption of uncollectibility. Moreover, if
a provider refers its non-Medicare accounts but not its Medicare accounts to
a collection agency, the Medicare accounts could not be claimed as a
Medicare bad debt even after the passage of 120 days. In the same manner,
if a provider refers all uncollected accounts to a collection agency but
only records in its books the Medicare accounts as bad debts at the point of
referral, the Medicare bad debts cannot be allowed. Also, some providers

ATTACHMENT
Page 3

send an informational statement to the beneficiary which does not require
payment and believe that the mailing of such a statement starts the 120
days.  The 120-day period does not begin until the hospital has made a
serious demand for payment, i.e., until it has sent a bill for an amount
owed by the beneficiary.

Another concern expressed about the bad debt policy relates to the
documentation required to be maintained by providers to support their claim
for Medicare bad debts.  In resolving this concern, we considered the impact
of the moratorium on the bad debt documentation requirements contained in
the FY 1990 audit guidelines, which represent a revision to the audit
guidelines in effect as of August 1, 19878.  The moratorium prohibits the
intermediary from disallowing Medicare bad debts on the basis of those
revised audit guidelines if the intermediary otherwise would have allowed
the bad debts on the basis of its reasonable interpretation of the
documentation requirements in effect on August 1, 1987 (including the
previous audit guidelines and PRM Section 314).  Accordingly, when an
intermediary disallowed bad debts on the basis of the documentation
requirements in the FY 1990 audit guidelines, the intermediary must reverse
that disallowance if it would have accepted the provider's documentation,
provided that doing so is consistent with PRM Sections 310.B, and 314, and
the audit guidelines in effect as of August 1, 1987.

**EXHIBIT 9**

# MEDICARE REIMBURSEMENT FLASH

**OM BLUE CROSS AND BLUE SHIELD OF TENNESSEE**

Flash No. 180
Hospital Flash No. 180
SNF Flash No. 120
HHA FLASH No. 80
February, 1990

To:       All Medicare Participating Providers

From:     Harold H. Cantrell, Jr., Director

Subject:  Audit Documentation


The Health Care Financing Administration (HCFA) reviews and assesses the audit work performed by Medicare intermediaries in an effort to test and improve the quality of this work.  As a result of this process, HCFA informs intermediaries of its audit quality expectations.  Recent communications from HCFA require that certain information must be obtained for our audit files.

To assist you in maintaining the proper documentation to support the costs claimed on your Medicare cost report, we have outlined below information which will be required for all audits.  Please note that these are minimum requirements and additional information may be required.  Your assistance in providing this data will ensure your audit is completed as expeditiously as possible.


## Bad Debt Listing

The bad debt listing that supports the bad debts claimed on your Medicare cost report must contain <u>all</u> of the following information:

1. Beneficiary name
2. Beneficiary HIC number
3. Date(s) of service
4. Date of first bill
5. Medicare paid date
6. Date of write-off
7. Amount of debt
8. Medicare deductible and coinsurance amount
9. Medicaid payment amount

Bad debts cannot be considered for reimbursement unless the list contains all the above criteria.  This listing is required to be submitted with the HCFA-339.



**Blue Cross Blue Shield** of Tennessee

Chattanooga, Tennessee 37401

Page 2
Audit Documentation

Bad Debt Collection Efforts

HCFA has provided us with the following clarification regarding collection efforts. When a provider writes-off an account after in-house collection efforts and then turns the account over to a collection agency, the amount cannot be claimed as a Medicare bad debt on the date of the write-off. The account can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.

It will be necessary for you to maintain auditable documentation to support the fact the collection agency has exhausted their collection efforts.

Bad Debt Recoveries

It will be necessary for you to separately identify Medicare bad debt recoveries. If currently your records do not distinguish Medicare recoveries from non-Medicare, it is imperative that you immediately begin to identify Medicare bad debt recoveries.

Chart of Accounts

Each year we will request a copy of the chart of accounts that was in effect at the close of your cost reporting period. You should identify any changes made from the prior year's edition.

Leases/Rental Agreements

A copy of all new leases/rental agreements will be requested if not supplied with the HCFA-339 submission. Also copies of all leases/rental agreements in effect, but not previously furnished to us, will be necessary.

Debt Instruments/Agreements

A copy of all new debt instruments/agreements will be required if not supplied with the HCFA-339 submission. It will also be necessary to furnish us copies of all debt instruments/agreements in effect but not previously supplied to us.

Page 3
Audit Documentation

<u>Provider-Based Physician Allocation Agreement</u>

The HCFA-339 submission requires providers to furnish written allocation agreements for each of their provider based physicians. Auditable time records must be maintained to substantiate any provider component time.

<u>Disproportionate Share Providers</u>

It will be necessary for the provider to maintain a record of Medicaid covered days. It is suggested that a summary be prepared indicating total Medicaid days by remittance advice date. The summary and supporting remittance advices should be available to our staff during the audit. Please remember that Medicaid days applicable to your excluded units should not be included in your total Medicaid days used for the calculation of the disproportionate share adjustment.

Should you have any questions, please contact David Jackson at (615) 755-5761.

# Medicare Reimbursement *FLASH*



Flash No.   183
Hospital Flash No. 183
SNF Flash No. 121
HHA Flash No. 81
June, 1992


TO:       All Medicare Participating Providers

FROM:     Harold H. Cantrell, Jr., Director

SUBJECT:  Medicare Bad Debts


During the past few years, the Health Care Financing
Administration (HCFA) has placed an emphasis on the
reimbursement of Medicare bad debts.  During this time we
have received several clarifications from HCFA relative to
this issue.  To assist you in maintaining the proper
documentation to support the bad debts claimed on your
Medicare cost report, we have outlined below the requirements
for the reimbursement of your Medicare bad debts.  This Flash
supersedes the sections relative to bad debts contained in
Flash 180-Audit Documentation.


Definition of Allowable Bad Debt

Provider Reimbursement Manual (PRM) Section 302.2 defines an
allowable bad debt as a bad debt that results from
uncollectible Medicare deductible and coinsurance amounts and
that meets the four criteria in PRM Section 308.  These four
criteria require a provider to establish that the debt was
related to covered services and attributable to unpaid
deductible and coinsurance amounts, that reasonable
collection efforts were made, that the debt was actually
uncollectible when claimed as worthless, and that there was
no likelihood of future recovery.


Reasonable Collection Efforts

The requirement of reasonable collection efforts is explained
in PRM Section 310.  Reasonable collection efforts must
involve the issuance of a bill shortly after the discharge or
death of the patient, to be followed by subsequent billings,

---

collection letters, and telephone calls or personal contacts, all amounting to a genuine, rather than a token, effort to collect the debt. In addition, the provider must employ the same level of effort that it puts forth to collect comparable amounts from Non-Medicare patients.

PRM Section 310.2 adds the "presumption" that a bill is uncollectible if reasonable collection efforts have been pursued for more than 120 days. This section provides that if, after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible. (See note below.) This presumption relieves providers of having to document that a debt is "actually uncollectible when claimed as worthless," consistent with PRM Section 308(3). The presumption will hold unless there is reason to believe that the debt is, in fact, collectible.

This presumption is not available with respect to debts that are claimed in 120 days or less from the first bill. For those debts, the provider must be prepared to demonstrate that the debt was "actually uncollectible."

A provider in all cases must be able to support that it pursued reasonable collection efforts. The provider must also document that a debt is actually uncollectible when claimed as worthless when the debt is claimed in 120 days or less. This requires a clear showing that the debt was uncollectible and would remain uncollectible even if collection efforts were sustained for more than 120 days from the first bill.

> NOTE: The 120 days does not begin until the provider has made a serious demand for payment, i.e., until it has sent a bill for an amount owed by the beneficiary. Some providers send an informational statement upon discharge to the beneficiary which does not require payment. The sending of the informational statement will not begin the 120 day period.

## Indigent Patients

Reasonable collection efforts, as outlined above, may be waived for Medicare indigent patients. A Medicare beneficiary who also qualifies for Medicaid may be considered indigent automatically. For other Medicare beneficiaries, the provider should apply its customary practices for determining indigency. Please refer to PRM Section 312 for the factors which should be incorporated into the provider's indigency guidelines.

The bad debt for an indigent patient may be written off and
claimed upon discharge or upon the determination of
indigency, whichever is later.


Audit Documentation

    A.   Bad Debt Listing

        The bad debt listing that supports the bad debts
        claimed on your Medicare cost report must contain
        all of the following information:

        1.   Beneficiary name
        2.   Beneficiary HIC number
        3.   Date(s) of service
        4.   Date of first bill
        5.   Medicare paid date
        6.   Date of write-off
        7.   Amount of debt
        8.   Medicare deductible and coinsurance amount
        9.   Medicaid payment amount

        Bad debts cannot be considered for reimbursement
        unless the list contains all the above criteria. This
        listing is required to be submitted with the
        HCFA-339.


    B.   Bad Debt Recoveries

        It continues to be necessary for you to separately
        identify Medicare bad debt recoveries.

Please let us know if you have any questions.

344 0000                    HCA Dev. Svcs. Meditech          03.16.42 p.m.    11-01-2007         2/10

Flash 00-3                                                          Page 1 of 3



**Medicare
Provider
Reimbursement**



**RIVERBEND**

**Flash No. 00-3**

**March, 2000**

TO:        All Medicare Participating Providers

FROM:    Martha Calfee, Audit Manager

SUBJECT:   Medicare Bad Debts

This Flash supersedes Flash 183 dated June, 1992 related to Medicare Bad Debts.

To assist you in maintaining the proper documentation to support the bad debts claimed on your Medicare cost report, we have outlined below the requirements for the reimbursement of your Medicare bad debts.

### Definition of Allowable Bad Debt

Provider Reimbursement Manual (PRM) Section 302.2 defines an allowable bad debt as a bad debt that results from uncollectible Medicare deductible and coinsurance amounts and that meets the four criteria in PRM Section 308. These four criteria require a provider to establish that the debt was related to covered services and attributable to unpaid deductible and coinsurance amounts, that reasonable collection efforts were made, that the debt was actually uncollectible when claimed as worthless, and that there was no likelihood of future recovery.

### Reasonable Collection Efforts

The requirement of reasonable collection efforts is explained in PRM Section 310. Reasonable collection efforts must involve the issuance of a bill shortly after the discharge or death of the patient, to be followed by subsequent billings, collection letters, and telephone calls or personal contacts, all amounting to a genuine, rather than token, effort to collect the debt. In addition, the provider must employ the same level of effort that it puts forth to collect comparable amounts from Non-Medicare patients.

PRM Section 310.2 adds the "presumption" that a bill is uncollectible if reasonable collection efforts have been pursued for more than 120 days. This section provides that if, after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible. (See note below.) This presumption relieves providers of having to document that a debt is "actually uncollectible when claimed as worthless," consistent with PRM Section 308(3). The presumption will hold unless there is reason to believe that the debt is, in fact, collectible.

This presumption is not available with respect to debts that are claimed in 120 days or less from the first bill. For those debts, the provider must be prepared to demonstrate that the debt was "actually uncollectible."

A provider in all cases must be able to support that it pursued reasonable collection efforts. The provider must also document that a debt is actually uncollectible when claimed as worthless when the debt is claimed in 120 days or less. This requires a **clear** showing that the debt was uncollectible and would remain uncollectible even if collection efforts were sustained for more than 120 days from the first bill.

NOTE: The 120 days does not begin until the provider has made a serious demand for payment,

344 6366                    HCA Dev. Svcs. Meditech       03:17:03 p.m.    11-01-2007        3/10

i.e., until it has sent a bill for an amount owed by the beneficiary. Some providers send an informational statement upon discharge to the beneficiary, which does not require payment. The sending of the informational statement will not begin the 120 day period.

## Indigent Patients

Reasonable collection efforts, as outlined above, may be waived for Medicare indigent patients. A Medicare beneficiary who also qualifies for Medicaid may be considered indigent automatically. For other Medicare beneficiaries, the provider should apply its customary practices for determining indigency. Please refer to PRM Section 312 for the factors which should be incorporated into the provider's indigency guidelines.

The bad debt for an indigent patient may be written off and claimed upon discharge or upon the determination of indigency, whichever is later.

## Audit Documentation

### A. Bad Debt Listing

The bad debt listing that supports the bad debts claimed on your Medicare cost report must contain **ALL** of the following information:

1. Beneficiary name
2. Beneficiary HIC number
3. Date(s) of service
4. Date of first bill
5. Medicare paid date
6. Date of write-off
7. Amount of debt
8. Medicare deductible and coinsurance amount
9. Medicaid payment amount

Bad debts cannot be considered for reimbursement unless the list contains **all** of the above criteria. This listing is required to be submitted with the HCFA-339. This data is also required for your Medicare/Medicaid crossover listings. In accordance with PRM 314, uncollectible deductibles and coinsurance amounts are recognized as allowable bad debts in the reporting period in which the debts are determined to be worthless.

### A. Bad Debt Recoveries

It will be necessary for you to separately identify Medicare bad debt recoveries. If currently your records do not distinguish Medicare recoveries from non-Medicare, it is imperative that you immediately begin to identify Medicare bad debt recoveries.

## Reduction of Bad Debts – Hospitals

The Balanced Budget Act of 1997 requires the reduction in the amount of hospital bad debts otherwise treated as allowable cost, as follows:

- For cost reporting periods beginning during FY 1998 (10/1/97 to 9/30/98), by 25 percent of such amounts

344 8388                          HCA Dev. Svcs. Meditech          03:17:19 p.m.     11-01-2007          4/10

‹Flash 00-3                                                                  Page 3 of 3

otherwise allowable.

- For cost reporting periods beginning during FY 1999 (10/1/98 to 9/30/99), by 40 percent of such amounts otherwise allowable.

- For cost reporting periods beginning during a subsequent FY (10/1/99), by 45 percent of such amounts otherwise allowable.

The reduction is applied after allowable bad debts are reduced by recoveries.

## Outpatient Therapy Services

The concept of Medicare payments to a provider of services for the deductible and coinsurance bad debts applies to the "reasonable cost" payment system. Medicare has continued to recognize bad debts for hospitals, skilled nursing facilities, and home health services where prospective payments or other payments is based upon cost. However, effective January 1, 1999, therapy services are reimbursed on a fee schedule that is different from other fee schedules in that it is not based upon cost or charges. Therefore, effective for therapy services on or after January 1, 1999, bad debts claimed for deductibles and coinsurance **cannot** be claimed on the Medicare cost report. Please ensure compliance regarding the therapy services change.

If you have any questions, please contact me at (423) 755-5761.

Back to **Flash Page**

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FOOTHILL HOSPITAL - MORRIS L. JOHNSTON MEMORIAL, a California nonprofit corporation, dba Foothill Presbyterian Hospital,<br><br>      Plaintiff,<br><br>    v.<br><br>MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services,<br><br>      Defendant. | Civil Action No. 1:07-CV-00701 (ESH) |

## [PROPOSED] ORDER

Having considered FOOTHILL HOSPITAL - MORRIS L. JOHNSTON MEMORIAL, a California nonprofit corporation, dba Foothill Presbyterian Hospital's ("Plaintiff") Motion for Summary Judgment, the Points and Authorities and exhibits in support thereof, the administrative record in this case, and all other pleadings on file in this case, along with the oral argument presented by the parties at the hearing on this summary judgment motion,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Plaintiff's motion for summary judgment shall be and hereby is granted and Defendant's Motion for Summary Judgment shall be and hereby is denied.

**IT IS FURTHER ORDERED** that the final decision rendered by the Defendant Secretary of Health and Human Services in Plaintiff's appeal of the denial of its claims for reimbursement for Medicare bad debts for its fiscal year ending June 30, 1995 be, and hereby is, reversed, on the grounds that the Secretary's policy denying bad debt reimbursement solely because the bad debts remain at an outside collection agency is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

**IT IS FURTHER ORDERED** that this matter be remanded to the Secretary to issue payment to Plaintiffs for said Medicare bad debts, along with interest pursuant to 42 U.S.C. § 1395oo(f)(2) and costs of suit.

IT IS SO ORDERED.


DATED:_____

_____
United States District Judge