# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

FOOTHILL HOSPITAL - MORRIS L.
JOHNSTON MEMORIAL, a California
nonprofit corporation, dba Foothill
Presbyterian Hospital,

       Plaintiff,

  vs.

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and
Human Welfare,

       Defendant.

CASE NO. 1:07-CV-00701-ESH

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

# IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# AND IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR

# SUMMARY JUDGMENT

# TABLE OF CONTENTS <span>Page</span>

I.    THE BAD DEBT MORATORIUM PREVENTS THE SECRETARY FROM
ADOPTING NEW POLICIES AFTER AUGUST 1, 1987, AND THEREFORE
THE POLICY ENFORCED HEREIN IS INVALID. .......................................................1

II.   THE ADMINISTRATOR'S DECISION HEREIN IS ARBITRARY,
CAPRICIOUS, AND CONTRARY TO LAW.................................................................9

    A.    The Secretary's Position Prohibiting Providers From Claiming Bad Debts
Whenever The Accounts Remain At An Outside Collection Agency Is
Entitled To Only Limited Deference. ...................................................................10

    B.    The Presumption of Collectibility Adopted by the HCFA Administrator Is
Inconsistent With Other Longstanding Aspects of Bad Debt Policy.....................12

    C.    The Secretary Should Not Be Permitted To Retroactively Apply A Rule
Enunciated In An Agency Adjudication. ..............................................................15

    D.    The Secretary's New Policy Is Invalid Because It Has Not Been Properly
Published In The Federal Register.......................................................................17

III.  CONCLUSION...............................................................................................................19

I.      **THE BAD DEBT MORATORIUM PREVENTS THE SECRETARY FROM ADOPTING NEW POLICIES AFTER AUGUST 1, 1987, AND THEREFORE THE POLICY ENFORCED HEREIN IS INVALID.**

One of the two principal arguments raised by plaintiff Foothill Hospital (the "Hospital") is that there is an absolute prohibition to the policy purportedly adopted by defendant Secretary of Health and Human Services (the "Secretary") to deny all Medicare bad debt reimbursement if the debts were written off while still remaining at an outside collection agency, because it is a new policy that was adopted after the "bad debt moratorium" (the "Moratorium") was enacted. The first sentence of the Moratorium unequivocally precludes the Secretary from changing bad debt policies that were in effect on August 1, 1987. Since the policy at issue herein was first adopted (albeit not consistently) through an audit instruction in the Medicare Intermediary Manual ("MIM") during 1989, it is invalid.

In Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Sec.'s Opp."), the Secretary acknowledges that the policy to categorically deny bad debts when the accounts remain at an outside collection agency (the "presumption of collectibility") was adopted subsequent to August 1, 1987. In the Hospital's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Hosp.'s Mem."), the Hospital pointed out a Hospital Audit Program provision that predated August 1, 1987 and discussed debts referred to collection agencies as "uncollectible," the very condition that allows hospitals to claim them as bad debts. Hosp.'s Mem., at 17. The Secretary ignored this authority and made no attempt to demonstrate that the "presumption of collectibility" was in effect prior to August 1, 1987. To the contrary, the Secretary agreed with the Hospital about the date of origin, as the first authority for this

1

policy cited by the Secretary is MIM, 13-4, § 4198. Sec.'s Opp., at 7. As the Hospital has explained, this policy was first adopted in 1989; it is a "NEW POLICY" that was effective for cost report audits performed after 10/12/89. Hosp.'s Mem., at 17-18.[1]

While the Secretary does not contest that the presumption of collectibility was adopted after the Moratorium's effective date, she opposes the Hospital's position on the grounds that the Moratorium does not mean what it says. He makes the astonishing statement that "[i]t is well settled that the bad debt moratorium does not preclude changes in Medicare payment policies after August 1, 1987." The statement that this issue is "well settled" is astonishing, even blatantly misleading, because it is completely unsupported and, further, directly contrary to the position that the Secretary has repeatedly taken previously. In an attempt to provide authority for this clearly erroneous interpretation of the Moratorium, the Secretary has cited four cases to allegedly support his position that the Moratorium does not prohibit him from changing policies. However, for the reasons explained below, not one of these cases supports his position at all; to the contrary, two of the cases explicitly support the Hospital's reading of the Moratorium.

Before addressing these four decisions, we note that the proper standard to evaluate the meaning of the Moratorium is the familiar standard set forth by the Supreme Court in *Chevron,*

---

[1] It is not even clear that this new policy was properly adopted by the MIM provision, and the subsequent 1990 policy memorandum (Hosp.'s Mem., at 18), because not only was it not subjected to the normal rulemaking process required by the Administrative Procedure Act, but it was never included in the Provider Reimbursement Manual, which is the Medicare Program's principal sub-regulatory guidance that is provided to hospitals. The Secretary also failed to properly publish this new interpretive rule in the Federal Register. *See* Section II.D., *infra.* Further, as previously discussed in detail by the Hospital, the CMS Administrator has taken a contrary position in published decisions, making it unclear whether the policy, only purportedly adopted through this provision that was directed at fiscal intermediaries, not providers, actually remained in effect during the 1990's. Hosp.'s Mem., at 23-26.

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984).  In

*Chevron*, the Supreme Court stated:

> When a court reviews an agency's construction of the statute which
> it administers, it is confronted with two questions. First, always, is
> the question whether Congress has directly spoken to the precise
> question at issue. If the intent of Congress is clear, that is the end
> of the matter; for the court, as well as the agency, must give effect
> to the unambiguously expressed intent of Congress.  If, however,
> the court determines Congress has not directly addressed the
> precise question at issue, the court does not simply impose its own
> construction on the statute, as would be necessary in the absence of
> an administrative interpretation. Rather, if the statute is silent or
> ambiguous with respect to the specific issue, the question for the
> court is whether the agency's answer is based on a permissible
> construction of the statute.

467 U.S. 842-43.  In this case, the language of the statute is so clear that its meaning can be

determined at the first stage of the *Chevron* analysis.

The first paragraph of the Moratorium (as adopted in 1987 and amended in 1988)

provides:

> In making payments to hospitals under the XVIII of the Social
> Security Act, the Secretary of Health and Human Services shall not
> make any change in the policy in effect on August 1, 1987, with
> respect to payment under title XVIII of the Social Security Act to
> providers of service for reasonable costs relating to unrecovered
> costs associated with unpaid deductible and coinsurance amounts
> incurred under such title (including criteria for what constitutes a
> reasonable collection effort, including criteria for indigency
> determination procedures, for record keeping, and for determining
> whether to refer a claim to an external collection agency).

Pub.L. No. 100-647 § 8402, 102 Stat. 3798 (1988).[2]  It is impossible to imagine an interpretation

of this that would allow the Secretary to make post-1987 changes in bad debt policy.  Because

---

[2]  This cite to the 1988 revision of the Moratorium was cited, at Hosp.'s Mem., p. 15,
perhaps incorrectly, as "102 Stat. 3342," which was obtained from Westlaw.  There seems to be a
variation as to how this is cited in different sources, but we believe the cite given here is the
correct one.

the meaning is so clear, there is no need for the court to consider the meaning under the second step of the *Chevron* analysis.[3]

As stated above, the four cases cited by the Secretary (Sec.'s Opp., at 23, fn. 8) do not at all support his position regarding the meaning of the Moratorium; in fact, it is almost shocking that he has cited to them. The Hospital will address them in the order of their citation in the footnote:

1.    *University Health Servs. v. HHS*, 120 F. 3d 1145, 1152 (11th Cir. 1997). This case pertained to claims for bad debts that the plaintiff hospital had made for its 1986 fiscal year. The issue in that case pertained to the second paragraph of the Moratorium, not the first, and turned on whether the fiscal intermediary had "accepted" the hospital's particular practices (treating Medicare and non-Medicare claims differently) which were inconsistent with the Secretary's policies at the time. Since the case addressed a period prior to August 1, 1987, the case could not possibly have had any bearing on whether the Secretary was entitled to change policies after that date. Further, on p. 1152 cited by the Secretary, the *University* court cited favorably to the *Hennepin County* decision, which had language specifically supporting the Hospital's interpretation of the first paragraph of the Moratorium.

_____

[3] Even if the Court could find some ambiguity and would engage upon a review under the second step of *Chevron* to determine whether the Secretary's construction is permissible, deference given to the Secretary's opinion here would be very limited, as he has previously espoused the complete opposite interpretation. *See discussion, infra.* Inconsistent agency interpretations are entitled to reduced deference. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446, n. 30 (1987). Further, the construction of the statute that the Secretary has expressed in his brief is merely a litigation position, which in itself is not entitled to much deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("We have never applied the principle of [*Chevron*, etc.] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.")

2.      *Hennepin Co. Medical Ctr. v. Shalala*, 81 F.3d 743, 750-51 (8th Cir. 1996).  This case addressed Medicare bad debt practices (again, differential treatment between Medicare and non-Medicare patients) that occurred during the plaintiff hospital's 1983 fiscal year.  Thus, again, this case could not possibly have any bearing on whether the Moratorium prevented the Secretary from changing policies after August 1, 1987.  Nonetheless, in the course of its decision, the court expressed the following analysis:

> In passing the moratorium, Congress was motivated to prevent unexpected consequences to providers from the inspector general's proposed changes in the criteria for bad debt reimbursement.  1988 Conf. Rep. 277, *reprinted in* 1988 U.S.C.C.A.N. at 5337.  Permitting correction of errors made by intermediaries in the application of rules existing on August 1, 1987 is consistent with that policy.  It appears Congress merely sought to freeze a moment in time, forbidding the Secretary to change the criteria after that date, but allowing full enforcement of the policies in place before it.  [Emphasis added.]

81 F.3d at 751.  This statement by the *Hennepin* court supports the Hospital's view on the scope of the Moratorium, not the Secretary's.  It expresses the understanding that the Secretary was prohibited from changing bad debt criteria after 1987.

3.      *Harris County Hosp. Dist. v. Shalala*, 64 F.3d 220, 222 (5th Cir. 1995).  This case pertained to Medicare bad debts for the plaintiff hospital's 1988 fiscal year.  However, the focus of the case was not whether the Secretary could change policies, but whether the intermediary had "accepted" the provider's procedures for determining indigency, which appeared to be inconsistent with requirements stated clearly in the Provider Reimbursement Manual.  Not only did this case not pertain to the first paragraph of the Moratorium, but the court did not even quote the first paragraph in its opinion.

4.      *Detroit Receiving Hosp. v. Shalala*, 999 F.Supp. 944, 950 (E.D. Mich. 1998).  This case should never have been cited in the first place, because the opinion was vacated by the

Sixth Circuit.  The District Court found in favor of the Secretary, but the Sixth Circuit reversed,

in an unpublished opinion, finding for the plaintiff hospital and remanding.  *Detroit Receiving*

*Hosp. v. Shalala*, 194 F.3d 1312 (Table), 1999 WL 970277 (6th Cir. 1999).  Although the District

Court opinion was vacated, the Secretary cited it, so the Hospital feels compelled to point out

that it states the exact opposite of what the Secretary represented to this Court.  If the Secretary

had read further into the opinion, he would have seen the following discussion:

> On the face of the statutory language itself, the moratorium includes two restrictions upon the Secretary.  First, it prohibits the Secretary from making "any change in the policy in effect on August 1, 1987, with respect to payment under [Medicare] to providers of service for reasonable costs relating to uncovered costs…(including criteria for what constitutes a reasonable collection effort), [and] including criteria for…determining whether to refer a claim to an external collection agency."  42 U.S.C.A. § 1395f note. Second, the moratorium prohibits…
>
> Thus, the moratorium is aimed at accomplishing a freeze on the status quo ante as of August 1, 1987 on two levels:  (1) the Secretary may not change her policies regulating the collection of Medicare bad debt and the definitions thereunder; and (2) the Secretary may not require a hospital to change its bad debt collection policies if these policies had been accepted by an intermediary and that intermediary's acceptance was in accordance with the rules in effect at that time.

999 F. Supp., at 954.

In its unpublished opinion, moreover, the Sixth Circuit reiterated this same understanding

that there are two separate restrictions embodied in the Moratorium:

> The Moratorium clearly contains two prohibitions; read in the light of logic, the ordinary rules of English grammar and usage, and the Moratorium's legislative history, we conclude that the prohibitions are these: First, the Secretary is prohibited from making any change in "the policy in effect on August 1, 1987," which governed payment to providers for their reasonable costs relating to their unrecovered costs; that "policy," which the Secretary is prohibited from changing, includes the criteria governing what constitutes a "reasonable collection effort," which in turn includes the criteria for determining whether to refer a claim to an external

> collection agency. Second, the Secretary is prohibited from
> requiring a hospital to make changes in the hospital's bad debt
> collection policy . . .

1999 WL 970277, at p. 12.

Thus, the cases cited by the Secretary do <u>not</u> support his view that it is "well settled" that the Moratorium allows him to change bad debt policy after August 1, 1987, and, moreover, two of those cases state the exact opposite. At least one other Circuit Court has also held that the Moratorium prevents the Secretary from making changes in bad debt policy. *See Community Hosp. of Monterey Peninsula v. Thompson*, 323 F. 3d 782, 798, fn. 9 (9th Cir. 2003) ("Indeed, as the Providers stress, there is strong reason to believe that the author [of a Provider Reimbursement Manual provision promulgated in 1995] had no intent to change existing policy. Effective in August of 1987, Congress imposed a moratorium on changes in bad debt reimbursement policies, and the Secretary lacked authority in November of 1995 to effect a change in policy.")

Moreover, despite his spurious claim that his right to change bad debt policy after 1987 is "well settled," the Secretary himself has said the opposite in the past. For example, in his Brief for Appellee in *Detroit Receiving Hospital* before the Sixth Circuit, the Secretary stated as follows:

> The language of the moratorium is set forth *supra* at pages
> 7-8. The first paragraph of that statute precludes the Secretary
> from affirmatively changing her rules relating to the criteria for
> bad debt determinations. Detroit Receiving does not argue that the
> Secretary violated that paragraph of the moratorium.

*See* Brief for Appellee, *Detroit Receiving Hospital v. Shalala*, October 30, 1998, p. 26, relevant portion attached hereto as Exhibit 10. Similarly, in the *Community Hosp. of Monterey Peninsula* case, cited above, the Secretary made a similar statement that was critical to his position in that appeal:

Moreover, interpreting PRM-II § 1102.3L as dispensing with the requirement that providers bill the State Medicaid Agency would be untenable because it would constitute a change in Medicare's bad debt policy, which is prohibited under a Congressional moratorium that prohibits the Secretary from changing the bad debt policies that were in effect on August 1, 1987. The Secretary has had a consistent policy of requiring providers to bill the State Medicaid agency as a condition of reimbursement for Medicare crossover bad debts ever since the Secretary's promulgation of the regulations in 1966 and issuance of the PRM provisions in 1983. ER 285 I. Therefore, the moratorium prohibits the Secretary from changing the requirements in order to allow providers to submit alternative documentation in lieu of billing the State agency, as the district court interprets the questionnaire (issued in November 1995) to do.

Brief for the Defendant-Appellant, *Community Hosp. of Monterey Peninsula v. Thompson*, April 11, 2002, 2002 WL 32107150, p. 20, relevant portion attached hereto as Exhibit 11. Finally, there is a third example. In the Brief for Appellant submitted to the Eleventh Circuit in the *University Health Services* case, cited above, the Secretary stated that the Moratorium prevents him from changing bad debt policy:

A.    The Purpose And Intent Of The Legislative Moratorium.

The OBRA of 1987, as amended, preserves Medicare bad debt policy that was in effect on August 1, 1987. The Act and its legislative history reflect a congressional intent <u>to preclude the Secretary</u> from increasing provider requirements applicable to claims for reimbursement of Medicare bad debt claims after that date. <u>Additionally</u>, the moratorium broadens the definition of Medicare policy to include intermediary interpretations of Medicare bad debt policy, rendered prior to August 1, 1987, but only if such interpretations were "express" and "consistent with Medicare policy." [Emphasis added]

Brief for the Appellant, *University Health Servs., Inc. v. Shalala*, March 1996, 1996 WL 33469762, p. 23, relevant portion attached hereto as Exhibit 12.[4]

---

[4] The Hospital requests that the Court take judicial notice of these excerpts from the Secretary's appellate briefs that are included here as Exhibits 10, 11, and 12.

It is not surprising that the Secretary's previous position on the meaning of the first paragraph of the Moratorium is consistent with the Hospital's position, because the language of the Moratorium is so clear.  In the face of the Moratorium's clear language, previous judicial interpretations, and the Secretary's own views in the past, this Court should reject the Secretary's view, developed apparently only for this case, that the Moratorium does not prevent him from changing policies after August 1987.   In light of the fact that the policy to deem all bad debts sent to collection agencies *per se* ineligible for being written off and claimed on the Medicare cost report was adopted (if at all) first in 1989, as the Secretary agrees, the policy must be deemed unenforceable.

## II.    <u>THE ADMINISTRATOR'S DECISION HEREIN IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW</u>.

Because, as discussed above, the Secretary's 1989 purported change in policy occurred after the effective date of the Moratorium, the Court's analysis need not go any further in order to rule in favor of the Hospital.  Nonetheless, the Hospital has argued, and discusses further here, that, even if the Secretary's policy as expressed in the Administrator's decision herein was allowable under the Moratorium, it is arbitrary and capricious and thus should be reversed. Further, because the Secretary failed to properly publish the policy in the Federal Register and is retroactively enforcing a policy adopted through adjudication, the policy should be declared unenforceable.

A.    **The Secretary's Position Prohibiting Providers From Claiming Bad Debts Whenever The Accounts Remain At An Outside Collection Agency Is Entitled To Only Limited Deference.**

In its motion for summary judgment, the Hospital argued that the Secretary's position herein was entitled to only limited deference because of the notable inconsistency in the Secretary's position as to whether debts referred to outside collection agencies could be deemed worthless and claimed as "bad debts" on the Medicare cost report. In rebutting this, the Secretary misstates the Supreme Court's analysis, claiming that the Supreme Court held in *Thomas Jefferson University v. Shalala, 512 U.S. 504 (1994)*, at p. 151, that "[d]eference is heightened for an agency's interpretation of a statute or regulation that is consistent through time." Sec.'s Opp., at 14. There is no such concept of "heightened deference" expressed in *Thomas Jefferson*; rather, the court repeats the accepted maxim that there is "considerably less deference" for an agency's interpretation that conflicts with a prior interpretation or has been inconsistent over time. In that case, the court rejected the application of this principle, because there was no persuasive evidence that the Secretary had interpreted the Medicare provision at issue therein inconsistently. In this case, however, there can be no question that there has been inconsistent treatment, treatment that was explicit and directly contrary to the position currently espoused.

In *Thomas Jefferson*, in arguing that there had been inconsistency, the plaintiff relied on an internal operating memorandum, which did not even address the principle at issue, and the fact that the plaintiff's fiscal intermediary had purportedly allowed reimbursement that violated the principle at issue, although there was no evidence that the agency was aware of this. 512 U.S. at 516-17. This is in great contrast to the instant case, wherein the Secretary, through his

10

direct designate the Administrator of the Centers for Medicare and Medicaid Services ("CMS"), specifically addressed the issue at hand.  The Secretary attempts to obfuscate this fact by stating that the Hospital "asserts that the Secretary's decision here conflicts with 1995 and 2000 PRRB decisions" and that "any contrary PRRB decisions made in the context of individual claims adjudication are not precedential and do not establish inconsistency in the Secretary's policy-making position."  Sec.'s Opp., at 14-15 (emphasis in the original.)

The Hospital has not referred the Court merely to PRRB decisions, as the Secretary would have the Court believe, but to a HCFA Administrator decision, *Lourdes Hospital v. Blue Cross and Blue Shield Association*, Oct. 27, 1995, CCH Medicare & Medicaid Guide, ¶ 43,723 (Exhibit 6 to Plaintiff's Motion for Summary Judgment).[5]  Thus, it was the CMS Administrator himself, the direct designate of the Secretary and the same person who has now declared that bad debts cannot be claimed if the accounts remain at a collection agency, who took the precise opposite position a few years ago.  *See* quotation from *Lourdes* at Hosp.'s Mem., pp. 23-24, wherein the Administrator clearly holds that Medicare accounts that were subject to the hospital's collection activity and then sent to an outside collection agency may be written off and claimed as bad debts on the Medicare cost report for that year, even though still pending at an outside collection agency.  While the Hospital also referenced other instances where CMS or one of its contractors issued conflicting information on this issue (Hosp.'s Mem., at  24-26), the fact is that the CMS Administrator himself previously stated a position diametrically opposed to the position he has taken with the Hospital here.  There could be no clearer example of inconsistency, and,

---

[5]  CMS was called HCFA (the Health Care Financing Administration) at the time of this previous decision.  The HCFA Administrator is the same as the current CMS Administrator.

therefore, the Court is bound to give considerably less deference to the Administrator's position than if he had taken a consistent position in the past.

The Hospital also notes that the Secretary has attempted to deflect this Court away from the inconsistency in his position by citing authority for the proposition that PRRB and CMS Administrator decisions is not precedential.  Sec's Opp., at 14-15.  The point is not whether the *Lourdes* decision, or the decision by the PRRB, left standing by the Administrator, in *Methodist Hosp. of Dyersburg v. Blue Cross and Blue Shield Ass'n*, PRRB Hearing Dec. No. 2000-D56, May 30, 2000, CCH Medicare & Medicaid Guide, ¶ 80,502, 2000 WL 796345 (discussed at Hosp.'s Mem., at 24-25), is precedential.  The point is that, when considering whether the Administrator's decision herein is arbitrary and capricious, the Court must give his position considerably less deference than if the agency's position had previously been consistent.

**B.**    **The Presumption of Collectibility Adopted by the HCFA Administrator Is Inconsistent With Other Longstanding Aspects of Bad Debt Policy.**

The Hospital has argued that the policy expressed by the Administrator herein, that debts sent to a collection agency must *per se* be deemed to be collectible until returned from the agency, makes little sense in light of other aspects of his bad debt policy.  Before discussing this further, the Hospital notes that the Secretary has attempted to deny that the Administrator's decision actually says what it does say.

The Administrator's decision states:

> If a provider continues to attempt to collection of a debt, either through in-house or a collection agency, it is reasonable to conclude that the provider still considers that debt to have value and that it is not worthless.  Thus, the Administrator finds it reasonable to expect a provider to demonstrate that it has completed its collection effort, including outside collection, before claiming debts as worthless.

> Thereby, if a provider deems a debt uncollectible after reasonable collection efforts, and thus worthless, a provider would not be expected to pursue further collection activities. However, if a provider does continue to pursue collection activities, clearly it does not believe the debt to be worthless.

A.R., at 7-8. This language could not be clearer. The Administrator has expressed a policy that would deny all bad debt reimbursement if a provider is still continuing collection efforts, including placement at an outside collection agency, and, based on this stated policy, has upheld the intermediary's denial of the Hospital's bad debts for the year at issue. The Secretary, in his brief, has attempted to soften this position by stating: "Here, there is such evidence [that the debts are still collectible], since it is reasonable to conclude that a debt that has just been referred to a collection agency cannot be deemed uncollectible until the agency has the opportunity to so at least some work to collect it." Sec.'s Opp., at 21. This is misleading, because the Administrator did not base his decision on the fact that the accounts were not at the collection agency for a period of time before they were written off. To the contrary, the Administrator's position, as expressed in his decision, is that no bad debt reimbursement may _ever_ be claimed while the debts remain at a collection agency.[6]

This absolute policy makes little sense in light of other aspects of bad debt reimbursement established by the Secretary. As the Hospital has noted, Provider Reimbursement Manual – I ("PRM-I") § 310.2 establishes a presumption that debts may be deemed uncollectible

---

[6] The Secretary also refers to facts in the case of _Dameron Hosp. Ass'n v. Leavitt,_ 2007 WL 2288289, Slip Op. (E.D. Cal. 2007), where it appears that the provider waited 30 to 60 days after referral to a collection agency before writing off the debt and claiming it on its Medicare cost report, as if the slight delay between referral to the collection agency and write-off made a difference. This is disingenuous, because the CMS Administrator upheld the denial of bad debt reimbursement for _Dameron_ regardless of this slight delay, finding that the accounts could not be shown to be worthless because they remained at the collection agency. _Dameron Hosp.,_ CMS Administrator Dec., April 17, 2006, CCH Medicare & Medicaid Guide, ¶ 81,254.

if reasonable collection efforts have been made for at least 120 days. The Secretary attempts to eviscerate this provision by focusing on the word "may" and suggesting it is therefore "discretionary." That is true, in a way; it gives discretion to the provider to take advantage of the presumption and claim bad debts after at least 120 days of collection efforts, as long as those efforts have been "reasonable." But the presumption would be meaningless, if providers had to prove each debt to be individually uncollectible before it could be claimed from the Medicare program.[7]

The Hospital has also pointed to PRM-I, § 316, which provides for an offset against current bad debts if the Hospital collects amounts that had previously been written off and claimed as bad debts, as further evidence that the "presumption of collectibility" was inconsistent with long-established reimbursement policy. Hosp.'s Mem., at 22. The Secretary has ignored this in his opposition. However, this policy protects the program from paying for bad debts that are ultimately collected, and it would be unnecessary if absolutely all collection efforts ceased when bad debts were claimed. The Administrator claims that this provision "in no way infers that the Medicare program expects, or even anticipates, providers to continue to pursue collection activities after claiming Medicare bad debts on their cost reports." A.R., at 7-8. This is truly disingenuous, because offset of payments on accounts that had been written off and claimed as bad debts in prior years is a fundamental part of the bad debt calculation every year. If CMS truly did not expect or anticipate that there would likely be any recoveries in subsequent

---

[7] If the use of the term "may" in § 310.2 means that the intermediary, rather than the provider, has "discretion" to consider a debt uncollectible after 120 days, that would make no sense. Only the provider could exercise discretion at the time it files its cost report and determines the correct amount of bad debts to claim. The intermediary does not even consider the provider's bad debts until the time of audit, months or years later.

years after bad debts were claimed, then the offset of recoveries pursuant to § 316 would be few and far between.  That simply is not the case.

Further, it would truly be contrary to sound business practices and to the interests of the Medicare program to force providers to cease absolutely all collection efforts when claiming reimbursement for bad debts.  Since the program benefits from the recovery, however unlikely, of bad debts after they have been written off, it makes no sense to demand that no efforts at all be made in subsequent years, which would result in no additional funds at all trickling in to the Medicare program.

C.    **The Secretary Should Not Be Permitted To Retroactively Apply A Rule Enunciated In An Agency Adjudication.**

As discussed above, the Secretary clearly set forth a policy in the *Lourdes* HCFA Administrator's Decision that is contrary to the policy prohibiting reimbursement of bad debts that remain at outside collection agencies that the Secretary is currently espousing.  Since the Secretary announced a contrary position in *Lourdes*, and let that policy decision remain standing in the PRRB decision in *Methodist Hosp. of Dyersberg*, it appears that the first pronouncement of its new position on this issue was in the CMS Administrator's Decision in *Battle Creek Health System v. Blue Cross/Blue Shield Association*, November 12, 2004, CCH Medicare & Medicaid Guide ¶ 81,261.  Having first announced this new rule through adjudication, the Secretary is now trying to apply it both retrospectively and prospectively.[8]

---

[8]  The Secretary asserts that it is "nothing more than Plaintiff's bare speculation" that, to the extent the Secretary established a policy of not allowing bad debt reimbursement when accounts remain at a collection agency, in 1989 he later abandoned that policy.  However, the *Lourdes* decision is clear in its allowance of bad debt when accounts remain at a collection agency, so it is absolutely clear that the Secretary was <u>not</u> following its 1989 policy by 1995.

While the general rule is that rules announced through adjudication may have retroactive as well as prospective effect, a retrospective application can properly be withheld when to apply the new rule to past conduct or prior events would work a "manifest injustice." *Clark-Cowlitz Joint Operating Agency v. F.E.R.C.,* 826 F.2d 1074 (D.C. Cir. 1987); *cert. denied* February 29, 1988. A list of five factors to assist courts in determining whether to grant an exception to the general rule permitting retroactive application of a rule enunciated in an agency adjudication was set forth in *Retail, Wholesale & Department Store Union v. N.L.R.B.*, 466 F.2d 380 (D.C. Cir. 1972):

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id*. at 390.

Considering these factors, it is clear that it would be inappropriate to allow the Secretary to retroactively apply the "presumption of collectibility" announced in *Battle Creek:*

1.      While the case is not one of first impression, since it was addressed in *Lourdes*, it essentially has the same impact as one of first impression, since the opposite policy was previously announced by the Secretary, through the CMS Administrator.

2.      The new rule clearly represents an abrupt departure from well-established practice, since the CMS Administrator had announced a contrary policy in *Lourdes*, which was based, as the CMS Administrator stated, on the statutes, regulations and Provider Reimbursement Manual provisions in effect at the time.

3.     The Hospital relied on the prior rule, as it understood it from the existing statutes, regulations and Provider Reimbursement Manual provisions, just as the CMS Administrator understood the rule to be when he discussed the policy in *Lourdes* in 1995.

4.     The burden of applying this policy retroactively on the Hospital is clearly great, since it is being deprived of a substantial amount of Medicare reimbursement.

5.     The Hospital can see no strong interest in applying this new rule retroactively, since the Medicare program is protected against any losses by its policy requiring offset of any future collections of bad debts that had been reimbursed by Medicare in the fiscal year at issue.

Additionally, in *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 322 (D.C. Cir. 2006), this Circuit noted that "an agency is free to change course in a regulatory regime provided that it offers a reasoned explanation for so doing and is not otherwise constrained by statutory limitations."  Here, no explanation is offered by the agency in changing course from the only formal determination previously rendered on this issue, *Lourdes*, and the change in course is specifically prohibited by the Moratorium.  Accordingly, the Court should find that it would be a "manifest injustice" to allow this new policy, announced by the CMS Administrator in *Battle Creek*, to be applied to cost reporting years that preceded the publication of that decision.

**D.     The Secretary's New Policy Is Invalid Because It Has Not Been Properly Published In The Federal Register.**

In a recent case, *Chippewa Dialysis Services v. Leavitt*, 511 F.3d 172 (D.C. Cir. 2007), the D.C. Circuit invalidated an interpretive rule implemented by the Secretary, because the rule

had not been published in the Federal Register.[9]  The court in that case noted that the Medicare

Act, at 42 U.S.C. § 1395hh(c)(1) requires that "[t]he Secretary shall publish in the Federal

Register, not less frequently than every three months, a list of all manual instructions,

interpretative rules, statements of policy, and guidelines of general applicability."  511 F.3d at

176.  The plaintiffs challenged a 3.0 hours per treatment standard that the Secretary was using to

determine the reimbursement rate for dialysis services, because, among other reasons, this

standard had been adopted but never published in the Federal Register.  The Court found that the

Secretary should have published the 3.0 hours per treatment standard, and, because there had

been no notice to the providers, it reversed an unfavorable district court finding and remanded

the case for further proceedings as to one of the plaintiffs.  (For unrelated reasons, the failure to

publish was found to be harmless error for the other two plaintiffs).  511 F.3d at 177-178.

   In this case, the "presumption of collectibility" when bad debt accounts remain at an

outside collection agency was first announced in the Medicare Intermediary Manual provision

adopted in September 1989.  While Transmittal 28, which included this new policy, was listed in

the Federal Register in the quarterly listing of program issuances and coverage determinations.

*See* 55 F.R. 10290, March 20, 1990, attached as Exhibit 13.  However, the actual rule change

was not sufficiently disclosed.  The new rules are listed under Intermediary Manual, Audit

Procedures, but identified only as "Prospective Payments System Hospital Audit Guidelines."  A

hospital would not be put on notice from this vague description that the policies regarding bad

debt collection and write-off requirements were being changed because Medicare bad debt is

reimbursed outside of Medicare's prospective payment system.  Therefore, this listing in the

---

[9]  The Hospital did not raise this issue in its Motion for Summary Judgment because the
*Chippewa* decision was not issued until December 27, 2007, after the Hospital filed its Motion.

Federal Register was insufficient to meet the requirement that an interpretive rule should be listed there to put providers on notice of the change.

Even if this listing had been sufficient, however, the Secretary subsequently changed the policy, as evidenced by the HCFA Administrator Decision in *Lourdes*. Then, as discussed above, the policy was purportedly changed once again in the HCFA Administrator Decision in *Battle Creek*. However, the change in policy enunciated in *Battle Creek*, which has in effect now become an interpretive rule applied by the Secretary, was never published in the Federal Register, thus again running afoul of the requirement in 42 U.S.C. § 1395hh(c)(1). In light of the flip-flopping by the Secretary on this issue, the rule certainly should have been published therein to put providers on notice of the change in policy. For this additional reason, the new policy should be invalidated.

III.   **CONCLUSION**

For the foregoing reasons, the Court should reverse the decision of the CMS Administrator in this case and order reversal of the fiscal intermediary's adjustment, along with interest paid to the Hospital pursuant to 42 U.S.C. § 1395oo(f)(2).

Dated:  April 2, 2008                    Respectfully submitted,

                                        _____/s/ John R. Jacob_____
                                        John R. Jacob, Esq.
                                        D.C. Bar No. 444412
                                        Akin Gump Strauss Hauer & Feld LLP
                                        1333 New Hampshire Ave. N.W.
                                        Washington, D.C.  20036
                                        (202) 887-4582

_____

Of Counsel

John R. Hellow, Esq.
Byron J. Gross, Esq.
Hooper, Lundy and Bookman, Inc.
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Tel: (310) 551-8151
Fax: (310) 551-8181

Attorneys for Plaintiff

20

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

FOOTHILL HOSPITAL - MORRIS L. JOHNSTON MEMORIAL, a California nonprofit corporation, dba Foothill Presbyterian Hospital,

        Plaintiff,

vs.

MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services,

        Defendant.

CASE NO. 1:07-CV-00701-ESH

# PLAINTIFF'S RESPONSE

# TO DEFENDANT'S  STATEMENT OF MATERIAL FACTS

# AS TO WHICH THERE IS NO GENUINE ISSUE

Plaintiff Foothill Hospital – Morris L. Johnston Memorial, hereby responds to Defendant's Statement of Material Facts as to Which There Is No Genuine Issue in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h).

Plaintiff agrees with Defendant's statement in his Response to Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue that, to the extent the parties disagree as to the facts underlying the present action, those disagreements are not material.

Nonetheless, Plaintiff responds as follows to the numbered paragraphs in Defendant's Statement:

1.–2.   Not disputed.

3.   Agreed that the debt was written off while accounts were at a collection agency and that this policy was applied equally to Medicare and non-Medicare debts, but disputed as to the timing of the write-offs *vis-à-vis* referral to a collection agency.  Plaintiff asserts that there is not sufficient evidence in the record to determine the relative timing of these events.

4.–12.  Not disputed.

Dated:  April 2, 2008                    Respectfully submitted,


          /s/ John R. Jacob
John R. Jacob, Esq.
D.C. Bar No. 444412
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave., N.W.
Washington, D.C.  20036
(202) 887-4582

2

_____

Of Counsel

John R. Hellow, Esq.
Byron J. Gross, Esq.
Hooper, Lundy and Bookman, Inc.
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Tel: (310) 551-8151
Fax: (310) 551-8181

Attorneys for Plaintiff

**EXHIBIT  10**

No. 98-1429

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DETROIT RECEIVING HOSPITAL
AND UNIVERSITY HEALTH CENTER

Plaintiff-Appellant,

v.

DONNA E. SHALALA, SECRETARY OF HEALTH
AND HUMAN SERVICES, in her official capacity,

Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

BRIEF FOR APPELLEE

FRANK W. HUNGER
*Assistant Attorney General*

SAUL A. GREEN
*United States Attorney*

BARBARA C. BIDDLE
(202) 514-2541
KATHERINE S. GRUENHECK
(202) 514-3159
*Attorneys, Appellate Staff*
*Civil Division, Room 9608*
*Department of Justice*
*Washington, D.C. 20530-0001*

"Proof" Copy

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF SUBJECT MATTER AND APPELLATE
    JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

 ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    a.  Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    b.  Statutory and Regulatory Scheme . . . . . . . . . . . . . . . . . . . . . . 3

    c.  Course of Proceedings Below and Disposition in District Court . . . . . . . . . . 10

    d.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    I.     THE SECRETARY'S DISALLOWANCE OF A PORTION
          OF THE PROVIDER'S 1991 CLAIM FOR MEDICARE
          BAD DEBTS MUST BE UPHELD BECAUSE THE
          PROVIDER FAILED TO ENGAGE IN "REASONABLE
          COLLECTION EFFORTS" AS THAT PHRASE IS
          PROPERLY INTERPRETED BY PRM § 310 . . . . . . . . . . . . . . . . . 22

    II.    THE BAD DEBT MORATORIUM HAS NO APPLICATION
          HERE BECAUSE, PRIOR TO AUGUST 1, 1987,  THE
          PROVIDER'S BAD DEBT COLLECTION PRACTICE
          WAS NEVER EXPLICITLY ACCEPTED BY THE
          INTERMEDIARY, AND, IN ANY CASE, WAS CLEARLY
          INCONSISTENT WITH THE MEDICARE RULES IN EFFECT
          ON THAT DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

i

II.  THE BAD DEBT MORATORIUM HAS NO APPLICATION HERE
     BECAUSE, PRIOR TO AUGUST 1, 1987, THE PROVIDER'S BAD DEBT
     COLLECTION PRACTICE WAS NEVER EXPLICITLY ACCEPTED BY
     THE INTERMEDIARY, AND, IN ANY CASE, WAS CLEARLY
     INCONSISTENT WITH THE MEDICARE RULES IN EFFECT ON THAT
     DATE.

     The Secretary also held (R. 7 AR 10-11, JA __), and the district court affirmed (R. 24

Opin. at 30, JA __), that, under the circumstances of this case, the bad debt moratorium is not

triggered, and, thus, the intermediary's otherwise proper disallowance of the provider's 1991

Medicare bad debt claim must be allowed to stand.  Detroit Receiving challenges the

Secretary's interpretation of the moratorium, contending that that statute should apply here to

override application of PRM § 310 and thus to bar a disallowance of the provider's claim.  For

the reasons set forth below, the Secretary's interpretation of the bad debt moratorium, which is

part of the organic statute she is charged with interpreting, is reasonable and consistent with

Congress' intent and thus is entitled to considerable weight.

     The language of the moratorium is set forth *supra* at pages 7-8.  The first paragraph of

that statute precludes the Secretary from affirmatively changing her rules relating to the criteria

for bad debt determinations.  Detroit Receiving does not argue that the Secretary violated that

paragraph of the moratorium.

     Interpretation of the second paragraph is at issue here.  The second paragraph prohibits

intermediaries from imposing stiffer standards in the determination of Medicare bad debt in a

particular case than it "accepted" from that provider prior to August 1, 1987, but only if the

provider's pre-August 1987 practice was "in accordance with the rules in effect as of August

1, 1987."

     The Secretary held that "the moratorium applies only if an intermediary's prior

acceptance of a provider's bad debt practice policy was 'in accordance with the rules in effect

26

**EXHIBIT  11**

🗎 Original Image of this Document (PDF)

2002 WL 32107150 (C.A.9)
For opinion see 323 F.3d 782

Briefs and Other Related Documents

United States Court of Appeals,
Ninth Circuit.
COMMUNITY HOSPITAL OF MONTEREY PENINSULA, et al. Plaintiffs-Appellees,
v.
Tommy G. THOMPSON, Secretary of Health and Human Services Defendant-Appellant.
Nos. 01-17512, 02-15115.
April 11, 2002.

Appeal From the United States District Court for the Northern District of California District Court NO.
C-01-00142 VRW

Brief for the Defendant-Appellant

DAVID W. SHAPIRO, United States Attorney.
JOCELYN BURTON, Assistant United States Attorney, 450 Golden Gate Avenue, San Francisco, CA
94102, Telephone: (415) 436-7198, Facsimile: (415) 436-6748, Attorneys for Defendant-Appellant.

*i TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iv

STATEMENT OF JURISDICTION ... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ... 1

STATEMENT OF THE CASE ... 2

STATEMENT OF FACTS ... 3

I. Statutory and Regulatory Background ... 3

A. Medicare Review ... 3

B. Provider Cost Reimbursement Generally ... 5

C. Provider Reimbursement of Bad Debts ... 6

D. Bad Debt Pertaining to "Crossover" Payments ... 7

II. Administrative Proceedings Below ... 9

III. District Court Proceedings Below ... 13

SUMMARY OF THE ARGUMENT ... 14

STANDARD OF REVIEW ... 16

ARGUMENT ... 19

I. THE SECRETARY'S FINDING THAT PROVIDERS MUST BILL MEDI-CAL BEFORE CLAIMING REIMBURSEMENT FOR CROSSOVER BAD DEBT SHOULD BE UPHELD BECAUSE IT IS FULLY CONSISTENT WITH THE APPLICABLE STATUTORY AND REGULATORY PROVISIONS ... 19

*ii A. The Secretary Has Broad Statutory Authority to Determine the Amount of Medicare Reimbursement ... 19

B. The Secretary's Must-Bill Determination Is a Reasonable Interpretation of the Regulations at Issue ... 21

1. The Secretary's Interpretation of 42 C.F.R. § 413.80 is Reasonable ... 23

2. The Secretary's Interpretation of 42 C.F.R. § 413.20 is Reasonable ... 28

C. The District Court's Rejection of the Secretary's Interpretation of the Applicable Regulations Does Not Withstand Scrutiny ... 31

II. THE SECRETARY REASONABLY DETERMINED THAT THE HOSPITALS' PROPOSED SURROGATE DATA WOULD NOT MEET THE REGULATORY REQUIREMENTS FOR ESTABLISHING REIMBURSABLE MEDICARE BAD DEBT ... 45

A. Neither the Statute Nor the Regulations Require The Secretary to Accept Surrogate Documentation ... 46

B. The Secretary's Determination that Surrogate Documentation Is Insufficient Is Reasonable and Supported By Substantial Evidence ... 48

1. The Hospitals' Surrogate System Does Not Consist of Financial Records Maintained in the Ordinary Course of Business as the Regulations Require ... 48

2. The District Court Erred in Requiring the Secretary to Accept Proposed Surrogate Documentation That Would Be Neither Accurate Nor Reliable ... 49

*iii III. THE SECRETARY'S MUST-BILL POLICY DOES NOT VIOLATE 42 U.S.C. § 1395x(v)(1)(A)(i) ... 53

A. The Must-Bill Policy Does Not Implicate the Cost-Shifting Prohibition of 42 U.S.C. § 1395x(v)(1)(A)(i) ... 54

B. The Secretary's Interpretation of 42 U.S.C. § 1395x(v)(1)(A)(i) is Entitled to Substantial Deference ... 55

C. The District Court's Conclusion that the Secretary's Must-Bill Policy Violates the Cost-Shifting Prohibition Was Based on Erroneous Factual Determinations ... 57

CONCLUSION ... 60

*iv TABLE OF AUTHORITIES

FEDERAL CASES

Alhambra Hospital v. Thompson, 259 F.3d 1071 (9th Cir. 2001) ... 18, 35

Astoria Fed'l Savings and Loan Association v. Solimino, 501 U.S. 104 (1991) ... 39

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81

only time it is unequivocally clear that the State is not responsible for the coinsurance/deductibles of crossover patients. The ***43** services at issue in this litigation, however, are those for which the State normally provides coverage. Even though the State has implemented a payment ceiling, the State may cover some portion of the total amount of coinsurance/deductibles owing where the services are not categorically excluded. CAL. WELF. & INST. CODE § 14109.5. Because there is a possibility that the State will pay for at least some portion of the coinsurance/deductibles under a State payment ceiling, it is necessary for providers to engage in a "reasonable collection effort" by billing the State). [FN15]

> FN14. For example, Institutions for Mental Diseases ("IMD's") are permitted to claim Medicare crossover bad debts without billing the State agency where the services were provided to an individual aged 22-64, because the Medicaid statute and regulations categorically preclude payment for services provided to patients aged 22-64 in IMD's, and the State accordingly has absolutely no responsibility for the coinsurance/deductibles associated with those particular services. See, 42 U.S.C. § 1396d(a)(14) and (15); 42 C.F.R. §§ 435.1008(a)(2) and 441.13(a)(2) (State Medicaid Plan receives no Federal Financial Participation for services to this category of individuals).

> FN15. See Intermediary Manual, § 4499, Exhibit 15, ¶ 15.08 (ER 6008). The Intermediary Manual sets forth standards for the intermediaries' *auditing* of hospitals' cost reports and clearly requires that the provider bill the Medicaid program and have a "notice of [the State's] rejection" of the bill in each patient's file. ¶ 15.08B., D. The auditing standards in the Intermediary Manual are more authoritative than the Instructions for filling out a Cost Report Reimbursement Questionnaire. Compare description of the Audit Program (ER 6000) which focuses on the cost report itself with the description of the Questionnaire that must be submitted with the Provider Cost Report (ER 5892). Moreover, the audit standards at ¶ 15.08 were issued in December of 1985 prior to the moratorium (see text, infra, directly below). ER 6008 noting that ¶ 15.08 was issued "12-85."

Moreover, interpreting PRM-II § 1102.3L as dispensing with the requirement that providers bill the State Medicaid agency would be untenable because it would constitute a change in Medicare's bad debt policy, which is prohibited under a Congressional moratorium that prohibits the Secretary from ***44** changing the bad debt policies that were in effect on August 1, 1987.[FN16] The Secretary has had a consistent policy of requiring providers to bill the State Medicaid agency as a condition of reimbursement for Medicare crossover bad debts ever since the Secretary's promulgation of the regulations in 1966 and issuance of the PRM provisions in 1983. ER 285 I. Therefore, the moratorium prohibits the Secretary from changing the requirements in order to allow providers to submit alternative documentation in lieu of billing the State agency, as the district court interprets the questionnaire (issued in November 1995) to do.

> FN16. See Omnibus Budget Reconciliation Act of 1987 (OBRA), Pub.L. No. 100-203, § 4008(c), 101 Stat. 1330, 1350-55, as amended by the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100-647, § 8402, 102 Stat. 3342, 3798, and as further amended by the Omnibus Reconciliation Act of 1989, Pub.L. No. 101-239, § 6023(a), 103 Stat. 2106, 2167.

Of course, even if, *arguendo*, the district court's interpretation constituted a plausible interpretation of the Secretary's regulations and Manual provisions, or even if the district court's Order states the interpretation that this Court itself would prefer, that would not permit invalidation of the Secretary's interpretation. *Thomas Jefferson Univ.*, 512 U.S. at 512 (when reviewing an agency's interpretation of its own regulations, the court's task is not to select among several competing interpretations, but rather to defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by ***45** other indications of the Secretary's intent at the time of the regulation's promulgation). Moreover, to the extent that the district court's interpretation reflects a viable alternative interpretation of the regulations and Manual provisions, that would at most render

**EXHIBIT  12**



1996 WL 33469762 (C.A.11)                                                    Page 1
(Cite as: 1996 WL 33469762)

For Opinion See 120 F.3d 1145

United States Court of Appeals, Eleventh Circuit.
UNIVERSITY HEALTH SERVICES, INC., Plaintiff-Appellee,
v.
Donna E. SHALALA, Secretary of Health and Human Services, Defendant-Appellant.
No. 95-9493.
March, 1996.

On Appeal from the United States District Court for the Southern District of Georgia, Augusta Division

Brief for the Appellant

Frank W. Hunger, Assistant Attorney General, Harry D. Dixon, Jr., United States Attorney, Barbara C. Biddle, (202) 514-2541, Katherine S. Gruenheck, (202) 514-3159, Attorneys, Appellate Staff, Civil Division, Room 3617, Department of Justice.

*I STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. This case involves questions of first impression in this Circuit regarding whether equitable estoppel lies against the government in the context of reimbursement of a hospital's Medicare bad debts and, alternatively, whether the legislative moratorium on policy changes in reimbursement criteria for Medicare bad debts contained in the Omnibus Budget Reconciliation Act of 1987, as amended, applies in this case.

TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF TYPE SIZE AND STYLE

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ... 2

STATEMENT OF THE CASE ... 3

A. Course of Administrative and District Court Proceedings and Disposition Below ... 3

B. Statement of the Facts ... 5

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33469762 (C.A.11)
(Cite as: 1996 WL 33469762)

1. Statutory and Regulatory Scheme ... 5

2. Background And Procedural History ... 13

  a. Administrative Proceedings ... 13

  b. District Court Decision ... 21

STANDARD OF REVIEW ... 23

SUMMARY OF ARGUMENT ... 24

ARGUMENT ... 28

*ii INTRODUCTION ... 28

I. THE SECRETARY CANNOT BE ESTOPPED FROM DISALLOWING UNIVERSITY'S NONCONFORMING
MEDICARE BAD DEBT CLAIM BECAUSE THE PROVIDER FAILED TO PROVE REASONABLE, DETRI-
MENTAL RELIANCE ON PAST INTERMEDIARY ACTION ... 30

  A. There is No Case For Detrimental Reliance Here Because The Medicare Bad Debts
Collection Practice That University Followed In 1986 Was The Same One It Adopted
Years Earlier ... 33

  B. University's Reliance, If Any, Upon Past Intermediary Allowance Of Medicare
Bad Debt Claims Was Unreasonable Because Intermediaries Are Not Authorized To Make
Policy, And, In any Event, University's Practice Was Established without The In-
termediary's Knowledge Or Express Approval ... 35

*iii II. THE LEGISLATIVE MORATORIUM ON CHANGES IN BAD DEBT POLICY HAS NO APPLICA-
TION HERE ... 39

  A. The Purpose And Intent Of The Legislative Moratorium ... 39

  B. The Secretary's Bad Debt Policy Was Established Prior To The Legislative
Moratorium And The Administrative Record Demonstrates University's Nonconformity
With Such Policy ... 40

III. IN ADDITION TO FAILING TO MEET THE REGULATION'S "REASONABLE COLLECTION EF-
FORT" CRITERION, UNIVERSITY ALSO FAILED TO SATISFY THE REGULATION'S "SOUND BUSI-
NESS JUDGMENT" CRITERION ... 48

CONCLUSION ... 53

CERTIFICATE OF SERVICE

ADDENDUM

Note: Table of Contents page numbers missing in original document

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 33469762 (C.A.11)                                                                    Page 23
(Cite as: 1996 WL 33469762)

Second, even if the intermediary's failure to conduct an audit of the bad debt
item on University's cost reports prior to its review of the 1986 cost report is
viewed as lulling the provider into continuing on the erroneous course it had ad-
opted, such reliance was unreasonable. As the Supreme Court held in *Community
Health Servs.*, 467 U.S. at 64, the intermediary serves a purely administrative
function. It is a mere conduit for information. It has no authority to resolve
policy questions, and therefore no legal or equitable consequences may flow
against the government from either intermediary misinformation or inaction. *Id.*
And see *Alarcare Home Health Services. Inc. v. Sullivan*, 891 F.2d at 855.
Moreover, the facts here are less sympathetic to the provider than they were in
*Community Health Services* where the Supreme Court held that the provider's reli-
ance upon bad advice from an intermediary was not sufficient to establish estop-
pel. Here, University never even inquired as to how the Medicare program inter-
preted the "reasonable collection efforts" criterion in the bad debt regulation.
Accordingly, there was no reasonable basis for reliance on the intermediary's ac-
tions or inactions here.

   **\*39** II. THE LEGISLATIVE MORATORIUM ON CHANGES IN BAD DEBT POLICY HAS NO APPLICA-
                                      TION HERE.

The district court ruled in the alternative that the Secretary's disallowance is
based on a post-1987 change in the program's bad debt reimbursement policy and is
therefore barred by the OBRA of 1987, as amended. R. 1-33-20-21. The court's de-
cision is based upon a misunderstanding of the OBRA, Medicare policy, and the re-
cord facts. Below, we address each of these points in turn.

             A. *The Purpose And Intent Of The Legislative Moratorium.*

The OBRA of 1987, as amended, preserves Medicare bad debt policy that was in ef-
fect on August 1, 1987. The Act and its legislative history reflect a congression-
al intent to preclude the Secretary from increasing provider requirements applic-
able to claims for reimbursement of Medicare bad debt claims after that date. Ad-
ditionally, the moratorium broadens the definition of Medicare policy to include
intermediary interpretations of Medicare bad debt policy, rendered prior to August
1, 1987, but only if such interpretations were "express" *and* "consistent with
Medicare policy." The moratorium's extension of limited policy-making authority to
intermediaries stands in sharp contrast to the purely ministerial role historic-
ally assigned to them in the Medicare program. *See Community Health Servs., Inc.*,
467 U.S. at 2226. Such a limited delegation of legislative authority must be nar-
rowly construed.

**\*40** The district court failed to heed either limitation of the legislative
moratorium, as it relates to pre- August 1, 1987 intervenor actions, and there is
no record support for its application here. To the contrary, the evidence shows
that the provider's 1986 practice was clearly inconsistent with the Secretary's
comparable collections policy, and, prior to enactment of the moratorium, the in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

termediary allowed University's bad debt claims without knowledge of the provider's underlying, inconsistent practice.

B. The Secretary's Bad Debt Policy Was Established Prior To The Legislative Moratorium And The Administrative Record *Demonstrates University's Nonconformity With Such Policy.*

The district court found first that the "reasonable collection effort" clause of the bad debt regulation was ambiguous from the start and that the Secretary's guidelines PRM §§ 310.A and 310.2, interpretations in existence since at least the early 1980s,[FN23] offered some but not complete clarification on the question whether, as a prerequisite to reimbursement of a Medicare bad debt claim, a provider must continue its collection obligations vis-a-vis Medicare accounts at the conclusion of 120 days of collection effort where it does so as to non-Medicare accounts. R. 1-33-11. The district court then took notice that, in pre-1986 cost report years, the intermediary allowed reimbursement of *41 University's bad debt claims in circumstances where University continued collection efforts beyond 120 days as to its non-Medicare accounts only. R. 1-33-13. The court concluded that the intermediary's mere allowance of University's bad debt claims in those years (as discussed *infra*, without knowledge, much less express acceptance of University's practice) constituted an interpretation of "reasonable collection efforts" binding at least as to this provider under the second clause of the legislative moratorium. R. 1-33- 20-21. As we demonstrate below, the district court's decision cannot withstand analysis.

FN23. *See* Addendum at 18a-19a.

First, as discussed *supra*, the administrative record reflects that prior to review of the provider's 1986 cost report, the intermediary had no knowledge of University's practice with regard to collection efforts beyond 120 days. The type of practice utilized by University was not apparent from the face of the cost report. R. 2-7-298. There is no evidence that University ever volunteered this information to the intermediary. Nor was there any evidence that University even made an inquiry as to the proper practice. The undisputed evidence was that the intermediary did not learn of University's practice until 1989 when it conducted a specific audit of this item in University's 1986 cost report. R. 2-7-298. Upon learning of this practice, the intermediary disallowed the claim, explaining that the provider's practice was inconsistent with PRM § 310.A. R. 2-7-299. On the basis of this evidence, it must be *42 concluded that the intermediary never "expressly approved" University's practice as required by the second paragraph of the legislative moratorium.

Second, even if the intermediary's allowance of University's bad debt claims for cost years prior to 1986 may be taken as "tacit" ratification of such practice, as the district court found,[FN24] such "approval" is of no effect under the moratorium because the practice itself is inconsistent with the Secretary's policy, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT  13**

Branch (address above) in three copies (except that individuals may submit single copies) and identified with the docket number found in brackets in heading of this document. Comments and petitions may be seen in the Dockets Management Branch between 9 a.m. and 4 p.m., Monday through Friday.

Dated: March 12, 1990.

Stuart L. Nightingale,

*Associate Commissioner for Health Affairs.*

[FR Doc. 90-6285 Filed 3-19-90; 8:45 am]

BILLING CODE 4160-01-M

---

## Health Care Financing Administration

**[015-007-N]**

### Quarterly Listing of Program Issuances and Coverage Determinations

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** General Notice.

**SUMMARY:** This notice lists HCFA manual instructions, interpretative rules, statements of policy, and national coverage determinations that were published during July, August and September 1989 that relate to the Medicare program. Section 1871 (c) of the Social Security Act requires that we publish a list of our program issuances in the Federal Register every three months.

We also are providing the contents of several revisions to the Medicare Coverage Issues Manual. On August 21, 1989 we published (42 FR 34555) the content of the Manual and indicated that we will publish quarterly any updates. Adding the Coverage Issues Manual changes to this listing allows us to fulfill this requirement in a manner that facilitates easy identification of coverage and other changes in our manuals.

**FOR FURTHER INFORMATION CONTACT:**
Allen Savadkin (For Instruction Information Only) (301) 966-5255
Samuel Della Vechia (For Coverage Information) (301) 966-5316
Matt Plonski (For all Other Information) (301) 966-4662

**SUPPLEMENTARY INFORMATION:**

### I. Program Issuances

The Health Care Financing Administration (HCFA) is responsible for administering the Medicare program, a program which pays for health care and related services for 34 million Medicare beneficiaries. Administration of the program involves effective communications with regional offices, State governments, various providers of

health care, fiscal intermediaries and carriers who process claims and pay bills, and others. To implement the various statutes on which the program is based, we issue regulations under authority granted the Secretary under sections 1102 and 1871 and related provisions of the Social Security Act (the Act) and also issue various manuals, memoranda, and statements necessary to administer the program efficiently.

Section 1871(c)(1) of the Act requires that we publish in the Federal Register no less frequently than every three months a list of all Medicare manual instructions, interpretative rules, statements of policy, and guidelines of general applicability not issued as regulations. This is the seventh listing of issuances. As in prior notices, although both substantive and interpretive regulations published in the Federal Register in accordance with section 1871(a) of the Act are not subject to the publication requirement of section 1871(c), for the sake of completeness of the listing of operational and policy statements we are including regulations (proposed and final) published.

### II. Coverage Issues

We receive numerous inquiries from the general public about whether specific items or services are covered under Medicare. Providers, carriers and intermediaries have copies of the Medicare Coverage Issues Manual, which identifies whether certain specific medical items, services, technologies, or treatment procedures can be paid for under Medicare. We published on August 21, 1989 (54 FR 34555), a notice that contained all the Medicare coverage decisions issued in that manual.

In the notice we indicated that revisions to the Coverage Issues Manual will be published at least quarterly in the Federal Register. We also sometimes issue proposed or final national coverage decision changes in separate Federal Register notices. Since we have been publishing each quarter a notice listing all manual issuances, including any released for the Coverage Issues Manual, we are adding a table to this listing that contains revisions to the manual. Readers should find this an easy way to identify both our issuance of changes to all our manuals and the text of changes to the Coverage Issues Manual.

Revisions to the Coverage Issues Manual are published on an as needed basis. We publish revisions as a result of technological changes, medical practice changes, or in response to inquiries we receive seeking

clarification or resolution of a coverage issue under Medicare. If no Coverage Issues Manual revisions were published during a particular quarter, our listing will reflect that fact.

Not all revisions to the Coverage Issues Manual contain major changes. As with any instruction, sometimes minor clarifications or revisions are made within the text. We have decided to reprint any manual revision exactly as transmitted to manual holders, except we will not reprint material relating solely to the table of contents. The table of contents serves primarily as a finding aid for the user of manual material and does not identify items as covered or not.

Since the August 21, 1989, publication date we have published five issuances answering various inquiries concerning coverage issues. Issuance updates found in Table IV, when added to material from the manual published on August 21, 1989 (42 FR 3455), constitute a complete manual as of September 30, 1989. Parties interested in obtaining a copy of the manual and revisions should follow the instructions in section B.

#### A. How to Use the Listing

This notice is organized so that a reader may review the subjects of all manual issuances, memoranda, regulations, or coverage decisions published during this timeframe to determine whether any are of particular interest. We expect it to be used in concert with previously published notices. Most notably, those unfamiliar with a description of our manuals may wish to review Table I of our first three notices; those desiring information on the Medicare Coverage Issues Manual may wish to review the August 21, 1989 (42 FR 34555) publication; and those seeking information on the location of regional depository libraries may wish to review Table IV of our first notice (53 FR 21736). We have divided this current listing into four tables.

Table I describes where interested individuals can get a description of all previously published HCFA manuals and Memoranda.

Table II of this notice lists, for each of our manuals or Program Memoranda, a transmittal number unique to that instruction and a brief statement of its subject matter. The subject matter in a transmittal may consist of a single instruction or many. Often it is necessary to use information in a transmittal in conjunction with information currently in the manuals.

Table III lists all Medicare and Medicaid regulations and general notices published in the Federal Register

during this period. For each item, we list the date published, the title of the regulation, and the Parts of the Code of Federal Regulations (CFR) which have changes.

Table IV describes each revision to the Medicare Coverage Issues Manual that was published during the quarter. For each of the revisions, we list a brief synopsis of the revision as it appears on the transmittal sheet, the manual section number, and title of the section. We present a complete copy of the material as revised, no matter how minor the revision, and identify the revision by printing text that was changed in italics.

### B. How to Obtain Listed Material

• Manuals

An individual or organization interested in routinely receiving any manual and revisions to it may purchase a subscription to that manual. Those wishing to subscribe should contact either the Government Printing Office (GPO) or the National Technical Information Service (NTIS) at the following addresses: Superintendent of Documents, Government Printing Office, Washington, DC 20402. Telephone (202) 783–3238; National Technical Information Service, Department of Commerce, 5825 Port Royal Road, Springfield, VA 22161. Telephone (703) 487–4630.

In addition, individual manual transmittals and Program Memoranda listed in this notice can be purchased from NTIS. Interested parties should identify the transmittal(s) they want. GPO or NTIS will give complete details on how to obtain the publications they sell.

• Regulations and Notices

Regulations and notices are published in the daily Federal Register. Interested individuals may purchase individual copies or may subscribe to the Federal Register by contacting the Government Printing Office at the following address: Superintendent of Documents, Government Printing Office, Washington, DC 20402, Telephone (202) 783–3238. When ordering individual copies, it is necessary to cite either the date of publication or the volume number and page number.

• Rulings

Rulings are published on an infrequent basis by HCFA. Interested individuals can obtain copies from the nearest HCFA regional office or review them at the nearest regional depository library. We also sometimes publish Rulings in the Federal Register.

### C. How to Review Listed Material

Transmittals or Program Memoranda can be reviewed at a local Federal Depository Library (FDL). Under the Federal Depository Library Program, government publications are sent to approximately 1,400 designated libraries throughout the United States. Interested parties may examine the documents at any one of the FDLs. Some may have arrangements to transfer material to a local library not designated as an FDL. To locate the nearest FDL, individuals should contact any library.

In addition, individuals may contact regional depository libraries, which receive and retain at least one copy of nearly every Federal Government publication, either in printed or microfilm form, for use by the general public. These libraries provide reference services and interlibrary loans; however, they are not sales outlets. Individuals may obtain information about the location of the closest regional depository library from any library.

Superintendent of Documents numbers for each HCFA publication are shown in Table II, along with the HCFA publication and transmittal numbers. To help FDLs locate the instruction, use the Superintendent of Documents number, plus the HCFA transmittal number. For example, to find the Intermediary Manual part 3—Claims Process (HCFA-Pub. 13-3) transmittal containing "Claims Processing Timeliness" use the Superintendent of Documents number HE 22.8/6 and the HCFA transmittal number 1436.

### D. General Information

It is possible that an interested party may have a specific information need and not be able to determine from the listed information whether the issuance or regulation would fulfill that need. Consequently, we are providing information contact persons to answer general questions concerning these items. Copies are not available through the contact persons. Individuals are expected to procure copies or arrange to review them as noted above.

Questions concerning items in Tables I or II may be addressed to Allen Savadkin, Office of Issuances, Health Care Financing Administration, Room 688 East High Rise, 6325 Security Blvd., Baltimore, MD 21207; Telephone (301) 966–5285.

Questions concerning items in Table IV may be addressed to Samuel Della Vecchia, Office of Coverage Policy, Health Care Financing Administration, Room 401, East High Rise, 6325 Security Blvd., Baltimore, MD 21207, Telephone (301) 966–5316.

Questions concerning all other information may be addressed to Matt Plonski, Regulations Staff, Health Care Financing Administration, Room 132, East High Rise, 6325 Security Blvd., Baltimore, MD 21207, Telephone (301) 966–4662.

### Table I.—Description of Manuals, Memoranda and HCFA Rulings

An extensive descriptive listing of manuals and memoranda was previously published at 53 FR 21731 and supplemented at 53 FR 36892 and 53 FR 50579. Also, for a complete descriptive listing of the Medicare Coverage Issues Manual please review 53 FR 34555.

TABLE II.—MEDICARE MANUAL INSTRUCTIONS, JULY–SEPTEMBER 1989

| Trans. No. | Manual/Subject/Publication Number |
|---|---|
| | Intermediary Manual |
| | Part 2—Audits, Reimbursement, Program Administration (HCFA-Pub. 13–2) |
| | (Superintendent of Documents No. HE 22.8/6–2) |
| 371 | • Audits. |
| | Intermediary Manual |
| | Part 3—Claims Process (HCFA-Pub. 13.3) |
| | (Superintendent of Documents No. HE 22.8/6–2) |
| 1431 | • Intermediary Part B Appeals Report. |
| 1432 | • Intermediary Workload Report. |
| 1433 | • Physician Attestation. |
| | Standards for Intermediary Determinations Under Alternative Signature Option. |
| | Sample Questions for Site Visit. |
| 1434 | • Review of Form HCFA–1450. |
| | HCPCS for Hospital Outpatient Radiology Services. |
| | Radiology Pricer Program. |
| 1435 | • Processing Beneficiary Complaints and Inquiries Regarding Demand Bills. |
| | Letter Requesting SNF to Submit a Bill at Beneficiary's Request. |
| | Completion of SNF Denial Letters. |
| 1436 | • Claims Processing Timeliness. |
| 1437 | • Fraud and Abuse. |
| 1438 | • Review of Routine Home Care, Inpatient Respite, General Inpatient and Continuous Care Claims. |
| | Review of Hospice Claims for Hospital Admissions of Beneficiaries Who Have Elected Hospice Care. |
| | Review of Hospice Revocations. |
| | Followup Procedures. |
| | Hospice Report of Medical Review Activity. |
| | Coverage Compliance Review for Home Health Agency Claims "Documentation of Beneficiary Home Visit". |
| 1439 | • Provider Specific File. |
| | Provider Specific Data Record Layout and Description. |
| 1440 | • Speech Pathology Services Furnished By Hospital or By Other Under Arrangements With Hospital and Under Its Supervision. |
| | • Claims Processing Timeliness. |
| 1441 | Format for Fee Schedule, Prevailing Charge and Conversion Factor Data. |
| | Reporting Bills to HCFA. |
| | Batching Bills. |
| | Control of Rejected Bills. |
| | Followup/Control Notices for Rejected Bills. |

**10292** Federal Register / Vol. 55, No. 54 / Tuesday, March 20, 1990 / Notices

TABLE II.—MEDICARE MANUAL INSTRUC-
TIONS, JULY–SEPTEMBER 1989—Con-
tinued

| Trans. No. | Manual/Subject/Publication Number |
|---|---|
| | Automatically Corrected Bills. |
| | Monthly PRO Adjustment Bill Report. |
| 1442 | ● Reduction in Reimbursement Due to P.L. 100-177, P.L. 100-119, and P.L. 100-203. |
| | OCE Editor. |
| | Disclosure to Peer Review Organization. |
| 1443 | ● Dialysis for ESRD. |
| | Review of ESRD Bills. |
| | Intermediary Manual |
| | Part 4—Audit Procedures (HCFA-Pub. 13–4) |
| | (Superintendent of Documents No. 22.8/6-4) |
| 27 | ● Guidelines for Performing Provider Audits. |
| 28 | ● Prospective Payment System Hospital Audit Procedures. |
| | TEFRA Review Guidelines. |
| | Carriers Manual |
| | Part 3—Claims Process (HCFA-Pub. 14–3) |
| | (Superintendent of Documents No. HE 22.8/7) |
| 1313 | ● Coordination of Part A Denials From Intermediaries. |
| | Return of Individual Payment Records for Correction and Monthly Report of Payment Record Edit Exceptions. |
| 1314 | ● Monthly Carrier Appeals Report. |
| 1315 | ● Determining Reasonable Charge for Physicians' Services Furnished in Outpatient Settings. |
| 1316 | ● Overpayments. |
| | Determining Liability for Overpayments. |
| | The Overpayment Resulted from an Incorrect Reasonable Charge Determination. |
| | Total Overpayment Less Than $10. |
| | Overpayment Amount is at Least $10 But Less Than $50. |
| | Overpayment Amount is $50 or More. |
| | Refund Letter to Physician Returned as Undeliverable. |
| | Recovery by Offset. |
| | Interest. |
| | Physician Does Not Refund. |
| | Physician Responsible for. Refunding the Overpayment. |
| | Referral of Uncollected Physician Overpayments to HCFA. |
| | Large Scale Overpayments. |
| | Readjudication of Claims Included in Sample. |
| | Report of Estimates Derived from Sample. |
| | Disposing of the Case. |
| | Physician Offers to Settle on Compromise Basis. |
| | Person Overpaid Offers to Refund in Installments. |
| 1317 | ● Guidelines for Payment of a Technical Component for Diagnostic Cardiac Catheterization. |
| 1318 | ● Evidence of Medical Necessity for Home Oxygen Therapy. |
| 1319 | ● Covered Speech Pathology. |
| 1320 | ● Billings for Physician Assistant Services. |
| 1321 | ● Statements for Assigned Claims. |
| | Statements for Unassigned Claims. |
| 1322 | ● PRO Prior Approval for Certain Surgical Procedures. |
| 1323 | ● Effect of Waiver of Coinsurance or Deductible on Carrier Determinations of Actual Charges and Customary Charges. |

TABLE II.—MEDICARE MANUAL INSTRUC-
TIONS, JULY–SEPTEMBER 1989—Con-
tinued

| Trans. No. | Manual/Subject/Publication Number |
|---|---|
| 1324 | ● Determining Reasonable Charge for the Services of Physician Assistants. |
| | Program Memorandum Intermediaries (HCFA-Pub. 60/A) |
| | (Superintendent of Documents No. HE 22.8/6–5) |
| A-89-4 | ● Interim Payment Adjustments to Target Rates for PPS Excluded Hospitals And Units Due to Extension of Hospital Benefits Under the Medicare Catastrophic Coverage Act of 1988. |
| A-89-5 | ● Implementation of Outpatient Code Editor version 4.2 and ASC. |
| | Pricer Revision 2.0 (Attachment to Intermediaries Only). |
| A-89-6 | ● Coverage of Epoetin for Dialysis Patients. |
| A-89-7 | ● ICD-9-CM Coding on Home Health Agency Bills. |
| A-89-8 | ● Clarification of Use of Fee Schedule/ Prevailing Charge Data in Hospital Outpatient Limits. |
| A-89-9 | ● Medical Review, Outpatient Therapies. |
| | Program Memorandum Carriers (HCFA-Pub. 60/B) |
| | (Superintendent of Documents No. HE 22.8/6–5) |
| B-89-12 | ● Medical Review Definitions. |
| B-89-13 | ● Differentiation Between Physician Visits and Consultations (Attachment to Carriers Only). |
| B-89-14 | ● Revised Instructions for Form HCFA-484 Attending Physician's Certification of Medical Necessity for Home Oxygen Therapy. |
| B-89-15 | ● Suspension of Payments to Providers and/or Suppliers Referred to the Office of Inspector General for Fraud or Abuse Investigations. |
| B-89-16 | ● Provider Relations for Part B Catastrophic Coverage Provisions Effective January 1, 1990. |
| | Program Memorandum Intermediaries/Carriers (HCFA-Pub. 60 A/B) |
| | (Superintendent of Documents No. HE 22.8/6–5) |
| AB-89-5 | ● Notice of New Interest Rate Applicable on Clean Claims. |
| AB-89-6 | ● Mass Mailing of Notice to 14+ Million Medicare Beneficiaries. |
| AB-89-7 | ● Hospital Billing for Other Diagnostic Procedure Codes. |
| | State Operations Manual Provider Certification (HCFA-Pub. 7) |
| | (Superintendent of Documents No. HE 22.8/12) |
| 231 | ● Hospice—Multiple Locations. |
| | Election of Hospice Benefit by SNF or ICF Residents. |
| | Hospices-Citations and Description. |
| 232 | ● Emphasis; Components and Applicability. |
| | Team Composition. |
| | Type of Facility—Application of SNF/ ICF Regulations. |
| | Survey Procedures. |
| | Regional Office Manual Part 2—Medicare (HCFA-Pub. 23–2) |
| | (Superintendent of Documents No. HE 22.8/8) |
| 307 | ● Retention of Documentation. |
| | Production, Scheduling, Control and Distribution. |
| | ACERs for Multi-Regional Contractors. |
| | Evaluation of Contractors Under Fixed-Price Contracts. |
| | Scoring Methodology. |

TABLE II.—MEDICARE MANUAL INSTRUC-
TIONS, JULY–SEPTEMBER 1989—Con-
tinued

| Trans. No. | Manual/Subject/Publication Number |
|---|---|
| | ACER Format. |
| | Regional Office Manual Standards and Certification (HCFA-Pub. 23–4) |
| | (Superintendent of Documents No. HE 22.8/8–3) |
| 42 | ● Alternative Sanctions for Failure to Participate in Network Activities. |
| | Notice to ESRD Facility—Alternative Sanction for Failure to Participate With Network Goals and Objectives. |
| 43 | ● Look Behind Authority of HCFA. |
| | Waiver Criteria for Room Size and Maximum Number of Patients Per Room for LTC Facilities. |
| | Meaning of Providers and Suppliers. |
| | Disallowance of Federal Financial Participation to a State Because the State Fails to Follow Correct Certification Procedures for Medicaid Providers. |
| | Options for Operating Under a Correction or Reduction Plan. |
| | Application of Section 1922. |
| | State Elects Plan of Correction Option. |
| | State Eelcts Reduction Plan Option. |
| | Hospital Manual (HCFA-Pub. 10) |
| | (Superintendent of Documents No. HE 22.8/2) |
| 567 | ● Alternative Signature Option. |
| | Standards for Intermediary Determinations Under Alternative Signature Option. |
| 568 | ● HCPCS for Hospital Outpatient Radiology Services. |
| | Completion to Form HCFA-1450 for Inpatient and/or Outpatient Billing. |
| 569 | ● Claims Processing Timeliness. |
| 570 | ● Speech Pathology Services Furnished By the Hospital or By Others Under Arrangements With the Hospital and Under its Supervision. |
| 571 | ● Claims Processing Timeliness. |
| 572 | ● Reorganization of Manual. |
| 573 | ● Special Instructions on Completion of the HCFA-1450 Billed by Hospital-Based Renal Dialysis Facilities. |
| | Payment of EPO. |
| | Christian Science Sanatorium Hospital Manual Supplement (HCFA-Pub. 32) |
| | (Superintendent of Documents No. HE 22.8/2–2) |
| 24 | ● Claims Processing Timeliness. |
| 25 | ● Claims Processing Timeliness. |
| | Home Health Agency Manual (HCFA-Pub. 11) |
| | (Superintendent of Documents No. HE 22.8/5). |
| 224 | ● Definitions, Employee. |
| 225 | ● Claims Processing Timeliness. |
| 226 | ● Application of the General Principles to Speech Language Pathology Services. |
| 227 | ● Claims Processing Timeliness. |
| | Skilled Nursing Facility (HCFA-Pub. 12) |
| | (Superintendent of Documents No. HE 22.8/3) |
| 282 | ● Medicare as Secondary Payor for Disabled Individuals. |
| 283 | ● Completion of Denial Letters. |
| | Submitting Beneficiary Demand Bills. |
| 284 | ● Claims Processing Timeliness. |
| 285 | ● Speech Pathology. |
| 286 | ● Claims Processing Timeliness. |

| Trans. No. | Manual/Subject/Publication Number |
|---|---|
| | **TABLE II.—MEDICARE MANUAL INSTRUCTIONS, JULY–SEPTEMBER 1989—Continued** |
| | Rural Health Clinic Manual (HCFA-Pub. 27) (Superintendent of Documents No. HE 22.8/19:985) |
| 34 | ● Medicare as Secondary Payer for Disabled Individuals. |
| 35 | ● Claims Processing Timeliness. |
| 38 | ● Claims Processing Timeliness. |
| | Renal Dialysis Facility Manual (Non-Hospital Operated) (HCFA-Pub. 29) (Superintendent of Documents No. HE 22.8/13) |
| 39 | ● Claims Processing Timeliness. |
| 40 | ● Claims Processing Timeliness. |
| 41 | ● Coverage and Payment of Epoetin. Completion of Form HCFA-1450 by Independent Facilities for Dialysis Items and Services Billed Under the Composite Rate. |
| | Hospice Manual (HCFA-Pub. 21) (Superintendent of Documents No. HE 22.8/18) |
| 23 | ● Claims Processing Timeliness. |
| 24 | ● Claims Processing Timeliness. |
| | Outpatient Physical Therapy and Comprehensive Outpatient Rehabilitation Facility Manual (HCFA-Pub. 9) (Superintendent of Documents No. HE 22.8/9) |
| 88 | ● Medicare as Secondary Payer for Disabled Individuals. |
| 89 | ● Claims Processing Timeliness. |
| 90 | ● Speech Pathology. |
| 91 | ● Claims Processing Timeliness. |

| Trans. No. | Manual/Subject/Publication Number |
|---|---|
| | **TABLE II.—MEDICARE MANUAL INSTRUCTIONS, JULY–SEPTEMBER 1989—Continued** |
| | Coverage Issues Manual (HCFA-Pub. 6) (Superintendent of Documents No. HE 22.8/14) |
| 38 | ● Cardiac Output Monitoring by Electrical Bioimpedance. |
| 39 | ● Speech Pathology Services for the Treatment of Dysphagia. |
| 40 | ● Breast Reconstruction Following Mastectomy. |
| 41 | ● Cardiac Rehabilitation Programs. |
| 42 | ● Deithermy Treatment. |
| | Provider Reimbursement Manual, Part I (HCFA-Pub. 15–1) (Superintendent of Documents No. HE 22.8/4) |
| 351 | ● Prospective Payment Rates. |
| | Provider Reimbursement Manual, Part I, Chapter 27 Reimbursement for ESRD and Transplant Services (HCFA-Pub. 15-1–27) (Superintendent of Documents No. HE 22.8/4) |
| 11 | ● Special Circumstances. Instructions for Review and Submittal of the Cost Reporting Forms. |
| 12 | ● Definitions. Phase-In. Calculation of a Facility's Composite Payment Rate. Funding of ESRD Networks. Base Composite Rate. Payment for Dialysis Treatments Under the Composite Rate. |

| Trans. No. | Manual/Subject/Publication Number |
|---|---|
| | **TABLE II.—MEDICARE MANUAL INSTRUCTIONS, JULY–SEPTEMBER 1989—Continued** |
| | Time Period for Requesting an Exception. New Facility Exception Request. Cost Per Treatment. Frequency of Dialysis. Length of Training Period. Reimbursement for Home Dialysis Beneficiaries Who Choose to Deal Directly With the Medicare Program and Items and Services Furnished to Direct Dealing Home Dialysis Beneficiaries. Reporting Actual Costs. Inpatient Treatments. Information on Diskettes. Intermediary Review. Isolated Essential Facility. Allowable Compensation for Physician Owners and Medical Directors. Allowable Compensation for Owners, Chief Executive Officers, Administrators and Assistant Administrators. |
| | Medicare Carrier Quality Assurance Handbook (HCFA-Pub. 25) (Superintendent of Documents No. HE 22.8:C 23/982) |
| 40 | ● Payment. |

**TABLE III.—REGULATIONS AND NOTICES PUBLISHED JULY–SEPTEMBER, 1989**

| Publication date/cite | CFR part | Title |
|---|---|---|
| | | **Final Rules** |
| 07/14/89 (42 FR 29717) | 405 to 442, 447 to 483, 488 to 489, 498. | Medicare and Medicaid Programs: Requirements for Long-Term Care Facilities: Delay in Effective Date of Regulations. |
| 08/14/89 (42 FR 33354) | 484 | Medicare Program; Home Health Agencies: Conditions of Participation and Reduction in Record-keeping Requirements (Correction Published 08/23/89) (42 CFR 35131)). |
| 08/25/89 (42 FR 35329) | 403 | Medicare Program; Demonstration Project to Develop a Uniform Cost Reporting System for Hospitals. |
| 09/01/89 (42 FR 36452) | 412 | Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1990 rates. |
| 09/07/89 (42 FR 37270) | 413 to 424, 482 to 493 | Medicare Program; Swing Bed Program Changes. |
| 09/20/89 (42 FR 38677) | 405 to 424 | Medicare Program; Physician Involvement in Physical Therapy and Speech Pathology Services. |
| 09/29/89 (42 FR 40286) | 405 to 412, 413) | Medicare Program; Changes in Payment Policy for Direct Graduate Medical Education Costs. |
| | | **Proposed Rules** |
| 07/21/89 (42 FR 30558) | 424 | Medicare Program; Diagnosis Codes on Physician Bills. |
| 09/01/89 (42 FR 36736) | 405 to 410, 413-1 494 | Medicare Program; Medicare Coverage of Screening Mammography. |
| 09/07/89 (42 FR 37190) | 410 | Medicare Program; Catastrophic Outpatient Drug Benefit. |
| 09/07/89 (42 FR 37208) | 414 | Medicare Program; Payment for Covered Outpatient Drugs. |
| 09/07/89 (42 FR 37220) | 400 to 417, 485 to 489 | Medicare Program; Conditions of Participation for Home Intravenous Drug Therapy Providers. |
| 09/08/89 (42 FR 37422) | 410 to 424, 466 to 473). | Medicare Program; Coverage of Home Intravenous Drug Therapy Services. |
| 09/26/89 (42 FR 39421) | 435 to 436, 440 | Medicare Program; Eligibility and Coverage Requirements. |
| | | **Notices** |
| 07/05/89 (42 FR 28115) | | Medicare Program; Peer Review Organization; General Criteria and Standards for Evaluating Performance of Contract Obligations. |
| 07/10/89 (42 FR 28844) | | Medicare and Medicaid Programs; Meeting of the Advisory Panel on the Development of Uniform Needs Assessment Instrument(s). |
| 07/26/89 (42 FR 31385) | | Medicare and Medicaid Programs; ICD-9-M Coordination and Maintenance Committee Meeting. |
| 07/31/89 (42 FR 31576) | | Medicare Program; Peer Review Organizations; Area Designation. |
| 08/08/89 (42 FR 32482) | | Medicare and Medicaid Program; Meeting. |
| 08/21/89 (42 FR 34555) | | Medicare Program; National Coverage Decisions (Correction Published 09/22/89) (42 FR 39077). |
| 08/25/89 (42 FR 35395) | | Medicare Program; Employer and Duplicative Medicare Benefits; Clarification. |

TABLE III.—REGULATIONS AND NOTICES PUBLISHED JULY–SEPTEMBER, 1989—Continued

| Publication date/cite | CFR part | Title |
|---|---|---|
| 09/07/89 (42 FR 37239) | | Medicare Program; Outpatient Prescription Drugs; List of covered Home IV Drugs. |
| 09/19/89 (42 FR 39561) | | Quarterly Listing of Program Issuances. |
| 09/28/89 (42 FR 39814) | | Medicare Program; Hospice Cap |
| 09/29/89 (42 FR 40205) | | Medicare Program; Inpatient Hospital Deductible for 1990. |

## IV. Medicare Coverage Issues Manual

(For the reader's convenience, changes to previously published items are in italics.)

[Transmittal No. 38; Section 50–54]

### Cardiac Output Monitoring by Electrical Bioimpedance

This new section excludes from coverage the use of electrical bioimpedance to monitor cardiac output. The effective date for purposes of carrier implementation of this instruction was August 25, 1989. However, carriers may not implement this policy prior to April 19, 1990 in any way which would adversely affect a claimant. This means that carriers may not deny claims or defer decision on them based on this instruction. Carriers which have developed their own policies denying or otherwise limiting coverage for this service may retain them until this Notice becomes effective.

### 50–54   CARDIAC OUTPUT MONITORING BY ELECTRICAL BIOIMPEDANCE-NOT COVERED

*Electrical bioimpedance is a non-invasive method of using two pairs of electrodes placed on the thorax of the patient to determine stroke volume and cardiac output based upon the electrical impedance of the thorax to an externally imposed electrical current. (HCPCS code Q006 Assessment of Cardiac Output by Electrical Bioimpedance) The potential effect of long-term electrical bioimpedance has not been studied and precision and accuracy of the technique in severely ill patients has not been compared to invasive techniques. Electrical bioimpedance is not a widely accepted and established diagnostic modality, and cardiac output monitoring by electrical bioimpedance is still investigational. Cardiac output monitoring by electrical bioimpedance is, therefore, excluded from coverage at this time.*

[Transmittal No. 39; Section 35–89]

### Speech Pathology Services for the Treatment of Dysphagia

This new section provides for the coverage of speech pathology services for the treatment of dysphgia, regardless of the presence of a communication disability. It includes some patient selection criteria and examples of the types of therapy provided by speech pathologists. The effective date for purposes of carrier implementation of this instruction was August 28, 1989. However, carriers may not implement this policy prior to April 19, 1990, in any way which would adversely affect a claimant.

This means that carriers may not deny claims or defer decision on them based on this instruction. Carriers which have developed their own policies denying or otherwise limiting coverage for this service may retain them until this Notice becomes effective.

### 35–89   SPEECH PATHOLOGY SERVICES FOR THE TREATMENT OF DYSPHAGIA (Effective for services performed on and after 08/28/89.)

*Dysphagia is a swallowing disorder that may be due to various neurological, structural, and cognitive deficits. Dysphagia may be the result of head trauma, cerebrovascular accident, neuromuscular degenerative diseases, head and neck cancer, and encephalopathies. While dysphagia can afflict any age group, it most often appears among the elderly. Speech pathology services are covered under Medicare for the treatment of dysphagia, regardless of the presence of a communication disability.*

*Patients who are motivated, moderately alert, and have some degree of deglutition and swallowing functions are appropriate candidates for dysphagia therapy. Elements of the therapy program can include thermal stimulation to heighten the sensitivity of the swallowing reflex, exercises to improve oral-motor control, training in laryngeal adduction and compensatory swallowing techniques, and positioning and dietary modifications. All programs should be designed to ensure swallowing safety of the patient during*

*oral feedings and maintain adequate nutrition.*

*Cross-refer: Intermediary manual, § 3101.10A; Carriers Manual, § 2218; Hospital Manual, § 210.11; Home Health Agency Manual, § 205.2C.; Skilled Nursing Facility Manual, § 230.3B.; Outpatient Physical Therapy and Comprehensive Outpatient Rehabilitation Facility Manual, § 205.6.*

[Transmittal No. 40; Section 35–47]

### Breast Reconstruction Following Mastectomy

This revised section clarifies coverage of breast reconstruction surgery following a medically necessary mastectomy. Coverage of breast reconstruction following a mastectomy has been in effect since May 15, 1980. It also includes the International Classifications of Diseases, Ninth Revision, Clinical Modification (ICD–9–CM) codes and/or the HCFA Common Procedure Code System (HCPCS) code which apply.

### 35–47   BREAST RECONSTRUCTION FOLLOWING MASTECTOMY (Effective for services performed on and after May 15, 1980.)

*During recent years there has been a considerable change in the treatment of diseases of the breast such as fibrocystic disease, ICD–9–CM code 610.1; and cancer (breast cancer is a global term: the code listed will be specific). The codes which can be used to specify the type of breast cancer include those for malignant (primary, secondary, and cancer in situ), benign, uncertain behavior, and unspecified. Use one of the following ICD–9–CM codes: 173.5, 174.0, 174.1, 174.2, 174.3, 174.4, 174.5, 174.6, 174.7, 174.8, 174.9, 175.0, 175.9, 198.81,198.2, 216.5, 217, 232.5, 233.0, 238.3, 239.2, 293.3.*

While extirpation of the disease remains of primary importance, the quality of life following initial treatment is increasingly recognized as of great concern. The increased use of breast reconstruction procedures is due to several factors:

• A change in epidemiology of breast cancer, including an apparent increase in incidence;

• Improved surgical skills and techniques;
• The continuing development of better prostheses; and
• Increasing awareness by physicians of the importance of postsurgical psychological adjustment.

*Reconstruction of the breast following a medically necessary mastectomy is considered a relatively safe and effective noncosmetic procedure. A mastectomy may be simple, modified, radical, subtotal, total, unilateral, or bilateral and coded to reflect the appropriate procedure. The CPT code appropriate for indicating a mastectomy includes one of the following: 19120, 19160, 19162, 19180, 19182, 19200, 19220, 19240. The ICD–9–CM code is one of the following: 85.23, 85.34, 85.36, 85.41, 85.42, 85.43, 85.44, 85.46, 85.47, 85.48. Accordingly, program payment may be made for breast reconstruction surgery followng removal of a breast for any medical reason. Breast reconstruction is coded to reflect the specific procedure. CPT codes applicable to breast reconstruction include 19340, 19342, 19350, 19360, 19364, 19366, 19380, or 19396. The ICD–9–CM code is one of the following: 85.53, 85.54, 85.7, 85.85, 85.87.*

*Program payment may not be made for breast reconstruction for cosmetic reasons. (Cosmetic surgery is excluded from coverage under section 1862(a)(10) of the Social Security Act.)*

**[Transmittal No. 41; Section 35–25]**

**Cardiac Rehabilitation Programs**

This section has been revised to clarify the term "direct supervision" to mean that a physician must be immediately available and accessible but is not required to be physically present in the exercise room itself.

**35–25    CARDIAC REHABILITATION PROGRAMS.**

A. *General.*—Exercise programs for cardiac patients, commonly referred to cardiac rehabilitation programs, are increasingly being conducted in specialized, freestanding, cardiac rehabilitation clinics as well as in outpatient hospital departments. Exercise programs include specific types of exercise, individually prescribed for each patient.

Medicare coverage of cardiac rehabilitation programs are considered reasonble and necessary only for patients with a clear medical need, who are referred by their attending physician and (1) have a documented diagnosis of acute myocardial infarction within the preceding 12 months; or (2) have had coronary bypass surgery; and/or (3) have stable angina pectoris. Cardiac

rehabilitation programs may be provided either by the outpatient department of a hospital or in a physician-directed clinic. Coverage for either program is subject to the following conditions:

• The facility meets the definition of a hospital outpatient department or a physician-directed clinic, i.e., a physician is on the premises available to perform medical duties at all times the facility is open, and each patient is under the care of a hospital or clinic physician;
• The facility has available for immediate use all the necesary cardiopulmonary emergency diagnostic and therapeutic life saving equipment accepted by the medical community as medically necessary, e.g., oxygen, cardiopulmonary resuscitation equipment, or defibrillator;
• The Program is conducted in an area set aside for the exclusive use of the program while it is in session;
• The Program is staffed by personnel necessary to conduct the program safely and effectively, who are trained in both basic and advanced life support techniques and in exercise therapy for coronary disease. Services of nonphysician personel must be furnished under the direct supervision of a physician. Direct supervision means that a *physician must be in the exercise program area and immediately available and accessible for an emergency at all times the exercise program is conducted. It does not require that a physician be physically present in the exercise room itself, provided the contractor does not determine that the physician is too remote from the patients' exercise area to be considered immediately available and accessible. The examples below are for illustration purposes only. They are not meant to limit the discretion of the contractor to make determinations in this regard.*

—*The case in which a contractor determines that the presence of a physician in an office across the hall from the exercise room who is available at all times for an emergency meets the requirement that the physician is immediately available and accessible; or*
—*The case in which a contractor determines that the presence of a physician in a building other than that containing the exercise room does not meet the requirement that the physician is immediately available and accessible; and*

• The nonphysician personnel are employees of either the physician, hospital, or clinic conducting the

program and their services are "incident-to a physician's professional services."

Contractors need not undertake elaborate or costly monitoring activities to determine whether these requirements are met, but need only satisfy themselves to the extent that they ordinarily do in connection with, for example, the requirements for coverage of services in physician-directed clinics. (See Carriers Manual, § 2050.4; Intermediary Manual, § 3112.4A; Hospital Manual, § 230.4.)

In addition to the conditions listed above, coverage for cardiac rehabilitation programs furnished by hospitals to outpatients are also subject to the rules described in the Intermediary Manual, § 3112.4 and the Hospital Manual, § 230.4. Reasonable charge reimbursement for these services which are performed in "freestanding" clinics are subject to the limitations set forth in the Carriers Manual, § 5241.

B. *Diagnostic Testing—Stress Testing.*—A prospective candidate for a cardiac rehabilitation program must be evaluated for his suitability to participate. A valuable diagnostic test for this purpose is the stress test. The program need not necessarily include a stress test, but may accept one performed by the patient's attending physican. Stress testing performed in the outpatient department of a hospital or in a physician-directed clinic may be covered when reasonable and necessary for open or more of the following:
• Evaluation of chest pain, especially atypical chest pain;
• Development of exercise prescriptions for patients with known cardiac disease; and/or
• Preoperative and postoperative evaluation of patients undergoing coronary artery by-pass procedures.

Refer to subsection E, Utilization Screens, for the acceptable frequency of stress testing performed during an individual's exercise program.

*ECG Rhythm Strips.* ECG rhythm strips (and other ECG monitoring) constitute an important and necessary procedure which should be done periodically while a cardiac patient is engaged in a physician-controlled exercise program. See subsection E, Utilization Screens, for allowable screens.

C. *Other Diagnostic and Therapeutic Services.*—A freestanding or hospital based cardiac rehabilitation clinic may also provide diagnostic and therapeutic services other than stress testing and ECG monitoring. Any such other services must meet the usual coverage requirements for the specific service.

10296      **Federal Register** / Vol. 55, No. 54 / Tuesday, March 20, 1990 / Notices

e.g., the incident-to, and reasonable and necessary requirements.

1. *Psychotherapy and Psychological Testing.*—It would not normally be considered reasonable and necessary to provide psychotherapy to all cardiac rehabilitation patients, or even to test all such patients to determine whether they may have a mental, psychoneurotic, or personality disorder. However, where a patient has a diagnosed mental, psychoneurotic, or personality disorder, psychotherapy furnished by a psychiatrist—or by a psychologist rendering such services incident to a physician's professional service—may be covered. Similarly, diagnostic testing of a cardiac rehabilitation patient for a mental problem may be covered where the patient shows appropriate symptoms, e.g., excessive anxiety or fear associated with the cardiac disease.

2. *Physical and Occupational Therapy.*—Physical therapy and occupational therapy would not be covered when furnished in connection with cardiac rehabilitation exercise program services covered under this section unless there also is a diagnosed noncardiac condition requiring such therapy, e.g., where a patient who is just recuperating from an acute phase of heart disease may have had a stroke which would require physical and/or occupational therapy. (While the cardiac rehabilitation exercise program may by some be considered a form of physical therapy, it is a specialized program conducted and/or supervised by specially trained personnel whose services are performed under the direct supervision of a physician.) Restrictions on coverage of physical therapy and occupational therapy under this section do not affect rules regarding coverage or noncoverage of such services when furnished in a hospital inpatient or outpatient setting.
(See Intermediary Manual, § 3101.9 and Hosptial Manual, § 210.9.)

3. *Patient Education Services.*—Many cardiac rehabilitation programs provide health education in the form of lectures or counseling in which patients and/or family members are given information, e.g., on diet, nutrition, and sexual activity to assist them in adjusting their living habits because of the cardiac condition. However, the same kind of information would have been furnished to a patient and/or family members by the attending physician following the patient's acute cardiac episode. Therefore, formal lectures and counseling on these subjects are not considered reasonable and necessary as a separately-identifiable service when provided as a part of a cardiac rehabilitation exercise

program. In addition, where a free-standing cardiac rehabilitation clinic provides room and board for the patient (and in some cases family members), these services are not covered under Medicare.

D. *Duration of the Program.*—Services provided in connection with a cardiac rehabilitation exercise program may be considered reasonable and necessary for up to 36 sessions, usually 3 sessions a week in a single 12 week period. Coverage for continued participation in cardiac exercise programs beyond 12 week in a single 12 week period. Coverage for continued participation in cardiac exercise programs beyond 12 weeks would be allowed only on a case-by-case basis with exit criteria taken into consideration.

Although firm exit criteria for terminating the therapeutic outpatient exercise treatment and rehabilitation program have not been established, the following guidelines have been identified as acceptable:

• The patient has achieved a stable level of exercise tolerance without ischemia or dysrrhthmia;

• Symptoms of angina or dyspnea are stable at the patient's maximum exercise level;

• Patient's *resting* blood pressure and heart rate are within normal limits; or

• The stress test is not *positive* during exercise. (A *positive test* in this context implies an ECG with a junctional depression of 2mm or more associated with slowly rising horizontal, or down sloping ST segment.)

Accordingly, claims for coverage of cardiac rehabilitation exercise programs beyond 12 weeks are reviewed by the contractors' medical consultants. When claims are accompanied by acceptable documentation that the patient has not reached an exit level, coverage may be extended, but should not exceed a maximum of 24 weeks.

E. *Utilization Screens.*—Patients who participate in cardiac rehabilitation programs will require certain services more frequently than other patients being treated on an outpatient basis. Therefore, in order to provide coverge in a uniform manner, the following utilization screens should be implemented in addition to existing screens for any cardiac rehabilitation services not listed:

1. *Group 1 Services*

• Continuous ECG telemetric monitoring during exercise;

• ECG rhythm strip with interpretation and physician's revision of exercise prescription; and

• Limited examination for physician followup to adjust medication or other treatment changes.

A visit including one or more of this range of routine services is considered as one routine cardiac rehabilitation visit. In order for the visit to be reimbursable, at least one of the Group 1 services must be performed. The same rate of reimbursement would be allowed for each visit, but not all the services need be performed at each visit.

Allow a maximum of three visits per week.

2. *Group 2 Services*

• New patient comprehensive evaluation, including history, physical, and preparation of initial exercise prescription.

Allow one at the beginning of the program if not already performed by the patient's attending physican, or if that performed by the patient's attending physician is not acceptable to the program's director.

• ECG stress test (treadmill or bicycle ergometer) with physician monitoring and report.

Allow one at the beginning of the program and one after 3 months (usually the completion of the program).

• Other physician services, as needed.

[Transmittal No. 42; Section 35–41]

**Diathermy Treatment**

This revised section deletes any previous reference to Diapulse or to any other brand names.

## 35–41  DIATHERMY TREATMENT

*High energy pulsed wave diathermy machines have been found to produce some degree of therapeutic benefit for essentially* the same conditions and to the same extent as standard diathermy. Accordingly, where the contractor's medical staff has determined that the pulsed wave diathermy apparatus used is one which is considered therapeutically effective, the treatments are considered a covered service, but only for those conditions for which standard diathermy is medically indicated and only when rendered by a physician or incident to a physician's professional services. Further, when the charge for covered pulsed wave diathermy treatment is substantially in excess of *that which is reasonable for standard diathermy,* reimbursement is based *on the reasonable charge for standard diathermy (CPT–4 code 97024, ICD–9–CM code 93.34).*
Cross-refer: § 35–3

(Catalog of Federal Domestic Assistance Program No. 13.773, Hospital Insurance; and Program No. 13.774, Medicare-Supplementary Medical Insurance Program)

Dated: March, 2, 1990.

Gail R. Wilensky,

*Administrator, Health Care Financing Administration.*

[FR Doc. 90-6308 Filed 3-19-90; 8:45 am]

BILLING CODE 4120-01-M

## National Institutes of Health

### National Panel of the National Advisory Neurological Disorders and Stroke Council; Solicitation of Public Comments for the National Panel for Research in Neurological Disorders

Notice is hereby given that the National Panel of the National Advisory Neurological Disorders and Stroke Council plans to solicit public comments in order to increase its knowledge and understanding of the needs and opportunities for research on brain and nervous system disorders in the 1990s. Information from scientists, physicians and representatives of interested organizations and institutions may be shared with the National Panel at the National Meeting for Research in Neurological Disorders on April 17, 1990, from 9 a.m. until 5 p.m., at the Department of Health and Human Services, Hubert H. Humphrey Building, Conference Room 800, 200 Independence Avenue, SW., Washington, DC.

The 1990s have been declared the Decade of the Brain by the President and the Congress. The "Decade" will bring into focus the significant opportunities in neurological research that can be realized through an expanded research effort. The Advisory Council of the National Institute of Neurological Disorders and Stroke has appointed a National Panel to frame a research plan for the implementation of the Decade of the Brain. The plan will document specific research objectives to be achieved, the steps to be initiated to achieve those objectives, and the resources required to reach the specified goals.

The attendance and the number of presentations during the conference will be limited to the time and space available. Thus, all individuals representing organizations and institutions who wish to make an oral presentation at the meeting must arrange for a written statement of their testimony to be sent to Dr. Michael D. Walker, Executive Director, National Panel for Research in Neurological Disorders. Statements must be received by Social and Scientific Systems, Inc.,

7101 Wisconsin Avenue, Suite 610, Bethesda, Maryland 20814-4805, by 5 p.m., April 2, 1990. Prior notification of those desiring to present oral testimony would be helpful (complete name, affiliation, address and telephone number). Only speakers discussing subjects relevant to research in neurological disorders will be scheduled. Each speaker will be limited to 10 minutes to summarize or highlight the written statement. Those who cannot attend the meeting but would like to submit a written statement are encouraged to do so by the April 2 deadline. All statements may not exceed three pages but may include limited addenda. Any queries about the meeting may be directed to Mrs. Johanna McDonough at 301-986-4870.

Dated: March 14, 1990.

William F. Raub,

*Acting Director, National Institutes of Health.*

[FR Doc. 90-6260 Filed 3-19-90; 8:45 am]

BILLING CODE 4140-01-M

### National Cancer Institute; Meetings of Subcommittee on Cancer Centers

Pursuant to Public Law 92-463, notice is hereby given for two meetings to be held by the Subcommittee on Cancer Centers, National Cancer Advisory Board, National Center Institute on April 17 and on April 30 in Building 31, Conference Room 11A10, National Institutes of Health, Bethesda, Maryland 20892.

Both meetings will be open to the public from 10 a.m. to 4 p.m. to discuss the 5-Year Plan on Cancer Centers. Attendance by the public will be limited to space available.

Mrs. Winifred J. Lumsden, Committee Management Officer, National Cancer Institute, 9000 Rockville Pike, Building 31, Room 10A06, National Institutes of Health, Bethesda, Maryland 20892 (301/496-5708) will provide a summaries of the meetings and rosters of members, upon request.

Other information pertaining to the meetings can be obtained upon request from the Executive Secretary, Dr. Brian Kimes, National Cancer Institutes, National Institutes of Health, Executive Plaza-North, Room 300, Bethesda, Maryland 20892 (301-496-8537).

Dated: March 13, 1990.

Betty J. Beveridge,

*Committee Management Officer, NIH.*

[FR Doc. 90-6261 Filed 3-19-90; 8:45 am]

BILLING CODE 4140-01-M

### National Institute of Dental Research; Meeting of Dental Research Programs Advisory Committee

Pursuant to Public Law 92-463, notice is hereby given of the meeting of the Dental Research Programs Advisory Committee, National Institute of Dental Research, April 19-20, 1990, in the Embassy III Room of the Ramada Inn, 8400 Wisconsin Avenue, Bethesda, Maryland, from 9 a.m. to recess on April 19 and 9 a.m. to adjournment on April 20.

The entire meeting will be open to the public to discuss research progress and ongoing plans and programs on the causes, nature, diagnosis, treatment and prevention of oral diseases and conditions. Attendance by the public will be limited to space available.

Dr. Wayne Wray, Deputy Director for Extramural Program, NIDR, NIH, Westwood Building, Room 502, Bethesda, MD 20892 (telephone 301/496-7748) will provide a summary of the meeting, roster of committee members and substantive program information upon requestion.

(Catalog of Federal Domestic Assistance Program Nos. 13.121-Diseases of the Teeth and Supporting Tissues: Caries and Restorative Materials; Periodontal and Soft Tissue Diseases; 13.122-Disorders of Structure, Function, and Behavior. Craniofacial Anomalies, Pain Control, and Behavioral Studies; 13.845-Dental Research Institutes, National Institutes of Health.)

Dated: March 12, 1990.

Betty J. Beveridge,

*Committee Management Officer, NIH.*

[FR Doc. 90-6262 Filed 3-19-90; 8:45 am]

BILLING CODE 4140-01-M

## Office of Community Services

[Program Announcement No. OCS-90-1]

### Request for Applications Under the Office of Community Services' Fiscal Year 1990 Discretionary Grants Program

**AGENCY:** Office of Community Services, FSA, HHS.

**ACTION:** Request for applications under the Office of Community Services' Discretionary Grants Program.

**SUMMARY:** The Family Support Administration, Office of Community Services (OCS) announces that competing applications will be accepted for new and continuation grants pursuant to the Secretary's discretionary authority under section 681(a)(2) of the Community Services Block Grant Act of

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

FOOTHILL HOSPITAL - MORRIS L.
JOHNSTON MEMORIAL, a California
nonprofit corporation, dba Foothill
Presbyterian Hospital,

         Plaintiff,

vs.

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and
Human Services,

         Defendant.

CASE NO. 1:07-CV-00701-ESH

## [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY

## JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Having considered the Motions for Summary Judgment submitted by plaintiff FOOTHILL HOSPITAL - MORRIS L. JOHNSTON MEMORIAL, a California nonprofit corporation, dba Foothill Presbyterian Hospital's and defendant Michael O. Leavitt, Secretary of the Department of Health and Human Services, and the Points and Authorities and exhibits in support both motions, the administrative record in this case, and all other pleadings on file in this case, along with the oral argument presented by the parties at the hearing on these cross-motions for summary judgment,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Plaintiff's Motion for Summary Judgment shall be and hereby is granted and Defendant's Motion for Summary Judgment shall be and hereby is denied.

**IT IS FURTHER ORDERED** that the final decision rendered by the Defendant Secretary of Health and Human Services in Plaintiff's appeal of the denial of its claims for reimbursement for Medicare bad debts for its fiscal year ending June 30, 1995 be, and hereby is, reversed, on the grounds that the Secretary's policy denying bad debt reimbursement solely because the bad debts remain at an outside collection agency is prohibited by the Moratorium on Medicare bad debts, is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

**IT IS FURTHER ORDERED** that this matter be remanded to the Secretary to issue payment to Plaintiffs for said Medicare bad debts, along with interest pursuant to 42 U.S.C. § 1395oo(f)(2) and costs of suit.

IT IS SO ORDERED.

DATED:_____

_____
United States District Judge

Prepared by:  Attorneys for Plaintiff

2