UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| **FOOTHILL HOSPITAL - MORRIS L. JOHNSTON MEMORIAL,** a California nonprofit corporation, d/b/a Foothill Presbyterian Hospital, | ) ) ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | Civil Action No. 07-701 (ESH) |
| **MICHAEL O. LEAVITT**, Secretary of the United States Department of Health and Human Services, | ) ) ) ) | |
| **Defendant.** | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff is a Medicare provider seeking reimbursement for the unpaid debts of Medicare beneficiaries. Defendant denied plaintiff's reimbursement claims, ruling that the debts could not be deemed "uncollectible" under 42 C.F.R. § 413.89(e) because plaintiff had referred these bad debts to an outside collection agency. Plaintiff argues that defendant's current view constitutes a change in policy, in violation of 42 U.S.C. § 1395f note (hereinafter "Bad Debt Moratorium" or "Moratorium"). In the alternative, plaintiff contends that defendant's decision is arbitrary, capricious, and inconsistent with the governing statute and regulations. Before the Court are the parties' cross-motions for summary judgment. Because the Court finds that defendant's decision violates the Bad Debt Moratorium, plaintiff's summary judgment motion will be granted and defendant's motion will be denied.

**BACKGROUND**

**I.    STATUTORY AND REGULATORY BACKGROUND**

Medicare is a federally funded system of health insurance for the aged and disabled. 42 U.S.C. § 1395 *et seq*. The program is administered by the Centers for Medicare and Medicaid Services ("CMS"),[1] under the direction of the Secretary of the United States Department of Health and Human Services ("Secretary"). 42 U.S.C. § 1395kk; 42 C.F.R. § 400.200 *et seq*. When a Medicare provider treats a beneficiary of the program, it collects coinsurance and deductible payments from the patient, and it then seeks reimbursement for the remaining costs from the Medicare program. (Compl. ¶¶ 10, 12.) The provider initiates the reimbursement process by filing a Medicare cost report with its fiscal intermediary, a private insurance company that processes payments on behalf of CMS. (Def.'s SJ Mot. 2-3.)[2] The fiscal intermediary responds with a Notice of Program Reimbursement ("NPR"), which informs the provider which of its reimbursement requests have been accepted or denied. (*Id.*) If a request is denied, the provider can appeal the fiscal intermediary's decision to the Provider Reimbursement Review Board ("PRRB") within 180 days of the issuance of the NPR. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1841. The PRRB's decision is final unless the CMS Administrator ("Administrator") elects to review it. 42 C.F.R. § 405.1875(a)(1).

The Medicare statute prohibits cost shifting, which means that the costs for treating Medicare beneficiaries are not to be borne by those who are not Medicare recipients and their

---

[1] CMS was formerly known as the Health Care Financing Administration ("HCFA").

[2] Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, filed March 3, 2008 ["Def.'s SJ Mot."].

non-Medicare costs are not to be borne by the Medicare program. 42 U.S.C. §1395x(v)(1)(A)(i). As a result, when a provider is unable to collect coinsurance and deductible payments from Medicare beneficiaries, the Medicare program reimburses the provider for these bad debts so that the costs will not be passed on to non-Medicare patients. 42 C.F.R. § 413.89(d). Providers must demonstrate that their bad debts satisfy four criteria before they can be reimbursed:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts;
> (2) The provider must be able to establish that reasonable collection efforts were made;
> (3) The debt was actually uncollectible when claimed as worthless; and
> (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

*Id*. § 413.89(e). *See also* Provider Reimbursement Manual ["PRM"]§ 308 (reiterating these four criteria). A key question is when a delinquent account becomes "uncollectible" so that the provider qualifies for reimbursement.[3] The government has been struggling with this issue for decades, and its actions have often been inconsistent. *See, e.g.*, *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743, 747 (8th Cir. 1996) (discussing a 1986 proposal by the HHS Inspector General to radically restructure the system for handling bad debts).

On August 1, 1987, in an attempt to shield Medicare providers from the Inspector General's proposed policy changes, *id*. at 750-51, Congress enacted what became known as the Bad Debt Moratorium:

---

[3] The Provider Reimbursement Manual anticipates that some bad debts may be recovered even though they have been deemed "uncollectible." When such recoveries occur, the provider's subsequent bad debt allowance is reduced by the amount of the recovery. PRM §§ 314, 316.

> SEC. 4008. OTHER PROVISIONS RELATING TO PAYMENT
> FOR INPATIENT HOSPITAL SERVICES.
> (c) CONTINUATION OF BAD DEBT RECOGNITION FOR
> HOSPITAL SERVICES. -- In making payments to hospitals under
> title XVIII of the Social Security Act, the Secretary of Health and
> Human Services shall not make any change in the policy in effect
> on August 1, 1987, with respect to payment under title XVIII of
> the Social Security Act to providers of service for reasonable costs
> relating to unrecovered costs associated with unpaid deductible
> and coinsurance amounts incurred under such title (including
> criteria for what constitutes a reasonable collection effort).

Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 (reprinted in 42 U.S.C. § 1395f note). Thereafter, the HHS Inspector General continued to press for closer scrutiny of bad debt reimbursement requests. *Hennepin*, 81 F.3d at 747. In fact, in the fiscal year following the Bad Debt Moratorium, fiscal intermediaries disallowed forty percent of the bad debt claims. *Id*. In response, Congress added the following language in 1988 to the Bad Debt Moratorium:

> SEC. 802. MAINTENANCE OF BAD DEBT COLLECTION
> POLICY. Effective as of the date of the enactment of the Omnibus
> Budget Reconciliation Act "42 USC 1395f note" of 1987, section
> 4008(c) of such Act is amended by inserting after "reasonable
> collection effort" the following: ",including criteria for indigency
> determination procedures, for record keeping, and for determining
> whether to refer a claim to an external collection agency."

Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, 102 Stat. 3342 (reprinted in 42 U.S.C. § 1395f note). In 1989, Congress again amended the statute by adding the following:

> SEC. 6023. CLARIFICATION OF CONTINUATION OF
> AUGUST 1987 HOSPITAL BAD DEBT RECOGNITION
> POLICY. (a) IN GENERAL. -- Section 4008(c) of the Omnibus
> Budget Reconciliation Act of 1987 is amended by adding at the
> end the following: "The Secretary may not require a hospital to
> change its bad debt collection policy if a fiscal intermediary, in

> accordance with the rules in effect as of August 1, 1987, with
> respect to criteria for indigency determination procedures, record
> keeping, and determining whether to refer a claim to an external
> collection agency, has accepted such policy before that date, and
> the Secretary may not collect from the hospital on the basis of an
> expectation of a change in the hospital's collection policy."

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106 (reprinted in 42 U.S.C. § 1395f note).

With this last amendment, the Bad Debt Moratorium clearly prevents the Secretary from changing a provider's established bad debt policy, but the parties disagree about whether it also prohibits changes to the Secretary's own policies. Plaintiff argues that the original version already barred changes to the Secretary's own policies, and that the final amendment merely introduced an additional restriction with respect to an individual provider's policies. (Pl.'s SJ Mot. 14-16.)[4] Defendant contends that the final amendment is not an additional restriction, but rather a clarification of the Moratorium's original intent. (Def.'s SJ Mot. 22.) Under defendant's view, the Secretary is free to make changes to his own policies and is restricted only in modifying the individual policies of individual Medicare providers. (*Id.*)

## II.    PROCEDURAL HISTORY

Plaintiff, a Medicare provider, sought reimbursement for unpaid Medicare deductibles and coinsurance in its fiscal year ending September 30, 1995. (Compl. ¶ 22.) These bills had been outstanding for more than 300 days on average when plaintiff simultaneously wrote them off as uncollectible and sent them to an outside collection agency. (Pl.'s SJ Mot. 8; Def.'s SJ Mot. 18.) Plaintiff handled these accounts in the same manner that it handled non-Medicare

---

[4]Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, filed November 2, 2007 ["Pl.'s SJ Mot."].

accounts.  (Compl. ¶ 22.)

Plaintiff's fiscal intermediary, Blue Cross of California ("Blue Cross"),[5] disallowed $60,993 of its bad debt claims on December 16, 1996.  (Compl. ¶ 23.)  The position of Blue Cross was that "collection efforts do not come to an end until the provider makes a final decision to cease its efforts on pursuing a bad debt item, which is after the outside collection agency ceases the collection efforts."  (A. R. 152.)

Plaintiff appealed to the PRRB.  It argued that it had met all of the statutory criteria for bad debts reimbursement, or in the alternative, that the Blue Cross decision constituted a change in policy in violation of the Bad Debt Moratorium.  (A. R. 21.)  On December 19, 2006, the PRRB ruled in plaintiff's favor:

> Based upon the Provider's extensive in-house collection efforts that included numerous letters and active pursuit of claims for an average of over 300 days, the Board finds that the collections efforts documented by the Provider met the Secretary's regulatory requirements, and they were completed before the Provider determined the accounts to be uncollectible and worthless.  In addition, the Board finds that the conclusive presumption of collectibility based on outside collection account status runs afoul of well established precedent.

(*Id*. 25.)

The CMS Administrator elected to review the PRRB decision.  (Compl. ¶ 26.)  On February 16, 2007, it issued an opinion overruling the PRRB and upholding the decision by Blue Cross.  (*Id*.)  The Administrator held that "[i]f a provider continues to attempt collection of a debt . . . it is reasonable to conclude that the provider still considers that debt to have value and

---

[5]Blue Cross of California became known as United Government Services and is currently known as National Government Services.  (Compl. ¶ 23.)

that it is not worthless." (A. R. 7.) Like the PRRB, the Administrator did not consider the applicability of the Moratorium because there was nothing in the record about plaintiff's prior bad debt policy.[6] (*Id*. 8 n.7.)

Plaintiff initiated the instant action on April 17, 2007, arguing that defendant's decision constitutes a change in agency policy in violation of the Bad Debt Moratorium, or in the alternative, that the decision is arbitrary, capricious, and inconsistent with the governing statute and regulations.

## ANALYSIS

### I.   BAD DEBT MORATORIUM

#### A.  Statutory Interpretation

The threshold question is whether the Bad Debt Moratorium applies only to an individual Medicare provider's policies, as defendant argues, or whether it also limits the Secretary's own policies, as plaintiff contends. Neither the PRRB nor the CMS Administrator reached this issue, as both found that the Moratorium did not apply because the record, as plaintiff concedes, lacked information about plaintiff's bad debt policies. (A. R. 8, 25.) However, neither addressed the issue of whether the Moratorium applies to the Secretary's own policies.

That issue is now squarely before the Court, and it appears to be one of first impression.[7]

---

[6] The Administrator did not disturb the PRRB's factual finding that the defendant's collection efforts were reasonable or that all the requirements for Medicare bad debt reimbursement were met with the exception that the Administrator concluded that because the debts had been referred to a collection agency, they could not be deemed to be uncollectible. (A. R. 22.)

[7] In 2007, the Sixth Circuit upheld an intermediary's adjustments to bad debts that had been claimed when the accounts still remained with an outside collection agency. *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 411 (6th Cir. 2007). However, neither the district court nor

The question is one of statutory interpretation: does the 1987 Moratorium embrace the Secretary's policies as they existed as of August 1, 1987, so as to preclude a finding in this case that a bad debt is uncollectible if it has been referred to a collection agency? To answer this question the Court begins with the analysis set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), which first requires a determination as to whether the statute is ambiguous. In the Court's view, the Bad Debt Moratorium is unambiguous because "the intent of Congress is clear." *Id*. at 842. The original version of the Moratorium states that "the Secretary of Health and Human Services *shall not make any change in the policy* in effect on August 1, 1987." 42 U.S.C. § 1395f note (emphasis added). The plain meaning of this sentence is that the Secretary is prohibited from making any changes in the agency's bad debt policy as it existed as of August 1, 1987. Although the Moratorium was amended to incorporate a prohibition regarding the Secretary's ability to change an individual hospital's bad debt policy, there is nothing to suggest that this amendment was intended to change the meaning of the first sentence of the 1987 Moratorium with respect to the Secretary's bad debt collection policies. While defendant makes much of the use of the word "Clarification" in the 1989 amendment, arguing that it manifests an intent to clarify the original version rather

---

the appellate court addressed the issue, nor did the parties raise the issue, of whether the Moratorium serves as a bar to the Secretary's presumption of collectibility. Nor was the inconsistent treatment of this issue by the agency highlighted by the parties. (*See* Pl.'s SJ Mot. 19 n. 13, 27.) Moreover, the *Battle Creek* court was apparently unaware of its own contrary interpretation of the Moratorium as set forth in a 1999 unpublished opinion, where it concluded that the Moratorium contains two prohibitions, the first being that the Secretary cannot make any change in "the policy in effect on August 1, 1987." *Detroit Receiving Hosp. v. Shalala*, No. 98-1429, 1999 WL 970277, at *12 (6th Cir. Oct. 15, 1999). For these reasons, the Court finds defendant's reliance on *Battle Creek* to be of limited value.

than supplement it (Def.'s Reply 4),[8] this "clarification" did not alter the first sentence of the 1987 Moratorium. If Congress had meant to correct some arguable ambiguity in the original text, it would have replaced or modified this language rather than simply adding to it. Instead, Congress chose to keep the original language in the first sentence intact, thereby prohibiting the Secretary from making changes to his pre-August 1987 bad debt policies, and it added a separate requirement in 1989 prohibiting a fiscal intermediary from disallowing claims for bad debts for reasons pertaining to these specific elements of bad debt practices if it had approved such practices before August 1, 1987.

The historical context for the Moratorium also supports this view. In 1986, the HHS Inspector General proposed drastic changes to the Secretary's bad debt policy, such as "eliminating bad debt reimbursement entirely or attempting to recoup the costs by garnishing the social security checks of debtors." *Hennepin*, 81 F.3d at 747. These proposals were not adopted, but subsequently the Inspector General "called for much closer examination of providers' bad debt requests." *Id*. The 1987 Moratorium was a direct response to the Inspector General's plans to make bad debt reimbursement more restrictive. *See id*. at 750-51 ("Congress was motivated to prevent unexpected consequences to providers from the inspector general's proposed changes in the criteria for bad debt reimbursement.") This suggests that Congress was concerned about changes in the Secretary's policy, not the policies of individual providers. Thus, the clear meaning of the statute, as buttressed by Congress' intent, inexorably leads to the conclusion that the Moratorium applies to the Secretary's policies as they existed as of August 1,

---

[8] Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, filed May 2, 2008 ["Def.'s Reply"].

1987.

But even if the Court were to reach *Chevron*'s second prong (which it need not do), its conclusion would not change. First, as here, when a rule is merely interpretive, and not promulgated through the APA process, less deference is given the Secretary's interpretation than if the rule had been included in a properly promulgated regulation. *See EEOC v. Arabian Amer. Oil Co.*, 499 U.S. 244, 256 (1991). Moreover, and perhaps more importantly, the Secretary's interpretation is entitled to less deference where it has been inconsistent over the years. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (internal citations omitted); *United Transp. Union v. Lewis*, 711 F.2d 233, 242-43 (D.C. Cir. 1983) ("A statutory construction to which an agency has not consistently adhered is owed no deference."). That has been the case here. For instance, in *Lourdes Hosp. v. Blue Cross & Blue Shield Assoc.*, CCH Medicare & Medicaid Guide, ¶ 43,723 (Oct. 27, 1995), the CMS Administrator approved a bad debt claim even though an outside collection agency was still managing the delinquent accounts. (*See* Pl.'s SJ Mot., Exh. 6, 3-4.) Now the Administrator has issued an opinion in this case that is completely at odds with *Lourdes*, holding that "if a provider does continue to pursue collection activities, clearly it does not believe the debt to be worthless."[9]  (A. R. 8.)

---

[9] Defendant tries to downplay the importance of *Lourdes* by incorrectly referring to it as a PRRB decision. (Def.'s SJ Mot. 14.) But in fact, *Lourdes* was decided by the CMS Administrator. Defendant also attempts to explain away this inconsistency by arguing that each case is unique, and that the denial in this case "does not necessarily mean that 'no bad debt reimbursement may ever be claimed while the debts remain at a collection agency.'" (Def.'s Reply 11.) However, the CMS Administrator's categorical stance in this case belies any notion of flexibility.

Finally, the construction of the statute that the Secretary espouses in this case is essentially a litigation position which is also entitled to less deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("We have never applied the principle of [*Chevron*, *etc.*] to agency litigation positions that are wholly unsupported by regulations, rulings or administrative practice."). This is especially true given the fact that the Secretary's position is not only inconsistent with his prior practice[10] and his ruling in *Lourdes*, but it is contradicted by defendant's consistent position in earlier cases. For instance, in *Detroit Receiving*, defendant argued in its brief that:

> The first paragraph of [the Moratorium] precludes the Secretary from affirmatively changing her rules relating to the criteria for bad debt determinations. Detroit Receiving does not argue that the Secretary violated that paragraph of the Moratorium.

(Pl.'s Reply,[11] Exh. 10 (Br. for Appellee, Oct. 30, 1998, at 26).)

In *Community Hospital of Monterey Peninsula v. Thompson*, 323 F.3d 782 (9th Cir. 2003), the Secretary also proffered a similar interpretation:

> Moreover, interpreting PRM-II § 1102.3L as dispensing with the requirement that providers bill the State Medicaid Agency would be untenable because it would constitute a change in Medicare's bad debt policy, which is prohibited under a Congressional moratorium that prohibits the Secretary from changing the bad

---

[10]For example, a fiscal intermediary asked a CMS regional office in Texas the following question: "Does the collection agency have to officially quit working the account and return it to the provider prior to the bad debt being claimed?" CMS acknowledged that "the bad debt can be claimed . . . even if the collection agency is still working on the account." Correspondence between Virginia McKissick, CMS Regional Office VI, and Elise Steele, Medicare Part A (dated Dec. 17, 1997 and Mar. 6, 1998) (attached as Exh. 7 to Pl.'s SJ Mot.)

[11]Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, filed April 2, 2008 ["Pl.'s Reply"].

>  debt policies that were in effect on August 1, 1987.

(Pl.'s Reply, Exh. 11 (Br. for Def.-Appellant, Apr. 11, 2002, 2002 WL 32107150, at *20).)

And finally, in a brief submitted to the Eleventh Circuit in *University Health Servs. v. Shalala*, 120 F.3d 1145 (11th Cir. 1997), the Secretary explained the purpose and intent of the Moratorium in terms that contrast sharply to those that defendant uses here:

> The OBRA of 1987, as amended, preserves Medicare bad debt policy that was in effect on August 1, 1987. The Act and its legislative history reflect a congressional intent to preclude the Secretary from increasing provider requirements applicable to claims for reimbursement of Medicare bad debt claims after that date. Additionally, the moratorium broadens the definition of Medicare policy to include intermediary interpretations of Medicare bad debt policy, rendered prior to August 1, 1987, but only if such interpretations were "express" and "consistent with Medicare policy."

(Pl.'s Reply, Exh. 12 (Br. for Appellant, March 1996, 1996 WL 33469762, at *23).)[12]

Not surprisingly, the agency's prior position on the Moratorium has been embraced by several courts as well. For instance, as explained in note 7, *supra*, the Sixth Circuit, in an unpublished opinion in *Detroit Receiving*, concluded that there were two restrictions in the Moratorium:[13]

---

[12] Incredulously, defendant tries to disavow these statements, even though they constitute admissions of the defendant (*see* Fed. R. Evid. 801(d)(2)), by stating "To the extent the Secretary has suggested anything to the contrary in other briefs, that is irrelevant to the matter at hand. None of the undersigned counsel were involved in the other matters referenced in Plaintiff's Reply and therefore have no knowledge of the context for or basis of those purported arguments." (Def.'s Reply 7-8.)

[13] The district court opinion in *Detroit Receiving*, which was vacated on appeal, also reached the same result with respect to the meaning of the Moratorium:

> On the face of the statutory language itself, the moratorium includes two restrictions upon the Secretary. First, it prohibits the

> The Moratorium clearly contains two prohibitions; read in the light of logic, the ordinary rules of English grammar and usage, and the Moratorium's legislative history, we conclude that the prohibitions are these: First, the Secretary is prohibited from making any change in "the policy in effect on August 1, 1987," which governed payment to providers for their reasonable costs relating to their unrecovered costs; that "policy," which the Secretary is prohibited from changing, includes the criteria governing what constitutes a "reasonable collection effort," which in turn includes the criteria for determining whether to refer a claim to an external collection agency. Second, the Secretary is prohibited from requiring a hospital to make changes in the hospital's bad debt collection policy . . .

1999 WL 970277, at * 12.

Likewise, in *Community Hospital of Monterey Peninsula*, the court stated: "Indeed, as the Providers stress, there is strong reason to believe that the author [of a Provider Reimbursement Manual provision promulgated in 1995] had no intent to change existing policy. Effective in August of 1987, Congress imposed a moratorium on changes in bad debt

---

> Secretary from making "any change in the policy in effect on August 1, 1987, with respect to payment under [Medicare] to providers of service for reasonable costs relating to uncovered costs…(including criteria for what constitutes a reasonable collection effort), [and] including criteria for…determining whether to refer a claim to an external collection agency." 42 U.S.C.A. § 1395f note. . . .
>
> Thus, the moratorium is aimed at accomplishing a freeze on the status quo ante as of August 1, 1987 on two levels: (1) the Secretary may not change her policies regulating the collection of Medicare bad debt and the definitions thereunder; and (2) the Secretary may not require a hospital to change its bad debt collection policies if these policies had been accepted by an intermediary and that intermediary's acceptance was in accordance with the rules in effect at that time.

999 F. Supp. at 954.

reimbursement policies, and the Secretary lacked authority in November of 1995 to effect a change in policy." 323 F.3d at 798 n.9.

And in *Hennepin*, the Eighth Circuit addressed Medicare bad debt practices that occurred during the hospital's 1983 fiscal year. Since these practices predated the Moratorium, the issue of whether the Moratorium prevented the Secretary from changing his policies after August 1, 1987 was not before the court. Nonetheless, in dicta the court expressed its view of the Moratorium:

> In passing the moratorium, Congress was motivated to prevent unexpected consequences to providers from the inspector general's proposed changes in the criteria for bad debt reimbursement. 1988 Conf. Rep. 277, *reprinted in* 1988 U.S.C.C.A.N. at 5337. Permitting correction of errors made by intermediaries in the application of rules existing on August 1, 1987 is consistent with that policy. *It appears Congress merely sought to freeze a moment in time, forbidding the Secretary to change the criteria after that date, but allowing full enforcement of the policies in place before it.*

81 F.3d at 751 (emphasis added).

Thus, even the cases relied on by defendant -- *Detroit Receiving* and *Hennepin* (*see* Def.'s SJ Mot. 23 n.8) -- undermine the interpretation of the Moratorium that he advances in this litigation.[14]

---

[14]The only other cases cited by defendant provide no support for his position, since the opinions focus on an individual hospital's policies and not those of the Secretary. (*See* Def.'s SJ Mot. 23 n.8.) For instance, in *Univ. Health Servs., Inc. v. Health & Human Servs.*, 120 F.3d 1145, 1153 (11th Cir. 1997), the issue pertained to the second paragraph of the Moratorium, not the first. Second, the case addressed a period that predated August 1, 1987, so it had no bearing on the impact of the Moratorium on the Secretary's policies. *Id*. at 1148. Similarly, *Harris County Hosp. v. Shalala*, 64 F.3d 220, 222 (5th Cir. 1995), dealt with the issue of whether the intermediary had "accepted" the provider's procedures for determining indigency and therefore has no bearing on the issue here.

### B. Change in Policy

Now that the Court has determined that the Bad Debt Moratorium applies to the Secretary's own policies, the next question the Court must address is whether the Secretary's decision in this case constituted a change in policy. In denying plaintiff's claim, the CMS Administrator relied on comments by its own Center for Medicare Management ("CMM"), which said that "bad debt *cannot* be properly claimed while an account is still in collection at a collection agency." (A. R. 3) (emphasis added). The Administrator held that reimbursement is improper as long as the provider "continue[s] to pursue collection activities." (*Id.* 8). Such unequivocal language refutes defendant's argument that this decision "was not an expression of any global policy," and that it "does not necessarily mean that 'no bad debt reimbursement may ever be claimed while the debts remain at a collection agency.'"[15] (Def.'s Reply 11.) Moreover, as explained below, this blanket prohibition against reimbursement while collection efforts are ongoing constitutes a change in policy, for this policy did not exist prior to the effective date of the Moratorium.

In denying plaintiff's claim, the Administrator relied on the Medicare Intermediary Manual ("MIM") 13-4, § 4198, Exh. A-11 (A. R. 6):

> If the bad debt is written-off on the provider's books 121 days after the date of the bill and then turned over to a collection agency, the

---

[15] Defendant also argues that because plaintiff wrote-off the bad debt at the time of the transfer to the collection agency, the agency did not have any opportunity to pursue its own collection efforts. (Def.'s SJ Mot. 21-22.) The implication is that defendant may have approved the claim had plaintiff given the collection agency some time to work rather than filing the claim immediately. Again, defendant's argument is undermined by the CMS Administrator's ruling, which makes no reference whatsoever to the length of time a collection agency pursues a debt. Rather, according to the Administrator's ruling, reimbursement is denied as long as collection activities are ongoing. (A. R. 8.)

>amount cannot be claimed as a Medicare bad debt on the date of the write-off. It can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.

This provision may not be applied against plaintiff because it constituted a new rule when it was enacted in 1989, several years after the Bad Debt Moratorium. Tellingly, the label for this provision clearly states "NEW POLICY -- EFFECTIVE DATE: For Prospective Payment System (PPS) cost report audits performed after 10/12/89." (Pl.'s SJ Mot. 18, referring to Pl.'s Exh. 3.)

Defendant argues that it was not necessary for the Administrator to rely on the MIM because 42 C.F.R. § 413.89(e), the regulation establishing four criteria for bad debt reimbursement, provides sufficient support for its decision. (Def.'s Reply 8-9.) Specifically, defendant contends that the third and fourth criteria constitute a bar to reimbursement for debts held by collection agencies. The regulation requires that "(3) The debt was actually uncollectible when claimed as worthless; [and] (4) Sound business judgment established that there was no likelihood of recovery at any time in the future." 42 C.F.R. § 413.89(e). To support this contention, defendant relies on *Battle Creek Health Sys. v. Thompson*, 423 F. Supp. 2d 755, 760 (W.D. Mich. 2006), which upheld a fiscal intermediary's ruling that § 413.89(e) prohibits reimbursement for bad debts held by a collection agency. According to defendant, "even if the Court were to conclude that the MIM provision was prohibited by the moratorium, policies existing before the date of the moratorium support the Secretary's decision." (Def.'s Reply 9.)

This argument is unavailing for several reasons. First, *Battle Creek* did not address the applicability of the Moratorium, so it is of limited use here. *See* note 7, *supra*. Second,

16

defendant is confusing the regulation with his agency's interpretations of this regulation. While § 413.89(e) certainly predates the Moratorium, defendant's current interpretation of § 413.89(e), which prohibits all bad debts held by collection agencies, does not. For example, as previously discussed, in 1995 the CMS Administrator approved a bad debt claim even though a collection agency was still working on the account. *See Lourdes*, at 3-4; *see also* note 9, *supra*. Defendant therefore cannot argue that the Administrator's decision in *Battle Creek*, which came nine years after *Lourdes*, represents "policies existing before the date of the moratorium."[16] (Def.'s Reply 9.)

Not only is there a lack of support for defendant's current position, but several agency sources predating the Moratorium suggest that this new view is contrary to defendant's policy as of August 1, 1987. First, § 310.2 of the PRM, which was enacted in 1968, provides for a "presumption of uncollectibility" for unpaid debts more than 120 days old: "If after reasonable and customary attempts to collect a bill, the debt remains unpaid for more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible." This provision does not make any exclusions for debts held by a collection agency. Second, the Hospital Audit Program, dated December 1985, and found in the Intermediary Manual (Pub. HIM 13), uses the term "uncollectible" to refer to debts held by a collection agency. (Pl.'s SJ Mot. 17, Exh. 2.) Third, the previous version of the 1989 MIM provision relied on by the Administrator, which was effective when Congress passed the Moratorium, does not contain any

---

[16]None of the other sources cited in the Administrator's decision help the defendant's argument. The 1990 Memorandum (A. R. 3) obviously became effective after August 1, 1987, and is therefore inapplicable because of the Moratorium, and the relevant provisions of the PRM do not address the issue of bad debts held by collection agencies. (A. R. 5-6.)

language prohibiting reimbursement while a collection agency continues its efforts. (Pl.'s SJ Mot. 18, Exh. 4 (MIM § 4118.2, Part E).)

Therefore, the Court finds that the Administrator's decision constitutes a change in policy in violation of the Bad Debt Moratorium.[17]

## II.     REMEDY

Plaintiff requests that the Court reverse the CMS Administrator's decision, reinstate the PRRB's decision, and order defendant to reimburse it for the bad debts in question. (Compl. 8.) However, in a case such as this, remand is the proper remedy. *See Palisades v. Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) ("The district court had no jurisdiction to order specific relief. . . . [A] district court reviewing a final agency action does not perform its normal role but instead sits as an appellate tribunal. Thus, under settled principals of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.") (internal quotations and citations omitted).

Therefore, given the Court's finding that the CMS Administrator erred when it ruled that bad debts held by a collection agency are *per se* ineligible for reimbursement, the Court will vacate the Administrator's decision and remand the case to the Secretary.

---

[17]Because the Court bases its opinion on a violation of the Bad Debt Moratorium, it need not consider plaintiff's alternative argument that the decision is arbitrary, capricious, and inconsistent with the governing statute and regulations.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment [Dkt. #8] will be granted and defendant's motion for summary judgment [Dkt. #13] will be denied. A separate Order accompanies this Memorandum Opinion.

                                                                                    /s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: May 30, 2008